FILED

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

01 NOV 29 AM 9: 12

CLERK US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA FLORIDA

|  |  |  |
|---|---|---|
| RESPONSE REWARD SYSTEMS, L.C. | ) | Case No. 8:01CV2271-T |
|  | ) |  |
| Plaintiff | ) |  |
|  | ) |  |
| vs. | ) | Judge 24 |
|  | ) |  |
| MEIJER, INC. | ) | Magistrate Judge EAJ |
|  | ) |  |
| Defendant | ) |  |
|  | ) |  |
|  | ) |  |

## COMPLAINT AND DEMAND FOR JURY TRIAL
## (INJUNCTIVE RELIEF SOUGHT)

Plaintiff, Response Reward Systems, L.C., ("**Response Reward**") hereby sues

Defendant, Meijer, Inc. ("**Meijer**") and alleges as follows:

1.    This basis of this Complaint by Plaintiff Response Reward is for patent

infringement by Defendant Meijer which arises under the Patent Laws of the United

States, specifically including  35 U.S.C. Sections 271,  281,  283,  284  and 285.

2.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

1338(a) and 28 U.S.C. 1331.

3.    Venue is proper in this judicial district pursuant to 28 U.S.C. 1391(b) and 28 U.S.C.

1400(b).

4.    Plaintiff Response Reward is a limited liability company organized and existing

under the laws of the State of Florida, having its principal place of business located at

975 Treasure Lane, Vero Beach, Florida 32963.



**Page 1 of 6**

5.   On information and belief, Defendant Meijer is a corporation organized and existing under the laws of the State of Michigan, having its principal place of business located at 2929 Walker Avenue NW, Grand Rapids, MI 49544.

6.   Defendant Meijer is the registered owner of the internet domain name "meijer.com", and either directly or through or in conjunction with others, including Meijer Stores Limited Partnership, operates and/or controls an internet website accessible to consumers through the domain name "meijer.com", which website is involved with, causes and enables the issuance of coupons to consumers.

7.   Plaintiff Response Reward is the sole owner of United States Patent No. 5,128,752, entitled "System and Method for Generating and Redeeming Tokens" (hereinafter the "'752 Patent"), including the rights to sue, and to seek enjoinment of and recover for infringement thereof, which '752 Patent was duly and legally issued on July 7, 1992 to Henry von Kohorn as the sole inventor, and subsequently assigned to Plaintiff Response Reward on May 24, 1995, as confirmed by the records of the United States Patent and Trademark Office at Reel and Frame number 7541/0008. A copy of the '752 Patent is attached hereto as **Exhibit "1"**.

8.   Defendant Meijer has infringed, willfully infringed, contributed to infringement, and/or actively induced infringement of the '752 Patent, and continues to do so, and on information and belief intends to continue to do so in the future, by wrongfully making, offering to sell, selling and/or using the invention claimed in the '752 Patent, in the United States including in this judicial district, by, inter alia, offering and/or facilitating the issuance of coupons through the internet, which activity by Defendant Meijer infringes the claims of the '752 patent.

9.   Plaintiff Response Reward has been substantially and significantly financially and economically damaged and injured by the said unlawful infringement of the '752 Patent by Defendant Meijer.

10.   Unless enjoined by this Court, the said unlawful infringement of the '752 Patent by Defendant Meijer is expected to continue in the future,  as a consequence of which future continued unlawful infringement of the '752 Patent by Defendant Meijer, Plaintiff Response Reward will be irreparably harmed, as to which infringement Plaintiff Response Reward has no adequate remedy at law.

11.   Plaintiff Response Reward is the sole owner of United States Patent No. 5,227,874, entitled "Method for Measuring the Effectiveness of Stimuli on Decisions of Shoppers" (hereinafter the "'874 Patent"), including the rights to sue, and to seek enjoinment of and recover for infringement thereof, which "874 Patent was duly and legally issued on July 13, 1993 to Henry von Kohorn as the sole inventor, and subsequently assigned to Plaintiff Response Reward on May 24, 1995, as confirmed by the records of the United States Patent and Trademark Office at Reel and Frame number 7541/0008.  A copy of the '874 Patent is attached hereto as **Exhibit "2"**.

12.   Defendant Meijer has infringed, willfully infringed, contributed to infringement, and/or actively induced infringement of the '874 Patent, and continues to do so, and on information and belief intends to continue to do so in the future, by wrongfully making, offering to sell, selling and/or using the invention claimed in the '874 Patent, in the United States including in this judicial district, by, inter alia, offering and/or facilitating the issuance of coupons through the internet, which activity by Defendant Meijer infringes the claims of the '874 patent.

13.    Plaintiff Response Reward has been substantially and significantly financially and economically damaged and injured by the said unlawful infringement of the '874 Patent by Defendant Meijer.

14.    Unless enjoined by this Court, the said unlawful infringement of the '874 Patent by Defendant Meijer is expected to continue in the future,  as a consequence of which future continued unlawful infringement of the '874 Patent by Defendant Meijer, Plaintiff Response Reward will be irreparably harmed, as to which infringement Plaintiff Response Reward has no adequate remedy at law.

15.    Plaintiff Response Reward is the sole owner of United States Patent No. 5,249,044, entitled "Product Information Storage, Display, and Coupon Dispensing System" (hereinafter the "'044 Patent"), including the rights to sue, and to seek enjoinment of and recover for infringement thereof, which "044 Patent was duly and legally issued on September 28, 1993 to Henry von Kohorn as the sole inventor, and subsequently assigned to Plaintiff Response Reward on May 24, 1995, as confirmed by the records of the United States Patent and Trademark Office at Reel and Frame number 7541/0008.  A copy of the '044 Patent is attached hereto as **Exhibit "3"**.

16.    Defendant Meijer has infringed, willfully infringed, contributed to infringement, and/or actively induced infringement of the '044 Patent, and continues to do so, and on information and belief intends to continue to do so in the future, by wrongfully making, offering to sell, selling and/or using the invention claimed in the '044 Patent, in the United States including in this judicial district, by, inter alia, offering and/or facilitating the issuance of coupons through the internet, which activity by Defendant Meijer infringes the claims of the '044 patent.

17.    Plaintiff Response Reward has been substantially and significantly financially and economically damaged and injured by the said unlawful infringement of the '044 Patent by Defendant Meijer.

18.    Unless enjoined by this Court, the said unlawful infringement of the '044 Patent by Defendant Meijer is expected to continue in the future,  as a consequence of which future continued unlawful infringement of the '044 Patent by Defendant Meijer, Plaintiff Response Reward will be irreparably harmed, as to which infringement Plaintiff Response Reward has no adequate remedy at law.


**WHEREFORE,** Plaintiff Response Reward respectfully seeks and requests Judgment from this Court that:

1.    Defendant Meijer has willfully infringed, actively induced infringement of, and contributed to the infringement of the '752 Patent.

2.    Defendant Meijer has willfully infringed, actively induced infringement of, and contributed to the infringement of the '874 Patent.

3.    Defendant Meijer has willfully infringed, actively induced infringement of, and contributed to the infringement of the '044 Patent.

4.    Defendant Meijer and its directors, officers, employees, agents, servants and those persons active in concert and participation with any of them, be enjoined from further infringement, active inducement of infringement, and contributory infringement of the '752 Patent.

5.    Defendant Meijer and its directors, officers, employees, agents, servants and those persons active in concert and participation with any of them, be enjoined from further

infringement, active inducement of infringement, and contributory infringement of the '874 Patent.

6.    Defendant Meijer and its directors, officers, employees, agents, servants and those persons active in concert and participation with any of them, be enjoined from further infringement, active inducement of infringement, and contributory infringement of the '044 Patent.

7.    Plaintiff Response Reward be awarded damages sufficient to compensate it for infringement by Defendant Meijer, and that such damage be awarded to Plaintiff Response Reward with prejudgment interest;

8.    Plaintiff Response Reward be awarded all of the attorney fees, costs and expenses incurred by it related to this action;

9.    Plaintiff Response Reward be awarded such further relief as this Court may deem just, equitable and proper.

**PLAINITFF RESPONSE REWARD REQUESTS AND DEMANDS A TRIAL BY JURY.**


Dated:  November  28, 2001

John J. Halak
Florida Bar No. 905593
6717 Ashley Court
Sarasota, FL 34241
Tel: 941.922.9796
Fax: 941.927.4857
Attorney for Plaintiff
and Trial Counsel



# United States Patent [19]

## Von Kohorn

[11] **Patent Number:** 5,128,752

[45] **Date of Patent:** Jul. 7, 1992

[54] **SYSTEM AND METHOD FOR GENERATING AND REDEEMING TOKENS**

[76] Inventor: **Henry Von Kohorn**, 945 Treasure La., Vero Beach, Fla. 32963

[21] Appl. No.: **604,787**

[22] Filed: **Oct. 25, 1990**

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 424,089, Oct. 19, 1989, which is a continuation-in-part of Ser. No. 192,355, May 10, 1988, Pat. No. 4,926,255, and a continuation-in-part of Ser. No. 192,248, May 10, 1988, Pat. No. 4,876,592, which is a continuation-in-part of Ser. No. 837,827, Mar. 10, 1986, Pat. No. 4,745,468.

[51] Int. Cl.5 ............................................. H04N 7/00
[52] U.S. Cl. ......................................... 358/84; 455/2; 364/405
[58] Field of Search .................. 455/2, 4; 358/84, 86; 364/405

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,910,672 | 3/1990 | Off et al. | 364/405 |
| 4,926,256 | 5/1990 | Nanba | 455/2 |
| 4,949,256 | 8/1990 | Humble | 364/405 |
| 4,972,504 | 11/1990 | Daniel, Jr. et al. | 455/2 |

*Primary Examiner*—Curtis Kuntz
*Attorney, Agent, or Firm*—Perman & Green

[57] **ABSTRACT**

Tokens and coupons are generated in a television viewer's home by the viewer entering selected product information and authentication data transmitted to and displayed on the television into a home generating unit. The tokens and coupons can be presented to stores or redemption facilities for prizes and discounts on selected products. The matrix used to record the product information and verification data may also be provided with a code for use in giving additional prizes to purchasers whose code matches a predetermined code. The generating unit may also comprise a memory for storing information regarding the coupons generated by the unit for later review by marketing and manufacturing companies.

**40 Claims, 3 Drawing Sheets**



TRANSMITTER — 10

# FIG. I.

TRANSMITTER — 10



# FIG. 3.



FIG. 2.

FIG. 4A.

FIG. 4B.

FIG. 5.

Case 3:07-cv-02371-EAK Document 1-02 Filed 11/30/07 Page 10 of 116

# FIG. 6.



5,128,752

2

# SYSTEM AND METHOD FOR GENERATING AND REDEEMING TOKENS

## CROSS-REFERENCE TO RELATED APPLICATIONS

The present application is a continuation-in-part of copending U.S. patent application Ser. No. 07/424,089 filed Oct. 19, 1989, which is a continuation-in-part application of U.S. Pat. Ser. No. 07/192,355 filed May 10, 1988, now U.S. Pat. No. 4,926,255, and U.S. patent Ser. No. 07/192,248 filed May 10, 1988, now U.S. Pat. No. 4,876,592, which are continuation-in-part applications of U.S. Pat. Ser. No. 06/837,827 filed Mar. 10, 1986, now U.S. Pat. No. 4,745,468.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to generating and promoting redemption of tokens having value. More specifically, the present invention includes a system and method that permits the generating and dispensing of tokens, such as product discount coupons, specified by individual members of a broadcast audience in remote locations such as their homes, these individual members of the broadcast audience being potential shoppers or customers.

### 2. Prior Art

The current use of discount coupons has a serious drawback in that there is a substantially low rate of redemption of such coupons. Frequently there is only about a 2.5 to 4 percent redemption of the total number of coupons printed in newspapers, magazines, mailings, free-standing inserts, etc. This low rate of redemption significantly hinders the intended purpose of product coupons and the like; i.e.: to induce or encourage purchasers to buy a certain brand of product over other brands or, to encourage a potential purchaser to come to a specified seller's location rather than a competitor's location.

It is therefor a principal object of the present invention to raise the rate of redemption of prize or discount coupons and thus increase purchases of certain products, increase distribution of consideration to purchasers, and increase the volume of potential purchasers going to sellers' locations.

It is another object of the present invention to permit television viewers or radio listeners to specify a product or service from a variety of products and services and to dispense tokens, such as coupons carrying a discount on the specified product or services, at remote locations.

It is yet another object of the present invention to simplify the equipment required and method used for generating and dispensing coupons for promoting more frequent redemption than has been the case heretofore.

## SUMMARY OF THE INVENTION

The foregoing problems are overcome and other advantages are provided by a system and method for selectively generating tokens at a remote location which can be redeemed at a redemption location for value consideration. The present invention thus allows the redemption rate of tokens, such as discount coupons, to be raised significantly if such value consideration is applicable to a product or service selected or targeted by audience members for purchase or retainment.

In accordance with one method of the present invention, a method for generating and redeeming tokens having value comprises the steps of transmitting electronic program signals having information regarding at least one product available for purchase from a central location to remote locations, the information including data regarding token redemption and value consideration available upon purchase of the product; receiving and presenting the signals at the remote locations; providing token generating units at the remote locations, the units comprising means for selectively entering the information, buffer storage means for storing selected information data, a matrix adapted to record selected entered information and data, and means for writing the stored information and data on the matrix; entering information regarding a product intended for purchase at the unit; storing the information in the generating unit; generating a token by writing information regarding the product and the token redemption data on the matrix; dispensing the token from the unit; the method further including the steps of providing a redemption facility for redeeming the token; presenting the token at the redemption facility; verifying compliance with redemption terms on the token at the reception facility; and making the consideration of an authenticated token available upon purchase of the product.

In accordance with one system of the present invention, a system for generating redeemable tokens having value at remote locations of members of a broadcast audience is provided. The system comprises broadcast means at a central location for transmitting electronic program signals having product information and token redemption information. Means are provided at the members locations for receiving and presenting the program signals. Token generating units are provided at the members locations, each unit comprising means operable by individual ones of the members for entering product information, a matrix adapted to record entered information and data thereon, token generating means for generating tokens, buffer storage means for storing entered product information, means for activating the generating means, and means for dispensing tokens, the token generating means includes means for recording product information and token redemption data on the matrix upon activation of the generating means. The system further comprises a token redemption facility for authenticating compliance with redemption terms and for making the value of a presented token available to the member upon purchase of a product.

In accordance with another method of the present invention a method of increasing the redemption rate of discount coupons is provided comprising generating a coupon from a generating unit at a remote location in response to a purchaser's selection of available coupons entered into the unit; providing the coupons with a code; giving value consideration to a purchaser upon redemption of a coupon; and giving additional value consideration to a purchaser upon the coupon code having a predetermined correlation with a predetermined code.

In accordance with another method of the present invention, a method for attracting shoppers to sales outlets is provided comprising the steps of transmitting electronic signals conveying a task-setting message from a central location to shoppers' remote locations; receiving the task-setting signals at shoppers' remote locations; entering a response to a task setting message by a shopper at one of the remote locations; formulating

3

response criteria defining a prize- winning response to a task; said response criteria including a period of time for entering a response in a basis for scoring a prize-winning response; transmitting electronic signals conveying response criteria from a central location to the shoppers' remote locations; receiving the response criteria signals at shoppers' remote locations; comparing shoppers' responses with the response criteria; identifying a shopper's prize-winning response meeting the response criteria; scoring a prize-winning response in accordance with the scoring basis; compiling at a central location information relative to products available to prize-winning shoppers at a sales outlet; transmitting electronic signals conveying the product information from a central location to shoppers' remote locations; receiving the product information signals at shoppers' remote locations; presenting the product information at shoppers' remote locations; selectively entering product information chosen from the available product information at one of said remote locations; generating a hard copy record bearing an indication of a scored prize and of a selected product, the prize being available to a prize- winning shopper upon purchase of the selected product at a sales outlet; and dispensing the record to a prize-winning shopper at one of the remote locations.

BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing aspects and other features of the invention are explained in the following description, taken in connection with the accompanying drawings, wherein:

FIG. 1 is an illustrative view of a central station and remote location for use with the present invention.

FIG. 2 is a perspective view of one embodiment of a generating unit incorporating features of the present invention.

FIG. 3 is an illustrative view of a redemption center for use with a method of the present invention.

FIG. 4A is a perspective view of a matrix intended to be used as coupons generated from the generating unit shown in FIG. 2.

FIG. 4B is a front view of a coupon generated from the generating unit shown in FIG. 2.

FIG. 5 is a perspective view of an alternate form of matrix to be used with an alternate embodiment of the generating unit shown FIG. 2.

FIG. 6 is a flow diagram of one method of the present invention.

DETAILED DESCRIPTION OF THE INVENTION

To facilitate an understanding of the terms used herein, the following definitions are provided.

The terms "redeem" and "redemption" are intended to include the presentation, delivery, surrender or other form of turning in a token, in person, by mail, or otherwise, in exchange for merchandise, discounts, prizes, cash, vouchers or other consideration.

The term "token redemption data" is intended to include data specifying locations where tokens can be redeemed, dates or time limits during which tokens can be redeemed, and/or information to prevent fraud or cheating, such as verification data.

The term "consideration" is intended to include value whether monetary, commercial or symbolic.

The term "central" is intended to include a location or locations other than remote receiving locations such

4

as a television transmission station or any transmitter serving an area of members of a broadcast audience.

The term "token" is intended to include hard copy records, coupons, certificates, magnetic cards and other records that can be redeemed.

The term "dispensing tokens" is intended to include the issuing, delivery or making available tokens to a member of the broadcast audience, whether mechanically or manually.

The term "matrix" is intended to include a substrate on which information may be provided, recorded or stored, for example electro-magnetically as in the case of magnetic cards, plastic film, or by printing as in the case of a paper matrix, etc.

The term "product information" is intended to include listings, specifications, prices, discounts and other information for a product or service including depiction by language or graphics.

The term "code" is intended to comprise alphanumeric and/or other indicia or symbols.

In the context of the present method the term "sponsor" is intended to include advertisers, broadcasters, sales outlets, manufacturers, and suppliers of goods and services.

Referring to FIG. 1, there is shown a diagrammatical view of a central transmitter 10 and remote location 11. Although the present invention will be described below with reference to a television broadcast, it should be understood that the invention is applicable to any type of broadcast including radio broadcast and closed circuit broadcasts. Generally, a television program is transmitted by standard broadcast facilities 10 and received at various remote locations 11 on standard television receivers 12. Receiver 12 can be any suitable type of receiver including a passive video display or a liquid crystal display. Viewers 13, which also constitute potential shoppers or customers, at the various remote locations 11 constitute a broadcast audience. The present invention includes providing generating units 14 at the remote locations 11 of the members 13 of the broadcast audience. Each generating unit 14 is intended to be self contained and individually operated by a viewer 13 to generate and dispense tokens or coupons 2 (See FIG. 3) to the viewer 13 in the convenience of the viewer's home.

Referring also to FIG. 2, each generating unit 14, in the preferred embodiment shown, generally comprises a housing 16, a display screen 18, input keys 20, control keys 22, a replaceable matrix unit 24, a replaceable printer unit 26, a replaceable memory unit 28, a battery power source (not shown), and an electronic controller (not shown). It should be understood that the description of this preferred embodiment of the generating unit 14 is only illustrative. Alternate embodiments of the generating unit may include additional or less features. The generating unit 14 need not have a battery power source, but may alternatively have an electrical cord (not shown) for attachment to a household electrical outlet. In the embodiment shown, the generating unit 14 is generally intended to generate coupons 2 printed on paper. However, it should also be understood that the invention is equally applicable to the creation of other types of tokens, such as magnetic cards. The display screen 18, in the embodiment shown, is an LCD screen and can display information input into input keys 20. However, in an alternate embodiment of the invention, the screen 18 need not be provided. The product information can be provided on a TV screen or, can be pro-

vided audibly on a voice channel frequency. The input keys or data entering section 20 permits a TV-viewer 13 to enter product information into the unit 14, such as product names and specifications of a product which the viewer intends to buy in the near future, and verification data. The control keys or control section 22, in the embodiment shown, generally comprise an on/off key 30, a clear key 32, a clear-all key 34, and a print activation key 36. The control keys are suitably connected to the electronic controller (not shown) which is, in turn, connected to the memory unit 28 and printer unit 26. The memory unit 28, in the embodiment shown, generally comprises a first memory section 38 and a second memory section 40. The first memory section 38 is intended to be used as a temporary memory for storing information input at input keys 20 until such time as one of the control keys 22 are used. The temporary memory section 38 has two separate portions, a first single item memory portion and a second single record memory portion. The single item memory portion is intended to store only one type of information at a time, such as product name, product size, or discount value, etc. The single record memory portion is intended to store information for a single record which includes product name, product size, discount value, and verification data, etc. The viewer 13 can input data or information at keys 20 which is stored in the single item memory portion until an enter key is depressed and the information can be transferred to the single record memory portion. Alternatively, the viewer 13 can depress the clear key 32 to delete the information in the single item memory portion, but not affect information in the single record memory portion. Information in the single record memory portion can either be deleted by depressing the clear-all button 34 or depressing the print button 36. If the viewer depresses the print button 36, in addition to printing a coupon 2, the generating unit 14 can also store the printed information in its second memory section 40 for purposes as described below. The cost of the generating unit 14 can be inexpensive because the unit requires no complicated installation, wiring or attachment. The keyboard used as an entry device is not elaborate and may resemble that of a telephone keypad with touch buttons. When the viewer has entered information into the unit and pressed the print key 36, the printer unit 26 advances a matrix 42 (see FIG. 4A) from the matrix unit 24, prints the information from the single record memory portion onto the matrix, and dispenses the matrix with printed information (a coupon) out of the housing 16. The printing can be accomplished with or without impact using ink sprays, applying heat, magnetic pulses, laser beams, other light sources, providing depressions, or embossed markings. Referring to FIG. 3, the viewer 13 can present the coupon 2 at a redemption center or sales outlet 3 for consideration such as reduction in the purchase price of a product 4 or a free prize 5. While at home, the viewer can select a product in which the viewer is interested and, can use and activate the generating unit so as to print a token or discount coupon specifying such product or merchandise. Normally, the coupon will have printed on it a product indicia line 52 and a discount information line 54 (see FIG. 4B). These product indicia and discount information lines can include coupon redemption information such as places available for redemption, time period for redemption, etc. The employee 15 at the redemption facility 3 can review or authenticate the product indicia line, discount informa-

tion line, and any other recorded coupon redemption information to verify compliance with predetermined redemption requirements or limits before granting value consideration to the shopper 13. The employee 15 might authenticate by comparing the redemption information to a redemption listing or by entering the redemption information into a computer, such as by a keyboard or bar code reader. which would automatically compare the redemption information on the coupon to a redemption listing or database.

In the course of a television program, viewers can be informed of special sales, discounts, or promotional offers or events which make it attractive to a viewer to utilize coupons reflecting such offers. A number of methods to attract shoppers to sales outlets will now be described. For paper matrix 42 (see FIG. 4A), the matrix preferably has perforations 44, but these need not be provided if the generating unit 14 has a cutter to separate the printed coupon from the matrix. When desired, the matrix sections formed between the perforations 44 are premarked or prenumbered with indicia 46 suitable for use for verification or authentication purposes. However, this indicia 46 need not be provided or alternatively, may be provided by the generating unit 14. Thus, the coupons 2 generated and dispensed by the units 14 normally are prenumbered, such numbers being dissimilar. In an alternate embodiment, the indicia or code 46 may be provided as a machine-readable code. The code can also be provided from a group of markings consisting of numbers, letters, dots, dashes, regular and irregular shapes, codes, symbols and, discrete, connected, and continuous configurations. Utilizing this indicia 46, or parts thereof, an additional prize can be granted. An example would be a "blind" prize payable in cash or merchandise to a shopper who redeems one of the coupons in the course of the purchase of the discounted merchandise. If the indicia 46 on a coupon 2 matches indicia selected by the sponsor of the program, the shopper redeeming the coupon 2 is entitled to an additional prize 5. In a preferred embodiment, the shopper 13 will learn of such a "blind" prize having been won only upon the redemption of the coupon 2. Thus, the method will help to attract shoppers to stores to redeem coupons.

According to another embodiment, a code or "lucky" number 48 is originated by a member of the broadcast audience and shown on the token 2. This method of the invention permits an audience member to select his or her own "lucky" number in the hope that it will match the "lucky" number of the day selected by the sponsor and preferably ascertainable or discernible only upon redemption of the token 2.

In another embodiment, the transmitter or television station 10 also transmits verification data that must be entered into the generating unit 14 which is recorded on the coupon 2 as verification data or indicia 50. This verification indicia 50 can also be used to award "blind prizes". Thus, for example, a prize may be awarded to a shopper whose verification code 50 contains indicia specified and posted at a sales outlet 3 on the day of redemption. According to another method, the host of a TV-program can announce that coupons pertaining to a certain product "will carry a discount in excess of 20%". The shopper will not know how much larger than 20% the discount is until the coupon is redeemed.

The system also provides for a cumulative record being kept, if desired, by the generating unit 14 of all coupons requested by a member of the television audi-

7

8

ence. This record is compiled and retained in the generating unit in memory 40 and can be made available to sponsors of promotions in different ways. One method of making such coupon generation records available to a sponsor is by retrieving the recorded information from the generating unit 14 by a representative of the advertiser. A preferred method is to take advantage of the shoppers' need to periodically replenish the paper tapes or matrix unit 24 used to produce the coupons in the generating unit. Such paper tapes or matrix units 24 may be available to shoppers in retail stores or other redemption points and, when a shopper receives such a tape, the above mentioned purchase record may be collected from such shopper and made available to the sponsor.

The methods of the invention may permit a combination of measures to prevent forgeries and cheating. The matrix 42 may be of a special composition to make duplication difficult. If the token is to be a paper coupon, the coupons can be prenumbered or provided with other verifiable codes. Numbers or codes can also be transmitted from a central location, which numbers or codes replace or are in addition to the numbers or codes preprinted on the matrix 42. In order to prevent forging and counterfeiting, particularly of more valuable tokens, the token redemption terms can include alphanumeric and/or other indicia or symbols capable of authentication at a redemption center and can include a combination of two separate codes each capable of verification. For example, the information governing the redemption of a token can include a first verification code preprinted on a matrix and a second verification code entered into the generating unit by a shopper in accordance with information transmitted to shoppers by a TV station. The coupons may also have the user's identification preprinted thereon and, for larger prizes, a user may be asked to present identification at the time of redemption.

The system and method described above has the advantage that the generating unit 14 need not be programmed or controlled by external sources such as by electronic signals. The only electronic communication flow is from the central location to the TV-viewers, and the only information input into the generating unit is that entered by a TV-viewer on the input keys 20 or other entry device. The absence of two way communication significantly reduces capital investment and operating costs of the system. However, the system and method could be used with a two way communication system such as when the viewer communicates with the central transmitter station to indicate display or broadcast of product information on a specific product or group of products before using the unit 14 or during use of the unit.

The product information conveyed by electronic signals from a central location 10 may pertain to a single available product or to a plurality of available products, each accompanied by its specification, prize or discount information and, when desired, verification data. A member 13 of the broadcast audience can determine or select a product of interest at that time. If the product information conveyed relates to only one product, and the viewer 13 desires to obtain a token for that product, the user can enter the appropriate product information and verification data into the unit 14 and generate a token. If more than one product is available, the viewer can select the desired product or products and enter the information and data pertaining to the chosen merchandise or services into the unit 14. A single product may be available in different sizes or with different features and specifications in which event shoppers can select the size, feature or specification of their choosing. Alternatively, if the product is of no interest, the audience member may choose to disregard the offer of that product and, in effect, reject it by doing nothing. As used herein, the term "select" therefore is intended to apply also to the act of specifying a single available product for intended purpose, in addition to its more common meaning of selecting from a number of choices.

One method that can be employed may provide for a viewer to originate and specify a product from a class of products. The host of a TV-show may, for example, announce a special code and state that any coupon generated and bearing that code carries with it a predetermined amount of consideration or discount for a predetermined class of products, such as a discount of 30% on any household product. The special code can be combined with a verification code preprinted on the matrix to award large prizes. The combination of the two codes in a predetermined correlation to each other giving entitlement to the large prize. The viewer can generate such a coupon by specifying or entering into the unit a product of his or her own choosing, the announced discount, and the special code. In this manner, viewers can apply such discounts to products of their own choosing from a class of products. Random selection, or otherwise selecting codes in a controlled manner, can be used to give a "lucky" prize to a token redeemer similar to a sweepstakes or lottery with a "lucky" prize winner being ascertainable at either the viewer's remote location and/or a redemption facility.

Although the product specification can originate with the television viewer, the sponsor will frequently prefer to provide on the broadcast the names, prices and specifications of products available for prizes and discounts. In one of the methods, the host of a TV-program can state as part of the redemption terms for a token that a specified store or redemption center will grant a stipulated discount on an identified product or products within a limited period of time. Similar announcements can also be made part of a commercial or promotional message broadcast. The viewer can then select the product, related price or other information to generate a token. The verification or redemption data provided on the token can enable the redemption facility to reject coupons presented after the cutoff data or, coupons which are not for that facility.

The inducement of various kinds of "blind prizes" discernible only at the point of redemption and occasional sweepstake prizes, will ensure greater use and higher redemption rates of coupons. In addition to the product information, discount information and code numbers, the coupons can carry additional preprinted advertising and promotional messages. Advertisers can provide shoppers with predetermined numbers or codes for use in specifying specific products and product information, such as printed tables distributed at sales outlets or on the goods themselves or packaging of the goods. The viewer/shopper can then merely enter the abbreviated number or code for the selected product instead of the entire product information into the unit 14. Thus, a faster entry of product information can be provided.

Although the present invention has been primarily described above with reference to a paper matrix and printed paper coupons, FIG. 5 shows an alternate em-

5,128,752

10

bodiment of a matrix/coupon. In the embodiment shown, the matrix 60 is comprised of a plastic card having magnetic type strips 62 thereon. The strips 62 can have product information and verification data magnetically recorded thereon which can be read by a suitable reader at the redemption center. For this type of matrix, the generating unit would obviously have a means for magnetically recording information onto the strips 62. Once the card 60 is used as a token it could be returned to the customer with the information on the magnetic strips 62 erased for further use in the future.

Referring now to FIG. 6, there is shown a flow diagram of one method of the present invention to help better understand the invention. After broadcast of product information, the viewer/shopper can either select or not select a product. If a product is selected, a token will only be generated by the viewer/shopper activating the printer by pressing the print button. Until the print button is pressed, no token is generated. Upon pressing the print button a token is generated and its information stored in a memory unit retrieved by the sponsor when the matrix unit is replaced. Once the token is generated, the viewer/shopper can redeem the token by taking it to a redemption facility. If indicia on the token matches predetermined special prize indicia selected by a sponsor, the viewer/shopper also is awarded a "blind prize" in addition to the token's value. The systems and methods described above lend themselves well to the kind of data collection useful to advertisers for the purpose of determining shopping patterns of TV viewers. A number of data collection methods will now be described.

The token generating units can be provided with individual serial numbers. When desired, the printer can be equipped with permanent means for printing a viewer/shopper's name on every coupon, thus providing additional and verifiable identification. When a unit is sold or leased to the member of a household who is a potential shopper, the identity of that individual for that unit can be recorded. Thus, the coupons dispensed by that generating unit can print the serial number on the coupon and be traced back to and associated with the individual or household. Over a period of time the buying habits or patterns of that shopper or household can emerge by reviewing the redeemed tokens. When a generating unit is to be placed in a household comprising several members, particulars of the entire family can thus be illicited and recorded.

In addition to the above method, an identification card containing the user's name and the serial number of the generating unit can also be issued to the individual who buys or leases the unit. This card may be required for presentation and authentication when a large or sweepstake prize is claimed. The aforementioned cumulative record of all coupons requested by and dispensed to a shopper also can be used to create a demographic database. If, for example, a paper tape forms the matrix for 100 coupons, a sponsor, upon receipt of the cumulative record, has a ready made list of purchases expressed in percent for each product category.

Another method of awarding a blind prize or additional prizes can include the situation when a token generated by the unit 14 and a preprinted coupon, such as those found in newspapers and the like, are both presented for redemption at a redemption facility. In this method of the invention, the token could have a first code and the preprinted coupon a second code, such as machine-readable bar codes. In the event that both codes match, or at least partially have a predetermined correlation, the viewer/shopper would be entitled to the additional prize or a blind prize. Another method might include using a preprinted coupon as the matrix for a token. This method would include giving consideration in the form of a prize and/or discount to a redeemer upon redemption of such a combined coupon/token including both the value of the preprinted coupon and the value of the product discount entered into the generating unit and printed on the preprinted coupon. An additional prize or consideration for such a combined coupon/token might also be given.

Another system and method might include the transmission or broadcast by the central station 10 of a machine-readable signal and providing the generating unit with means for reading the signal. This machine-readable signal can be transmitted concurrently with the normal audio and visual signals, such as during a television commercial. If the viewer desires to purchase the product being advertised or desires access to the specific product information being transmitted in the machine-readable signal, the viewer would only need to press a button on the generating unit; either a print button or a view button. The generating unit could then either print a token or display the product information. If the product information was merely displayed, the viewer can either clear the displayed product information if a token is not desired or, print a token for that product. Another method might include transmissions over an extra television channel or several television channels which constantly update listings of product information. It might also be possible for viewers to call up categories most to their desire such as detergent, furniture polish, etc.

Let it be understood that the foregoing description is only illustrative of the invention. Various alternatives and modifications can be devised by those skilled in the art without departing from the spirit of the invention. Accordingly, the present invention is intended to embrace all such alternatives, modifications and variances which fall within the scope of the appended claims.

What is claimed is:

1. A method for generating and redeeming tokens having value comprising the steps of:

transmitting, from a central location to remote locations having potential shoppers, electronic program signals conveying product information regarding at least one product available for purchase, said product information including token redemption information and value consideration information, said value consideration information having information regarding value consideration available upon purchase of said product;

receiving and presenting said signals at said remote locations;

providing token generating units at said remote locations, said units comprising entering means for selectively entering, at least partially, said product information; means for storing entered information; a token matrix adapted to record information; and means for writing information stored in said means for storing on said matrix;

entering, at least partially, at said entering means product information selected by a potential shopper regarding a product intended for purchase;

storing said entered information in said token generating unit;

generating a token from said token generating unit by writing said entered information on said matrix and dispensing said token from said token generating unit to said potential shopper;

providing a redemption facility for redeeming said token:

presenting, by a shopper, said token at said redemption facility for redemption;

authenticating, by said redemption facility, token redemption information on said presented token; and

making value consideration of an authenticated token available, by said redemption facility, to a presenter of the token upon purchase by the presenter of the product identified on the token.

2. The method according to claim 1 wherein said matrix is a card with a magnetic strip and the step of writing information on said matrix comprises magnetically writing information onto said strip.

3. The method according to claim 1 wherein said matrix is paper and the step of writing comprises printing information onto said paper.

4. The method according to claim 3 further comprising providing said paper with a preprinted code.

5. The method according to claim 4 wherein at least a portion of said code is provided as a machine-readable code.

6. The method according to claim 1, wherein the product information includes a discount applicable to a class of products and wherein the step of entering includes selecting a product from the class to which said value consideration is to be applied.

7. The method according to claim 1 further including the step of awarding an additional prize for redemption of a token bearing a blind code having a correlation to a code previously determined by a sponsor, the blind code including information written on said matrix by said unit.

8. A method as in claim 1 further comprising the step of transmitting verification data from said central location to said remote locations.

9. A method as in claim 1 further comprising the step of providing verification data on said token.

10. A method as in claim 9 wherein the step of providing verification data on said token includes entering verification data into said token generating unit and said token generating unit writing said verification data on said token.

11. A method as in claim 1 wherein the step of authenticating comprises comparing coupon redemption information written on said token to a redemption listing at said redemption facility.

12. A method as in claim 1 further comprising:

providing a first code on a preprinted coupon;

providing a second code on said matrix at a remote location during the step of generating the token;

presenting the preprinted coupon and the token simultaneously at the redemption facility; and

presenting an additional prize to a shopper presenting the preprinted coupon and the generated token upon the occurrence of the first and second codes having a predetermined correlation.

13. A method as in claim 1 wherein said matrix is plastic and the step of writting information on said matrix comprises writting information on said plastic.

14. A system for generating redeemable tokens at remote locations of members of a broadcast audience, said system comprising:

broadcast means at a central location for transmitting electronic program signals including product information;

means at said members' locations for receiving and presenting said program signals;

token generating units at said members' locations, each unit comprising:

a housing;

means, operable by individual ones of said members and connected to said housing, for selectively entering product information into a means for storing entered product information;

a matrix removable connectable to said housing and adapted to record information thereon;

token generating means connected to said means for selectively storing entered product information, said token generating means including means for recording at least a portion of selectively entered product information on said matrix upon activation of said generating means; and

means, operable by a member of said audience, for activating said generating means to record said selected product information on said matrix to create a generated token.

15. The system according to claim 14 wherein said matrix is a magnetic card.

16. The system according to claim 14 wherein said matrix is a paper.

17. The system according to claim 14 wherein said generating unit includes means for storing a separate cumulative record of product information previously recorded onto tokens generated by said unit.

18. A system as in claim 14 wherein said means for entering is adapted to enter token redemption information into said buffer storage means and, wherein said token generating means is adapted to write said token redemption information on said matrix.

19. A system as in claim 14 wherein said means for entering is adapted to enter verification data into said buffer storage means and, said token generating means is adapted to write said verification data on said matrix.

20. The system as in claim 14 wherein said token generating units comprise means for recording on said matrix a code transmitted from said central location.

21. The system as in claim 14 wherein said token generating means include means for recording a cumulative compilation of entered product information.

22. A method as in claim 14 wherein said matrix is plastic.

23. A system as in claim 17 wherein said generating unit includes means for compiling said separate cumulative record.

24. A method for increasing the redemption rate of discount coupons comprising steps of:

transmitting, from a central location, electronic signals conveying product information, said product information including a product description, value information, and coupon redemption information;

receiving and presenting said signals at remote locations of individual shoppers;

providing, at said remote locations of individual shoppers, a coupon generating unit selectively operable by said shoppers, said coupon generating unit having means for generating coupons comprising product information selected by individual shoppers;

entering at least a portion of said product information by a shopper into said coupon generating unit;

generating, upon activation of a shopper, a coupon from said generating unit in response to a shopper's selective entry of product information into said coupon generating unit, said coupon having the selected product information thereon; and

giving value consideration to a shopper upon redemption of said coupon and purchase of the selected product identified on said coupon.

25. A method for determining the shopping pattern of TV-viewers, the method comprising steps of:

transmitting, from a central location, electronic signals conveying product information, said product information including a product description, value information, and coupon redemption information;

receiving and presenting said signals at remote locations of individual shoppers;

providing at the remote locations of individual shoppers, a coupon generating unit selectively operable by said shoppers, said coupon generating unit having means for generating coupons and means for compiling a cumulative record of coupons generated by said generating unit;

entering at least a portion of said product information by a shopper into said coupon generating unit;

generating, upon activation by a shopper, a coupon from said generating unit at said shopper's remote location, said coupon having at least a portion of said entered product information thereon;

compiling, in said coupon generating unit, a cumulative record of coupons generated by said generating unit;

giving value consideration to a shopper upon redemption of said coupon and purchase of a product identified on said coupon at a redemption location; and

collecting each of said cumulative records of said generating units and making said cumulative records of said generating units available to a sponsor or advertiser.

26. A method as in claim 25 wherein said cumulative record is a hard copy record.

27. The method as in claims 24 or 25 wherein the step of generating includes providing information on the coupon to identify the shopper activating the generating unit.

28. The method as in claim 27 further comprising the step of determining buying patterns of shoppers by review of redeemed coupons.

29. A method for determining the shopping pattern of individual members of a broadcast audience, the method comprising steps of:

(a) a first group of steps comprising:

providing, at remote locations of individual shoppers, a coupon generating unit selectively activatable by said shoppers, said coupon generating unit having means for generating coupons, said coupons having value and having product information, selected by individual shoppers, identified thereon;

generating, upon activation of said generating unit by a shopper, a coupon from said generating unit in after a shopper's selective entry of product information into said coupon generating unit, said coupon having value and having identified thereon said selected product information; and

giving value consideration to a shopper upon redemption of said coupon and purchase of a selected product identified on said coupon; and

(b) a second group of steps comprising:

providing at said remote locations of individual shoppers means for compiling a cumulative record of product information identified on said coupons;

compiling a cumulative record of an individual shopper's selected product information at said remote locations; and

making said compiled cumulative record available to a sponsor by said individual shopper.

30. A method for determining the shopping pattern of members of a broadcast audience, the method comprising steps of:

transmitting, from a central location, electronic signals conveying product information, said product information including a product description, value information, and coupon redemption information;

receiving and presenting said signals at remote locations of individual shoppers;

providing, at the remote locations of individual shoppers, a coupon generating unit operable by said shoppers, said coupon generating unit having means for selectively generating coupons and means for compiling a cumulative record of coupons generated by said generating unit;

entering at least a portion of said product information by a shopper into said coupon generating unit;

selectively generating, upon activation by a shopper, individual coupons from said generating unit at said shopper's remote location, said coupon having at least a portion of said entered product information thereon;

compiling, in said coupon generating unit, a cumulative record of individual coupons generated by said generating unit;

giving value consideration to a shopper upon redemption of said individual coupons and purchase of products identified on said coupons at a redemption location by said shopper; and

surrendering said cumulative records, compiled by said generating units, to a sponsor.

31. A method for making a cumulative record of intended purchases of individual shoppers available to sponsors comprising steps of:

transmitting, from a central location, electronic signals conveying product information, said product information including a product description, value information, and coupon redemption information;

receiving and presenting said signals at remote locations of individual shoppers;

providing, at remote locations of individual shoppers, a coupon generating unit operable by said shoppers, said coupon generating unit having means for selectively generating coupons and means for compiling a cumulative record of coupons generated by said generating unit;

entering at least a portion of said product information by a shopper into said coupon generating unit;

selectively generating, upon activation by a shopper, a product specific coupon from said generating unit at said shopper's remote location;

disengaging said coupon from said generating unit to said shopper;

compiling, at said shopper's remote location, a cumulative record of said generated coupons; and

**15**

delivering information regarding said cumulative record to a sponsor.

**32.** A method of creating a marketing data base comprising steps of:

permitting individual members of a remote broadcast 5 audience who are shoppers to specify products targeted for purchase by providing to said members a coupon generating unit having product entry means;

entering, by a member, a product specification into 10 said member's coupon generating unit;

generating a coupon from said generating unit in response to said step of entering, said coupon having value consideration available upon purchase of said specified product and redemption of said cou- 15 pon; and

compiling, in said coupon generating unit, a cumulative record of products targeted for purchase by said individual member to thereby create a data base that can be collected for each individual mem- 20 ber and used to establish a marketing data base.

**33.** The method according to claims 29, 30, 31 or 32 wherein said step of compiling comprises a plurality of recording steps, each recording step occurring each time a shopper activates said coupon generating unit. 25

**34.** The method according to claims 29, 30, 31 or 32 wherein said step of entering product information in-

**16**

cludes storing said product information in a memory of said coupon generating unit.

**35.** The method as in claims 29, 30, 31 or 32 further comprising analyzing a plurality of said cumulative records and thereby determining buying patterns of shoppers.

**36.** The method as in claims 29, 30, 31 or 32 further comprising a step of substantially simultaneously removing said cumulative record form said generating unit as a coupon matrix is being replenished in said generating unit.

**37.** The method as in claims 29, 30, 31 or 32 further comprising a step of storing said cumulative record at said shopper's remote location until retrieved by a sponsor.

**38.** The method as in claims 29, 30, 31 or 32, further comprising providing identification of a shopper on said shopper's cumulative record.

**39.** The method as in claim 30, wherein said step of surrendering said cumulative record includes said cumulative record being physically transported by said shopper to said sponsor in person.

**40.** The method as in claim 30, wherein said step of surrendering said cumulative record includes said cumulative record being mailed by said shopper to said sponsor.

\* \* \* \* \*

30

35

40

45

50

55

60

65

US005227874A

# United States Patent [19]

## Von Kohorn

[11] Patent Number: 5,227,874

[45] Date of Patent: Jul. 13, 1993

[54] **METHOD FOR MEASURING THE EFFECTIVENESS OF STIMULI ON DECISIONS OF SHOPPERS**

[76] Inventor: Henry Von Kohorn, 945 Treasure La., Vero Beach, Fla. 32963

[21] Appl. No.: 776,180

[22] Filed: Oct. 15, 1991

**Related U.S. Application Data**

[63] Continuation-in-part of Ser. No. 763,672, Sep. 19, 1991, and a continuation-in-part of Ser. No. 604,787, Oct. 25, 1990, Pat. No. 5,128,752, and a continuation-in-part of Ser. No. 603,882, Oct. 25, 1990, Pat. No. 5,057,915, and a continuation-in-part of Ser. No. 424,089, Oct. 19, 1989, Pat. No. 5,034,807, and a continuation-in-part of Ser. No. 192,355, May 10, 1988, Pat. No. 4,296,255, and a continuation-in-part of Ser. No. 192,248, May 10, 1988, Pat. No. 4,876,592, and a continuation-in-part of Ser. No. 837,827, Mar. 10, 1986, Pat. No. 4,745,468.

[51] Int. Cl.$^5$ .............................................. H04N 7/00

[52] U.S. Cl. .......................................... 358/84; 455/2; 455/4.2; 364/402

[58] Field of Search ................ 358/84, 86; 455/2, 4.1, 455/4.2, 5.1; 364/401, 402, 405

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 4,723,212 | 2/1988 | Minorum et al. .................... | 364/401 |
| 4,908,761 | 3/1990 | Tai ...................................... | 364/402 |
| 5,128,520 | 7/1992 | Rando et al. ....................... | 364/401 |
| 5,128,752 | 7/1992 | Von Kohorn ....................... | 364/405 |

*Primary Examiner*—Reinhard J. Eisenzopf
*Assistant Examiner*—Edward Urban

*Attorney, Agent, or Firm*—Perman & Green

[57] **ABSTRACT**

Methods for the evaluation of stimuli such as broadcast commercials intended to promote purchases by shoppers are disclosed. The methods quantify the effectiveness of controlled variables of stimuli and of inducements associated therewith. The immediate impact and degree of erosion of the impact of stimuli on families and on individual household members are measured. Inducements can take the form of printouts, such as monetary coupons, dispensed in homes of broadcast audience members who have responded to a task. The system and method for evaluating responses to broadcast or telephone programs, such as television programs, includes an instructional signal, such as a signal modulated onto a signal transmitted concurrently with the television program, or time-multiplexed therewith. At each of a plurality of remote receiving stations, one or more members of an audience has the opportunity to respond to a situation presented in the program by entering a response or a selection on a keyboard. The system includes at each remote receiving station a memory responsive to the instructional signal for storing acceptable responses, and a comparison circuit for comparing responses entered at the keyboard with those stored in the memory. Also provided is electronic circuitry for scoring the responses in accordance with commands from the instructional signal, and a recording device for providing a permanent record. A prize-winning respondent can select a product from a listing and apply the value of a prize to the purchase price of the selected product.

**29 Claims, 24 Drawing Sheets**





FIG. 1



FIG. 4

FIG. 2



FIG. 5



# FIG. 3



# FIG. 6



# FIG. 7



REMOTE RECEIVING STATION, 206 A



FIG. 8

# FIG. 9



TIMING UNIT, 336

PRESET

CLOCK — COUNT TO ZERO — 396 — KEY WORD — ROM 400 — CREDIT

START

COUNT TO ZERO — ROM 402 — CREDIT — FULL TEXT

PRESET — 398

TO PROG. MEMORY, 330

# FIG. 10

AMPL.

Fi — F3 — RESPONSE SIG. BAND
— SCORE SIG. BAND
F2

AUDIO — FREQ.

# FIG. 19

VOICE
INSTR
SCENE
INSTR
MUSIC INTERLUDE
INSTR
TIME

RESPONSE CRITERIA — SCORE CRITERIA

UNINTELLIGIBLE CODE BURST

# FIG. 20

INST SCENE INST

SYNC

RESP.

SCORE

TIME



FIG. 11

FIG. 12





FIG. 15

FIG. 16

FIG. 17





FIG. 22

# FIG. 23.



TO RESPONSE
UNIT 22 OR 210

# FIG. 24



SUBSCRIBER'S
SUB-SYSTEM

## FIG. 25





FIG. 26

## FIG. 27



# FIG. 28





**FIG. 29**



FIG. 30



FIG. 31



**FIG. 32**



RESPONSE UNIT — 1005

PRINT RECORD — 1006

PRINT CUMULATIVE
RECORD OF PRODUCTS
SELECTED, INCL.
STIMULUS & SHOPPER
IDENTIFICATION

1007

RECORD OF SELECTED
PRODUCT, PURCHASE
INCENTIVE, STIMULUS
& SHOPPER IDENTIFICATION — 1008

SHOPPER ENTERS
RETAIL STORE — 1009

RETAIL STORE — 1010

EXPOSE SHOPPER TO — 1011
COMPETITIVE IN-STORE
PROMOTION

PURCHASE DECISION
BY SHOPPER — 1012

SHOPPER DECIDES IN
FAVOR OF SELECTED
PRODUCT
1013

SHOPPER CANCELS
PURCHASE
DECISION
1021

SHOPPER DECIDES
IN FAVOR OF
COMPETITIVE
PRODUCT
1014

RECORD PRESENTED
BY SHOPPER FOR
REDEMPTION — 1015

COLLECT PRESENTED
RECORDS — 1016

1018

TABULATION OF
PRESENTED RECORDS — 1017

CUMULATIVE RECORDS
OF SELECTED PRODUCTS

DEDUCT PRESENTED RECORDS
FROM CUMULATIVE RECORDS

1019

1020

SALES LOST AND
ANALYSIS OF RESULTS

**FIG. 33**



**FIG. 34**

1

## METHOD FOR MEASURING THE EFFECTIVENESS OF STIMULI ON DECISIONS OF SHOPPERS

This application is a continuation-in-part of copending application Ser. No. 763,672 filed Sep. 19, 1991 and Ser. No. 604,787 filed Oct. 25, 1990, now U.S. Pat. No. 5,128,752 and Ser. No. 603,882 filed Oct. 25, 1990, now U.S. Pat. No. 5,057,915 and Ser. No. 424,089 filed Oct. 19, 1989, now U.S. Pat. No. 5,034,807 and Ser. No. 192,355 filed May 10, 1988, now U.S. Pat. No. 4,296,255 and Ser. No. 192,248 filed May 10, 1988, now U.S. Pat. No. 4,876,592 and Ser. No. 837,827 filed Mar. 10, 1986, now U.S. Pat. No. 4,745,468, re-examined and re-issued Jun. 11, 1991, Re-examination Certificate (1490th) B1, 4,745,468.

### BACKGROUND OF THE INVENTION

This invention relates to the measuring of the impact of stimuli on individuals and, more particularly to evaluating the short term and long term effectiveness of broadcast and print stimuli under varying circumstances.

Market researchers currently make great efforts to improve the degree of accuracy and validity of results that measure the impact and lasting effect of isolated and combined purchase stimuli such as television and radio commercials, as well as print advertisements. Yet, no method or system for achieving these objectives has been available. A particularly important target area of market research has been the assessment and evaluation of the continuing effectiveness of advertising and sales promotions presented to a shopper before the shopper enters a retail store, as affected by various types of in-store promotions and point-of-purchase advertising.

Also, heretofore, there has been no technique available to market researchers to quantitatively measure on an individual or on a household basis the effect of variables affecting promotions, such as frequency and timing of stimuli, shopping inducements and their effect on different population segments.

It therefore is an object of the present invention to quantify the initial impact and the continuing effectiveness of advertising on shoppers with respect to an identified advertisement in terms of the purchase of the advertised product. It is another object to measure the magnitude of sales which are lost and are excluded from a shopper's intended purchases. Most of these purchases are directed to a different product as a consequence of in-store advertising and the promotion of product competitive with the product initially selected for purchase by said shopper based on the immediate impact of the advertisement.

It is another object of the invention to quantify the impact on shoppers of a number of controlled variables of an advertising or promotional campaign, individually or in combination.

Manufacturers of packaged consumer goods sold in supermarkets sometimes find it difficult to obtain market data from these supermarkets. Yet, such manufacturers who are large advertisers are anxious to obtain as much feedback as possible giving them reliable information not only with respect to the overall redemption of coupons, but broken down by households or, ideally, by individual family members. Such information would be of utmost value to all advertisers in that, once the buying habit or pattern of an individual household is

2

known, marketing efforts can be focused on individual shoppers or families and the mailing cost and other expenses of indiscriminate direct mailings can be avoided. A typical example would be an elderly couple for which the said cumulative record would indicate no babyfood purchase and would obviate corresponding coupon mailings.

The above objects are attained by the invention by compiling a cumulative record as described in a form that lends itself to direct communication between families and manufacturers without requiring efforts or expenses by retailers.

The methods of the invention utilize shoppers' implementations of individual personal buying decisions, as evidenced by requested discount coupons, in the quantitative measurement of a shopper's buying behavior. At the same time, shoppers' buying decisions are used as yardsticks in the evaluation of the effectiveness of discrete functions of purchase stimuli.

All coupons, by their numbers or other identifications, can be traced to the household having requested them. This makes it possible to compare the coupons requested and redeemed with the coupons requested and not redeemed by individual families or shopping units. The method also permits an evaluation of each individual stimulus or advertisement household by household.

It may not be necessary to provide for all of these indications by shoppers on a nationwide scale, as market research on a more limited scale will yield data essential with respect to some marketing aspects, such as product development, packaging and overall advertising. In other respects, however, household by household data and purchasing behavior are valuable, such as in respect to direct mailings. These and other benefits of the invention are described herein.

### SUMMARY OF THE INVENTION

These and other objects quantifying the effects of advertising and promotional activities are achieved by the invention. ·

In practicing the invention, the systems described in the above identified patents and patent applications are used. Persons exposed to the stimulus of a television, radio or printed advertisement or other promotion are given an opportunity to respond to a task, such as the selection of an advertised product or to provide an answer to a question. Following a response, such persons receive a token having value, such as a coupon carrying a discount on the product featured in the advertisement. In the case of a correct answer to a question, a shopper's response is entered in a programmed response unit, which evaluates and scores the response and which prints a discount coupon specifying the advertised product. The response unit is programmed by electronic instructional signals which convey acceptable responses and the value of awards won by successful respondents. Each broadcast or print advertisement can be identified by a reference element, such as alphanumeric data and/or by the time of its appearance. Thus a shopper in the process of selecting a product and receiving a prize coupon identifies the stimulus that brought about the selection and buying decision.

In another version of the above method, a shopper need not respond to a question, but makes a product selection and requests the printing and dispensing of a coupon carrying a discount on the chosen advertised

5,227,874

**3**

product by entering an appropriate request in the entering device of a response unit.

The response units at individual shoppers' locations have means for dispensing individual coupons following a response and for compiling a cumulative record of products for which the shopper has requested or selected discount coupons. Such a cumulative record can take the form of a tape intermittently printed as coupons are requested. Whereas the coupons are dispensed individually when printed as described in connection with the drawings, the tape matrix having the cumulative coupon data printed thereon is temporarily retained in the response unit in the form of a tape.

It is removed and replaced the way the tapes of known calculators are retained until fully used, at which time they are replaced.

In the event a shopper uses, i.e. redeems all of the coupons requested by purchasing the specified product, the total number of products thus purchased will equal the number of products listed on the cumulative record compiled by the response unit of that shopper.

If, however, a shopper changes his or her mind following receipt of a coupon reading on a specified product and if said shopper purchases a competitor's product instead, or purchases no product, the total of presented coupons will be less than the total of products shown on said cumulative record, which reflects a shopper's original intention. The difference between these two sets of data represents the loss of sales due to a change of heart by a shopper following the time of exposure to the identified stimulus.

By identifying on each coupon the wanted product, the stimulus responsible for the initial buying decision and the member of a household, the method generates a person-by-person behavior pattern and reaction to discrete stimuli and to controlled variations thereof.

While the methods of the invention are applicable to all forms of stimuli, including stimuli to induce acts other than purchases, such as survey responses, the descriptions that follow focus primarily on purchase promotions and are intended to be only illustrative.

The methods of the invention permit the heretofore unattainable statistical analysis of a great many factors that have an impact on the buying behavior of shoppers. The advance in the statistical measurement of intangible factors such as the combination effect of stimuli or their timing and the increase or decrease in the monetary value of purchase incentives as reflected by the buying behavior of individual shoppers, is made possible by the methods of the invention which induce shoppers to avail themselves of monetary incentives in the form of shopper-selected, product-specific discount coupons and similar hard copy records; said inducements being promoted by the stimuli whose impact is to be quantified under controlled varied conditions.

The present method permits generating the buying pattern not only of a household but of the individuals comprising said household, including children. To identify each individual and in view of the fact that each household is associated with an identified response unit, the additional identification for each member of the household can be a very simple one, such as a one-digit number or initial. Children will have no problem entering their personal identification symbol when making a product selection.

The described methods thus add to present market research tools the capability of statistically measuring

**4**

the effectiveness of the discrete purchase behavior of an individual consumer.

## BRIEF DESCRIPTION OF THE DRAWINGS

The systems and methods of the invention are outlined in the following description, taken in connection with the following drawings:

FIG. 1 is a simplified diagrammatic view of a system incorporating the invention and configured to show two embodiments of receiving stations, one receiving station employing simulcast radio and television signals of a program produced in a studio, and the second receiving station employing a television receiver system modified to receive an instructional signal from the studio;

FIG. 2 shows the audio spectrum and a portion thereof designated for an instructional signal;

FIG. 3 is a detailed diagram of the system of FIG. 1;

FIG. 4 is a block diagram of an electronic response unit in each remote receiving station of FIG. 1 and 3;

FIG. 5 is a block diagram showing details of a dispenser of FIG. 4;

FIG. 6 shows an embodiment of the invention, similar to that of FIG. 3, the system of FIG. 6 employing the transmission of two signal groups each having plural sets of signals, wherein first and second signals of the first signal group are transmitted by video and audio portions of a television program, the first and the second signals presenting respectively a studio scene and a task for respondents, each and wherein two sets of signals of the second group, an instructional group, are combined with an audio signal of the first group;

FIG. 7 is an alternative embodiment of the system of FIG. 6 wherein the signals of the second group are interleaved with the video signal of the first group by use of the vertical retrace time slot of a television transmission;

FIG. 8 is a block diagram of a response unit for use with either of the systems of FIGS. 6 and 7;

FIG. 9 is a block diagram of a timing unit of FIG. 8;

FIG. 10 shows the audio spectrum and a portion thereof designated for instructional signal bands of the second signal group utilized, respectively, for answers and criteria for evaluating answers;

FIG. 11 is a diagrammatic view of receiving stations of the invention installed, as a further embodiment of the invention, in an aircraft, with separate receiving stations located at each passenger seat, this embodiment employing a recording of a game situation with instructions for response, each receiving station being equipped for both audio and video;

FIG. 12 is a block diagram showing interconnection of electric components of the system of the invention for the installation of FIG. 11, the system of FIG. 12 employing response units having components disclosed in FIG. 8;

FIG. 13 is a block diagram showing a modification of the central station of FIG. 6 to provide for an audio-only recording of the game program for use by the receiving stations of FIG. 11;

FIG. 14 is an alternative embodiment of FIG. 12 for use of an audio recorder, the system of FIG. 14 employing a recording provided by the system of FIG. 13, the system of FIG. 14 employing response units having components disclosed in FIG. 8;

FIGS. 15 and 16 show a modification of the systems of FIGS. 13 and 14, respectively, wherein the central station and the response units of the receiving stations

5,227,874

5

have been modified to be operative with response-criteria and scoring signals transmitted as unintelligible audio signals in the same audio band employed by the recorded audio description of a task-setting program and the audio instructions for response to the task;

FIG. 17 is a simplified diagrammatic view of the invention showing both the central station and a receiving station in which an audio recorder having four separate channels is employed, the channels communicating audio signals for task and instructions, for synchronization, for response criteria, and for scoring criteria;

FIG. 18 shows additional equipment which may be incorporated in the response units of FIGS. 11, 12, 14 and 16 for communication of scoring results by a digital communication system to a central dispenser for a hard-copy output of game results;

FIG. 19 is a timing diagram showing burst transmissions of response and scoring criteria between voice signals for an audio-only recording employing a single recording track;

FIG. 20 is a timing diagram showing simultaneous transmission of voice, synchronization, response and scoring criteria signal in an audio-only system employing a multiple track recording medium;

FIG. 21 shows schematically an alternative embodiment of the invention wherein the tape recorder is provided with five channels to allow separate and independent recordation of a verbal description of a scene and verbal instructions for responding to tasks presented in the scene;

FIG. 22 shows diagrammatically a further embodiment of the invention wherein a respondent can activate a prerecorded program by use of a telephone, the prerecorded program including a task, questions, instructions for responding, response criteria, and signals enabling automatic comparing of answers to predetermined responses and a scoring of responses by a response unit;

FIG. 23 shows diagrammatically a further embodiment in the transmission of an instructional signal from a central station to a remote receiving station by use of an optical link in combination with the video portion of a television transmission;

FIG. 24 is a diagram explaining operation of a telephone system of FIG. 22 for use in debiting and crediting a respondent;

FIG. 25 shows diagrammatically the storage of information in two of the memories of the response unit of FIGS. 8 and 26;

FIG. 26 is a block diagram of a response unit which is a modification of the response unit of FIG. 8;

FIG. 27 is a flow chart for operation of a computer in the response unit of FIG. 26;

FIG. 28 is a diagram showing a sequence of steps in the practice of the method of the invention;

FIG. 29 is a block diagram of a further embodiment of the invention wherein a central station and a set of remote playing stations are employed to conduct a wagering game including the issuance of coupons, or other form of wagering record, in a forgery proof system;

FIG. 30 is a block diagram of a playing station of the system of FIG. 29; and

FIG. 31 is a flow chart showing method steps employed at various components of the system of FIG. 29 for practicing the forgery proof wagering game.

FIG. 32 is a diagram of the method steps leading to shoppers' selection of a product coupon.

6

FIG. 33 is a diagram of the method steps leading to an analysis of the lasting effectiveness of stimuli to promote shopping decisions.

FIG. 34 depicts an embodiment of a mailing piece used in the invention, FIG. 34-A being the side with purchase information and FIG. 34-B being the side with mailing information.

## DETAILED DESCRIPTION

In the following description, FIGS. 1–5 disclose embodiments of the invention useful for programs to be conducted with participation from remote audiences. In the disclosure of FIGS. 6–10, the system is adapted for a greater selection of, and modification of, parameters in criteria for evaluating answers to questions. The criteria are controllable from a central station. A level of difficulty in the questions may be selected by a contestant. The embodiment of the system of FIGS. 1–5 is described in terms of two signal groups, namely, a radio/television signal group, Group One, and an instructional signal group, Group Two. The embodiment of the system of FIGS. 6–10 is described with reference to at least four types of signals, namely, a television signal presenting a studio scene (TV program), a television signal presenting a task such as a set of questions (task signal), a signal setting forth acceptable answers to questions (response criteria), and a signal setting forth criteria to be employed in the evaluation of the answers (scoring mode). In FIGS. 11–22, there is shown a set of embodiments of the invention wherein an event, scenario, presentation, situation or other scene having a task to be performed is recorded for subsequent playback to respondents. The system of FIGS. 1–5 will be described first, this being followed by a description of the system of FIGS. 6–10 and the system of FIGS. 11–23. The systems of the various embodiments will now be described primarily in the context of responses to tasks and questions; it being understood that the practice of the invention is applicable to the making, evaluation and rewarding of predictions. Methods and systems employed in the context of predictions of the outcome of events are more particularly described in connection with FIGS. 22 and 24.

FIG. 1 presents a simplified description of a system 10 wherein a central station 12 includes a studio 14, such as a television studio which broadcasts programs to many external or remote receiving stations, two such receiving stations 16 and 18 being shown by way of example. In accordance with the invention, each of the receiving stations 16 and 18 includes means for observing the broadcast program, such as a television screen 20, and means by which persons in the external viewing audience can respond to situations presented in the studio, the response means being a response unit 22 which evaluates and records responses entered by persons in the viewing audience.

Two signals are broadcast by the central station 12 to each of the receiving stations 16 and 18. One of these two signals is a program signal for presenting on the television screen 20 a program generated in the studio 14. The second of the two signals is an instructional or command signal for operation of the response unit 22, the instructional signal providing appropriate commands to the response unit 22 for evaluating, rejecting or accepting, and scoring audience responses to questions raised in the televised program.

Two modes of transmission are provided for the two signals. In the case of the receiving station 18, both of

5,227,874

7

the signals are carried by a single television channel carrier radiated from an antenna 24 of the central station 22, and received by an antenna 26 at the receiving station 18. The antenna 26 connects with a television system 28 which includes the foregoing television screen 20 and, furthermore, includes circuitry 30 for the separation of the instructional signal from the program signal. The instructional signal is then applied via line 32 to the response unit 22. In the case of the receiving station 16, the two signals are processed separately. The instructional signal is broadcast by a radio channel employing a radio antenna 34 at the central station 12, and received by an antenna 36 at the receiving station 16. Thus, at the receiving station 16, a standard television set 38 including the screen 20 receives the televised program via antenna 26 and presents the program on the screen 20. A separate radio receiver 40 and demodulator 42 are employed for receiving the instructional signal and for applying the instructional signal to the response unit 22.

In the practice of the invention, the instructional signal may be transmitted to a remote receiving station in any convenient manner such as via a cable transmission or by a specially broadcast transmission (not shown) or by combining the instructional signal with the audio signal in a radio broadcast or television broadcast. The combination of the instructional signal with the audio spectrum is demonstrated in the graph of FIG. 2 which shows a typical relationship of amplitude versus frequency in a transmitted audio spectrum. In that spectrum, a relatively narrow frequency band is set aside for transmission of the instructional signal, the narrow frequency band being at the upper frequency edge of the audio spectrum.

For example, the bandwidth of the instructional signal may be approximately 1% of the audio bandwidth, this being sufficient to enable a relatively slow transmission of instructional data to the response units 22 in the respective receiving stations. By maintaining the amplitude of the instructional signal well below that of the audio signal, the instructional signal does not introduce more than a negligible amount of interference with the audio signal. Also, it is noted that the instructional signal is not continuously present but, rather, appears only for a momentary burst of time, typically less than a few seconds duration, when necessary to instruct each response unit 22. In the case of the receiving station 16, a simulcast of radio and television is employed while, in the case of the receiving station 18, only the television program is broadcast, as has been described above. However, in both cases, the audio spectrum is the same, and the mode of combining the instructional signal with the audio transmission is the same. Typically, the system 10 would be implemented with only one of the transmissions, either the television transmission with the instructional signal combined therewith, as demonstrated by the receiving station 18, or by the simulcast of both the television and the radio transmissions as demonstrated by the receiving station 16. In the case of the simulcast, the instructional signal need not be combined with the television signal, the instructional signal appearing only in the radio broadcast from the antenna 34 as described above.

The receiver 40 and the demodulator 42 operate in a manner similar to that of the separation circuitry 30, and will be described in detail hereinafter, with reference to FIG. 3.

8

In both of the receiving stations 16 and 18, the response unit 22 includes a keyboard 44 whereby a person in the remote viewing audience enters a response. The response unit 22 includes a dispenser 46 which dispenses a record of the score and/or responses in a permanent recording medium such as a card 48 of plastic, or similar material, and including a well-known strip of magnetizable material (not shown) upon which the score and/or responses have been recorded. Alternatively, by way of example, the dispenser 46 may be constructed in a form (not shown) for outputting a tape which has been imprinted or punched with the desired information. Easily recognizable indicia may also be imprinted on the tape or card.

The system described lends itself well to multi-part questions and/or to multiple choice answers, for any of which special forms can be provided, to be filled in or otherwise marked. The response recording and/or data entering means can have provisions for the insertion of special forms or blanks, which can be made available or mailed to participants. For example, a school may mail to students forms specially prepared for a particular examination or assignment. The response unit 22 may therefore be configured to hold a recording medium such as a paper blank to which markings are applied. Alternatively, the medium, such as paper tape, discontinuous or continuous forms, may be inserted by the respondents.

Examination papers, whether taking the shape of forms to be filled in, or the result of a free hand composition or narrative, may also be graded by the comparator means, which is capable of identifying key phrases and words that are expected to appear on the completed examination paper. In similar fashion, comparator means to be described hereinafter is designed so as to be able to recognize and accept any one or more of a plurality of predetermined key words, symbols or phrases.

Dispenser 46 can be adapted to reward children who have provided answers meeting the predetermined response criteria by dispensing gold stars or other tokens. In another embodiment, the dispenser combines the coupons issued to winners with advertising material or shopping hints.

The records created pursuant to the present invention may be used as tokens, coupons, certificates and general proof of participation in the broadcast transmission program. Coupons may be redeemed by mail or in retail establishments for cash, prizes or discounts.

The following terms are useful in describing the system of the invention.

The term "quiz program" relates to one or more questions or interrogatories constituting an entire program, and also includes the insertion of a question into other material, such as a cinematic film presentation.

The term "task-setting" is intended to include the meaning of interrogative, opinion-eliciting, prediction-eliciting and statement-eliciting, as well as the soliciting of creative endeavors and all kinds of functions capable of being performed by an entry in a data entering device.

The term "comparing" relates to one or more possible established responses which may be established prior to or subsequent to a contestant's response (the previously known color of a golf ball, or during a game, a prediction of how close the ball will come to the hole), and a comparing of an actual response to an established response to determine if an actual response is acceptable. An acceptable response may be based on one or

5,227,874

9

more words or phrase or alphanumeric symbol or selection of designated objects, by way of example.

The terms "evaluating" and "scoring" are intended to refer to and include the meanings of sorting, counting, screening, evaluating, analyzing and processing information, data and responses in accordance with predetermined criteria, ranging from simple comparing tasks to computerized processing and analyses.

The term "interactive system" refers to a system for communicating from a sender to a respondent and having the capacity for allowing the sender to receive a communication, when desired, from the respondent whether by manual or electronic means.

The term "response" is intended to include answers, elicited opinions, predictions and statements, text and narrative provided by contestants, respondents, students and other participants in broadcasts calling for interaction, reaction and responses.

The term "response criteria" is intended to refer to descriptive words, key words, key phrases, parameters, equations, formulas, symbols and definiens describing or defining responses that have been determined by the producer of a program to be acceptable in the context of a task so as to qualify for a reward.

The terms "outcome criteria" and "success criteria" are intended to include alphanumeric symbols and data by which the outcome of an event can be described, measured or identified, such as key and descriptive words, coordinates, grid, pinpointed and other locations, pictorial, diagrammatic and graphic presentations, results, scores, counts, records, distances, rates and other measurements.

The term "processed response" is intended to refer to and include the results produced by screening, sorting, scoring, evaluating, massaging, statistically analyzing, or otherwise machine-processing responses, data and information provided by participants at the receiving stations.

The term "hard copy" is intended to refer to and include any kind of permanent record capable of being visually read, scanned or machine read. The term "matrix" may be used to refer to the source or origin from which something originates, takes form or develops, such as a cellulosic or plastic strip capable of being provided with printed markings or magnetic recordings so as to create a hard copy record. The term "simulcast" is intended to refer to the simultaneous, but separate transmission from different propagating sources of the video and audio portions of a program.

In the context of formulating response criteria, the terms "formulate", "generate", "format" and "reformat" are intended to refer to and include the selection and determination of all factors affecting the evaluation and scoring of responses.

In the case of a task requiring a prediction of the outcome of an event which has not yet occurred or been completed, such as the completion of a forward pass in a football game, or winning a hand at a card game such as bridge, the response criteria may be referred to as outcome criteria. The outcome criteria is to be transmitted to contestants at remote stations a time after the prediction has been made.

In the context of transmitting response criteria, for example, on an audio frequency, the use of the term "encoding" is intended to include various forms of signal coding as well as a transmission of signals at an increased speed which would render the signals unintelligible to the human ear. The term "encoding", as used

10

by way of example for transmitting response criteria, is intended to include other modes of communication such as various forms of color signal coding and transmission of signals to television stations capable of being read by sensors of devices for receiving signals outside the audible frequency range. The transmission of encoded information, whether within the audio spectrum or within the visual spectrum, is to be accomplished preferably in a fashion which is essentially unnoticed by a contestant and cannot be perceived as conveying information. In this sense, the encoding is perceptually unintelligible.

The term "keypad" is understood to include other forms of data entry devices, the keyboard being presented by way of example.

The term "print-out" is intended to include printed, embossed, punched, stamped, and other types of hard copy, paper, cardboard and plastic in the form of coupons, certificates, tokens, cards, forms and matrices. The printing of the print-out includes the foregoing forms of marking including the creation of three-dimensional configurations.

The term "central" as used, for example, in "central location", is intended to refer to a broadcast station or network serving a country, a time zone or a region, and also is intended to include discrete local broadcast stations operating independently and serving a town or other smaller geographic area, always provided that such "central" station serves a multiplicity of remote receiving stations.

The terms "remote" or "external" as used for example in "external audience", are intended to include all television viewers and radio listeners tuned into an electronic transmission station, irrespective of the distance from such central station; as such, a "remote" audience includes, for example, students or other respondents positioned in close proximity to the source of a program, as in the case of a closed circuit transmission.

The term "interval" is intended to mean time interval or period of time.

The terms "code", "encoding", and "encryption" are intended to include alphanumeric codes, color codes, bar codes and symbols, including those readable, recognizable or conveyable by humans and machines.

The terms "acceptable response" or "acceptable answer" are intended to include all answers to a question, which answers meet or exceed a minimum standard or degree of accuracy, comprehensiveness or responsiveness; such "acceptable answers" specifically including partially correct answers. Similarly "acceptable predictions" are intended to include predictions falling within predetermined parameters or meeting standards determined by the operator of an event following its occurrence. Answers and predictions may be defined as "acceptable" irrespective of a level of difficulty or a scoring mode.

The term "commercial message" as used herein includes sponsored, paid-for and other messages intended for commercial purposes.

The term "user" of a recording medium as used herein includes viewers, listeners, and buyers of a recording medium such as video tapes, and the target audience intended to be reached by the commercial message.

The term "intelligible" is intended to mean intelligible to a human without machine intervention, for example, without decoding, demodulation, change of transmission or receiving speed, or other manipulations to make a signal intelligible to humans. The term "intelligi-

5,227,874

11

ble" includes material and forms of expression which can be seen or heard such as written material or speech. The term "unintelligible", as applied to various signals which may be transmitted by equipment employed in the practice of the invention, is intended to include signals which can be made intelligible only be machine intervention.

The terms "multipart task" or "multipart question" are intended to include any situations, such as questions, tasks and puzzles, in which a contestant is required to provide chronologically spaced responses related to a common question, task, puzzle, or subject matter requiring an action by the contestant. Such a task may include so-called umbrella or omnibus questions comprising sub-groups, contingent questions (e.g "if the answer is "true", then proceed to . . . ) and sub-questions derived from a parent question.

The term "reward" is intended to include in its scope discounts, prizes, free merchandise, monetary awards and other rewards having monetary or symbolic value. A "sweepstakes award" may be a special award of extra value beyond the value of a typical award.

The term "host" is intended to include an on-stage and an off-stage announcer, master of ceremonies, program director, operator, guest host and celebrities, announcers of commercials and any other individual associated with the program or appointed to carry out one or more of the activities enumerated herein. It also is intended to include the individuals engaged in the operation of formulating a message or program for broadcasting on behalf of an advertiser, manufacturer, store or sponsor.

The term "difficulty level" is intended to include difficulty levels set by the host and inherent in the task or question, as reflected by possible answers, as well as difficulty levels inherent in a response or answer set by a respondent based on the speed, accuracy, comprehensiveness or responsiveness of the response and reflecting respondent's confidence in his or her knowledge of the subject matter. Similarly, a "difficulty level" may apply to the outcome of an event, as reflected by possible predictions.

In the formulation of a response to a question by a member of the external television audience, in the ensuing description reference will be made to a response in terms of recognition of key words as well as responses which require several words as in a phrase, sentence, formula and the like. It is to be understood that, in the generation of such responses, the term "word" includes also alphanumeric characters and other symbols such as pictorial representations which may be required as a proper response to a question.

With respect to various embodiments of the invention, the response unit 22 may be configured to provide the foregoing functions of evaluating and scoring, as well as the processed response.

In FIG. 3 the studio 14 is shown, by way of example, to include a television host 50, conducting a quiz program or game 52 in front of a television camera 54 which views both the game 52 and the host 50, and, also including when required, display means on stage (not shown) to provide an image thereof, which image is televised or only visible to the studio audience. Words spoken by the host 50, as well as other sounds in the studio 14, are converted by a microphone 56 to electric signals.

Also included within the studio 14 is a keyboard 58 by which the host 50 or another person, may enter

12

commands and instructions to be communicated via the instructional signal. The central station 12 further comprises an encoder 60 a modulator 62, an oscillator 64, a band-pass filter 66, a summer 68, a combiner 70, a radio transmitter 72, a television transmitter 74, and a switch 76. The switch 76 connects an input terminal of the combiner 70 to either an output terminal of the summer 68 on line 78 or an output terminal of the microphone 56 on line 80.

The instructional signals may be prerecorded and then propagated from a central transmission station to remote locations. In such a case, the host uses the keyboard (or other such device) to initiate the transmission of the instructional signal message.

In operation, the pressing of keys on the keyboard 58 activates the encoder 60 to output digital signals representing the keys which have been pressed. The oscillator 64 outputs a carrier signal which is modulated by the modulator 62 with the digital signals outputted by the encoder 60. The modulator 62 applies the modulated carrier signal to the filter 66 which narrows the bandwidth of the modulated signal to equal the instructional bandwidth shown in FIG. 2. The filtered signal is coupled from the filter 66 to one input terminal of the summer 68, a second input terminal of the summer 68 receiving the output electrical signal from the microphone 56 via line 80. An output signal of the camera 54 is connected to one input terminal of the combiner 70, either directly or via a video mixing unit (to be described with reference to FIG. 23). To facilitate the explanation of this embodiment of the invention, it is presumed now that the camera 54 is connected directly to the combiner 70. A second input terminal of the combiner 70 is connectable via the switch 76 in line 78 to an output terminal of the summer 68. In the alternative position of the switch 76, the second input terminal of the combiner 70 is connected via line 80 to receive the output electric signal of the microphone 56 rather than the output signal of the summer 68. An output terminal of the combiner 70 is connected to the television transmitter 74. Signals outputted by the summer 68 are connected via line 78 also to the radio transmitter 72.

The signal outputted by the band-pass filter 66 is the instructional signal which is to be transmitted via either the transmitter 72 or 74 to a remote receiving station. The signal outputted by the microphone 56 is the audio signal component of the signals transmitted in the television channel via the transmitter 74, and is also transmitted via the radio transmitter 72 to the remote receiving stations when a radio transmission of the audio portion of the activity in the studio 14 is desired. The summer 68 performs the function of combining the instructional signal with the audio signal whereby the instructional signal shares a small fraction of the audio spectrum as shown in FIG. 2. This is accomplished by adding the output signals of the microphone 56 and the filter 66 to output the sum signal on line 78. The combiner 70 functions, in a well-known fashion, to combine the video portion of the television channel signal from the camera 54 with either the microphone signal on line 80 or the composite signal of the summer 68 depending on the position of the switch 76.

In the event that the simulcast of both the radio and the television transmissions is to be provided by the transmitter 72 and 74, the switch 76 connects the combiner 70 to line 80 in which case the television signal transmitted by the transmitter 74 has the standard for-

5,227,874

13

mat of video and audio portions without the instructional signal, the latter being transmitted via the radio transmitter 72. In the event that the switch 76 is connected to line 78, then the television signal transmitted by the transmitter 74 includes the instructional signal within the audio portion of the television signal.

The circuitry of FIG. 3 demonstrates two possible embodiments of the invention wherein the receiving stations may have either of the two forms shown for the remote receiving stations 16 and 18. If all of the receiving stations have the form of the station 16, then the switch 76 may be placed in the position for connection of the line 80 to the combiner 70, in which case the transmitter 74 transmits a normal television signal while the instructional signal is transmitted by the transmitter 72. In the event that all of the receiving stations are in the form of the station 18 then the switch 76 connects a line 78 to the combiner 70 for providing a modified form of the transmitted television signal wherein the instructional signal is included within the television signal. In such case, the radio transmitter 72 is not used by the invention, but may, nevertheless, transmit a radio program to remote radios which do not form a part of the system of the invention.

The television system 28 comprises a receiver 82, a demodulator 84, and a speaker 86. The separation circuitry 30 comprises a narrow-band filter 88 and a demodulator 90. The passband of the filter 88 is equal to the bandwidth of the instructional signal shown in FIG. 2.

In the operation of the receiving station 16, the receiver 40 functions in the manner of a well-known radio receiver for receiving the radio transmission incident upon the antenna 36. In addition, the receiver 40 includes a narrow-band filter 92 having a passband equal to that of the filter 88. Thereby, the filter 92 extracts from the audio spectrum the portion of the spectrum, shown in FIG. 2 designated for the instructional signal. The signal outputted by the filter 92 is demodulated by the demodulator 42 to recover the digitally formatted signal produced by the encoder 60, which digitally formatted signal is applied to the response unit 22 for providing instruction thereto. The television set 38 in the receiving station 16, as noted hereinabove, functions in accordance with the well-known form of television 45 set outputting both audio and video signals, the latter appearing on the screen 20.

In the operation of the receiving station 18, the receiver 82 includes a well-known television tuner (not shown) and outputs the television signal of the channel to which the receiver 82 is tuned. The television signal outputted by the receiver 82 is demodulated in a well-known fashion by the demodulator 84 to provide a video signal which is presented on the television screen 20, and an audio signal which is presented by the speaker 86.

In accordance with a feature of the invention the demodulator 84 also applies an audio signal to the filter 88 of the separation circuitry 30. The filter 88 extracts the portion of the audio spectrum designated for the instructional signal, as does the filter 92, and outputs the instructional signal to the demodulator 90. The demodulator 90 operates, as does the demodulator 42 to recover the digitally formatted signal produced by the encoder 60, which digitally formatted signal is applied to the response unit 22 to provide instruction thereto. Thereby, the response units 22 of the receiving stations 16 and 18 are able to function concurrently with the

14

presentation of the broadcast television program upon the television screens 20. As indicated in the drawing for the receiving station 18, a member of the normally remote audience 94 operates the keyboard 44 of the response unit 22 while listening to the speaker 86 and watching the television screen 20.

With reference to FIG. 4, there is shown one embodiment of the response unit 22 of FIG. 3. The circuitry shown therein accomplishes the major functions of the response unit 22, namely, providing a member of the audience 94 with a means for entering a response to a situation viewed on the television screen 20 and/or heard via the speaker 86, not accepting (rejecting) or accepting, evaluating and scoring such response, recording such response, and outputting a temporary or permanent record of the response. In particular, it can be advantageous if the permanent record is in the form of the card 48, which form is machine readable to facilitate a reading of the score and/or response by either a third party or the host 50. It is to be understood that the circuitry of FIG. 4 constitutes only one possible embodiment of the invention for performing these functions and that other embodiments employing a digital computer suitably programmed (not shown) may also be employed.

The response unit 22 comprises three decoders 96, 98, and 100, a register 102, a score counter 104, a memory 106 for storing data, and a memory 108 for storing an operating program, a timer 110, a gate 112, a buffer store 114, a comparator 116 for comparing output signals of the store 114 with the memory 106, a logic unit 118, and a clock 120, these components being in addition to the keyboard 44 and the dispenser 46 disclosed previously with reference to FIGS. 1 and 3.

In operation, the memory 106 stores data with respect to the answers which are to be provided by the viewing audience. For example, in the event that the viewing audience is composed of children in a children's show wherein children are learning to identify colors, the host may point successively to a red hat, a blue table, and a green car and request to know the colors of the respective objects. In such case, the memory 106 would store response criteria, in this instance, the words red, blue, and green in the sequence corresponding to the order in which the objects are to be addressed by the host. The keys on the keyboard 44 may be similarly colored to enable entry of the correct response. Alternatively, for older children, the keyboard may be an alphanumeric keyboard, as is found on a typewriter, in which case the viewing audience is to type the words corresponding to the colors addressed by the host. In this case, the comparator 116 would compare the spelling of the words entered via the keyboard 44 with the spelling of the colors stored in the memory 106. The buffer store 114 stores the responses entered via the keyboard 44 to enable the comparator 116 to compare the response with the data stored in the memory 106.

The method and system of the invention lend themselves particularly well to educational shows for children. Questions pertaining to educational toys, to books, to stories and to subjects being taught or addressed, are interspersed in the show. Children are rewarded with tokens or other forms of award, such as coupons redeemable at candy stores, ice cream parlors, and the like.

The score counter 104 operates under command from the program memory 108 to score each correct response signal outputted by the comparator 116. When

5,227,874

15

the response entered at the keyboard 44 agrees with the data stored in the memory 106, the comparator 116 outputs a logic-1 signal via gate 112 to the counter 104. The output signal of the comparator 116 serves as an enable signal to initiate a count by the counter 104. The counter increments its count by 1, 2, 3, or other amount depending on the magnitude of the score to be awarded for the correct response. In the event that the response is to be timed in the sense that a limited time is available for the response, then the timer 110 is activated by the program memory 108 to render the gate 112 in a state of conduction of signals of the comparator 116 only during the interval of time when the response is permitted. Both before and after this interval of time, the timer 110 places the gate 112 in a state of nonconduction so that a response entered at the keyboard 44 outside of the desired response interval, or "window", cannot enable the counter 104 to increment or modify the score.

The output count, score, or evaluation of the counter 104 is applied to the dispenser 46 which includes a recording medium, such as the card 48, for providing a permanent record of the score. The dispenser 46 includes suitable magnetic recording heads (not shown)- for recording information on the card 48 in a well-known fashion. In addition, if desired, the dispenser 46 may include well-known encryption circuitry for recording the score on the card 48 in a fashion which cannot be read except by an automatic card reader having circuitry for decrypting the recorded message. The dispenser 46 is activated by the program memory 108 to accomplish the foregoing recording of the score.

The score counter/evaluator 104 can take different forms. While the score counting function is described herein for illustrative purposes, it should be understood that unit 104 may be designed to perform the processing of data entered by respondents on keyboard 44 or other data entering device. Included in such processing are, for instance, the computerized processing of data provided by respondents in accordance with one of several programs stored in memory 108 and brought into play by the instructional or command signals transmitted by transmitters 72 or 74. Questionnaires or forms used in market research may be stored in dispenser 46 or may be placed into it by respondents. Following a set of questions, or upon the completion of the broadcast, processed or unprocessed data are issued by dispenser 46 in the form of hard copy taking the form of one of the embodiments described. If desired, the actual response entered at the keyboard 44, such as the words red, blue, and green of the foregoing example, may be recorded by the dispenser 46. For this purpose, the responses are coupled from the buffer store 114 to a register 102 wherein the responses are stored prior to recording at the dispenser 46. After all of the responses have been stored in the register 102, the program memory 108 strobes the register 102 to pass the data of the responses into the dispenser 46 for recordation upon the card 48 or such other form of storage media as may be employed.

The printout mechanism or marking device may take different forms to meet the requirements of the broadcast, whether quiz programs, educational programs, tests surveys or other task setting assignments. These devices may be relatively small, utilizing a continuous tape as the substrate to which the markings are applied, or they may utilize full page printouts. The recording medium may be a special form or blank dispensed indi-

16

vidually by the device as a cut section, or may take other configurations, including discontinuous shapes.

Although completely blank forms may be used in recording respondents' entries in the data entering device, in many instances the forms or blanks preferably are provided with lines, grids, schematics and the like for easier subsequent scoring of responses recorded on such forms or blanks.

To prevent tampering, forging and counterfeiting, the recording medium may comprise material, such as paper or cardboard stock, plastic and the like, of special composition or containing admixtures of identifiable substances facilitating recognition by electronic or other sensing and scanning devices. Verification may also be facilitated by using recording media that are colored, coated, embossed, textured, magnetized or otherwise given recognizable properties.

By replacing the recording media, such as rolls of paper tape, periodically, and by stipulating redemption of the record thus created within a specified time period, the unauthorized reproduction, tampering with and counterfeiting of the marked recording media can, for all practical purposes, be prevented.

The marking may be applied by any known methods, including printing with or without impact, using ink sprays, heat, magnetic pulses, laser beams and other light sources. The markings may also take the form of depressions and embossed configurations legible by appropriate devices.

In addition, to prevent tampering, the recording mechanism, such as a printer, can be provided with means for alternatively and selectively applying one of a plurality of different types of markings. As an example, the color, intensity, width, spacing, positioning, font and resolution of the markings may be built into the recording means and may be controlled by radio or other electronic command signals from a central station.

The shape and configuration of the markings to be utilized at any particular time and subject to change at any time, includes numbers, letters, dots, dashes, regular and irregular shapes, codes, symbols and other configurations, which may be discrete, connected or continuous. The markings may also comprise shapes and configurations having no discernible pattern and readable only by appropriate scanning, reading or decoding means.

The number of combinations and permutations of the above mentioned properties of the recording media and markings is so large as practically to preclude tampering, forging, altering, counterfeiting or reproduction of authentic records; the unauthorized manufacture of special composition paper alone, would be far too costly and particularly time consuming to be practical.

According to a feature of the invention, with respect to preventing the forging of prize winning coupons, a would-be forger is denied use of the printer to accomplish forgery.

As an illustration, a TV-viewer having a response unit (as described above) in his home, is provided with two materials or matrices to form hard copy outputted by the dispenser. For example, the matrices may be a paper tape comprised of 100 coupon sections, which tape is fed into the printer of the response unit, and a verification card having 100 spaces or boxes. The coupons and the card have the name or other identification of the TV-viewer imprinted thereon. Codes can be provided on both the tapes and cards. The paper tape

5,227,874

17

and the verification card are tamper-resisting in various ways. Both can carry time limits for redemption. Tapes and cards provided to TV-viewers, say monthly, can for example have a 30-day limit for redemption. In view of the special composition of the tape and the card, their duplication by a forger would be impractical, because special paper or cardboard would have to be manufactured. The individual coupons and the spaces or boxes on the card carry identical consecutive numbers.

Each time a winning coupon is presented at a redemption center, the winner of such a prize is required to present the verification card. The numbers on the winning coupon and on the card are compared to verify their matching. When the coupon is redeemed, the corresponding space or box in the verification card are canceled or invalidated by any one of many known methods, such as marking, punching, tearing off, stamping and the like. When 100 coupons have been presented, both the paper tape and the verification card have been used up.

By the method described, forging of coupons alone is rendered useless. Frequent changing of the properties of tapes and cards by the operator of the system and the multiplication of obstacles faced by a would-be forger are so great as to make forging practically impossible.

A similar system can be employed when using magnetized cards in lieu of paper coupons. The magnetized card of a winning contestant is provided with identifying indicia and codes, the verification card carrying matching markings and codes. The redemption procedures are similar.

If magnetized cards are used and validated by dispenser, the validation may be erased at the time a card is presented for redemption, so that it may be reused.

It is noted that the data to be stored in the memory 106 is provided by the instruction signal on line 122 or 124 from the demodulators of the receiving stations 16 or 18 shown in FIG. 3. The digital format of the instructional signal is decoded by the decoder 96 to extract the portion of the signal relating to the data which is to be stored in memory 106. The decoder 98 decodes that portion of the signal which is to be employed for presetting the timer 110 for the designated interval of response time. The decoder 100 may be coupled directly to the memory 108, or via an OR gate which will be described with reference to FIG. 23. To facilitate the present explanation of this embodiment of the invention, it is presumed that the decoder 100 is connected directly to the memory 108. The decoder 100 decodes that portion of the instruction signal which presets the memory 108 to any one of a number of previously stored formats for responding to situations presented in the studio 14. In this regard, it is noted that the form of the instructional signal follows common communication practice wherein the instructional signal is set up as a sequence of digital words or fields which identify respective portions of the message dealing with data, timing interval, and program commands. Thereby, the decoders 96, 98 and 100 are able to recognize the specific parts of the instructional signal and to extract the requisite data and commands. The response criteria may consist of a simple requirement to be met by a respondent or may comprise a plurality of independently variable factors.

The control logic 118 operates in response to a succession of clock pulses provided by the clock 120 for outputting control function signals to the memories 106 and 108 and to the buffer store 114. A connection be-

18

tween the keyboard 44 and the logic unit 118 provides for a control function, such as an entry command whereby a person responding directs the store 114 to enter the data inputted by the keyboard 44. The control logic of the unit 118 may also be activated by a command from the program memory 108. Thereby, the response unit 22 is capable of receiving, scoring, and recording a response entered by a member of the audience at a remote receiving station.

The construction of the foregoing system of the invention permits its use in numerous situations involving participation wherein members in the external audience are to participate with members of the studio audience in situations requiring participation. An example of the utility of the system may be demonstrated by considering a television game/quiz show involving both people at home as well as in the studio. The invention makes it possible to broadcast quiz show permitting home viewers to become participants and contestants. The invention is applicable to a variety of present and future game shows.

As an illustration, a game show or quiz program may include the task of listing, in reverse chronological order, the names of all teams having won the baseball World Series, or the World Soccer Championship. A time limit is set which makes it impossible for contestants to enter all correct answers; this is common practice in aptitude tests.

There are five contestants on the studio stage. Each studio contestant is equipped with well known means to write, print, type or otherwise enter his or her response on a board, keyboard or other data entering device adapted so that the responses, in the process of being entered, may be projected on a screen or screens visible to the studio audience, but not to the contestants and not to the home viewers until the predetermined time limit has been reached, or until the time allowed has substantially been consumed. The responses of studio contestants can be displayed to the studio audience and to home viewers with some delay, thereby preventing any of the home contestants from benefiting from the answers of the stage contestants.

It therefore is an object of the system described to elicit responses from contestants at remote sites and to capture their responses in their data entering devices essentially before the responses given by stage or studio contestants become known to home contestants. This is accomplished by projecting the questions on a screen hidden from studio contestants but in view of the camera 54 of FIG. 3. Concurrently with, or prior to the projection of the questions, the host 50 employs the keyboard 58 to transmit instructions to the response units 22 of the remote audience. The response entered by a participant in the remote audience is timed and is subject to a time limit, the time period to conclude before the questions are presented to the studio contestants. Thereby, the responses of the remote audience are not influenced by the responses of the studio contestants. Keyboard 58 may be operated by a person other than the quiz show host and may be situated on-stage or off-stage.

In a simple version, the system can be employed to attract viewers and listeners not normally disposed to participate in game or quiz shows per se, but willing to answer a few unobtrusive questions, especially if pertaining to a subject of interest to the viewer. By responding to questions, a home viewer can, in effect, act as a contestant. The questions to be answered by home

5,227,874

19

viewers and radio listeners can be interspersed in shows other than quiz shows and can be so simple as to require essentially only a confirmation by participants of being tuned in to a particular program.

Thus, for instance, home participants may be asked to identify the soap opera character who earlier appeared in the program. Or home viewers of a sports program may be asked to name a player who just scored. These implementations of the system and accompanying awards to a correct answer are intended to increase the television and radio audience. Viewers of a soap opera or persons listening to a radio sports broadcast, constitute a highly targeted audience and as a result of the lower per-household cost, advertisers will be able to award more valuable coupons and prizes to successful respondents. Participants who have given an acceptable answer can be rewarded with a coupon of defined value to be redeemed in cash, or to be applied to the price of a specified product or to the price of any product in a specified retail outlet. Other forms of rewards, whether of commercial or symbolic value, may be devised.

Advertising material, such as shopping hints and promotional material may be provided on hard copy records as coupons, prior to the delivery of the matrix, for example a paper tape, to participants at remote locations; or the advertising material may be provided and printed on the coupons at the time at which other data, such as prize information, is provided thereon.

The latter method has the advantage that a sponsor or advertiser can have up-to-date promotional information printed on coupons by directing the station which transmits instructional signals to remote locations to include in such signals the desired advertising material. A last-minute-telephone call by an advertiser to the sub-carrier station with directives to incorporate certain instructional signals in the sub-carrier transmission will result in a large number of shoppers being alerted to special sales through up-to-the-minute coupon promotions.

The quantitative results obtained by this method can also be used in the statistical analysis and the reactions of audiences tuned in to certain programs. It is noted that the equipment of the invention may well be installed in numerous selected or random households in which case, responses by household members can readily serve as a bases for statistically sampling peoples' responses to a product, service, political candidates, corporate images and other subjects of surveys. The increased audience provided by the invention is significant in survey and market research fields because, by way of example, an increase of sample size from 2000 to 2 million will reduce a sampling error from 3% to 0.1%.

In the field of qualitative market analysis and consumer research, the system and methods described can be employed very effectively, substituting home viewers and listeners for the so-called focus groups or other population samples used to determine buyer responses to products and services. The versatility and flexibility of the home keyboard or other data entering device are particularly well suited to the elicitation of unbiased responses to questions or statements by advertising agencies and market analysts. The market research and other surveys and polls made possible by the system and methods described, can be part of a regular quiz show or can be conducted separately. Respondents are rewarded for their cooperation by issuing certificates, coupons and the like to them. The permanent records produced by the dispensing means in remote locations

20

can be mailed to the research organization. For this purpose the forms dispensed by the dispensers in participants' homes can take the form of self-addressed return envelopes. Special printed forms may be used in conducting research into respondents' reactions to tasks or questions. Coupon awards are dispensed separately or may be a tear-off section of a survey form.

The relative simplicity and compactness of the electronic devices comprising the response unit, and the fact that the response unit is not connected by wire and requires no installation, makes it possible to design the response unit as a portable unit. A plurality of such units may be placed in systematically or randomly selected homes, used for the desired research purposes and thereupon moved to new locations. The units may be battery powered to provide mobility for use at private or public locations.

For the implementation of game/quiz shows, the following advantages of the invention are noted. The system of the invention does not require any wiring or rewiring of a home nor the use of telephone lines, and may be offered to viewers free of charge. In the context of the disclosed embodiment, a telephone is suggested merely as a convenient and rapid means for interaction between respondent and host, but is not required to practice the invention. For example, the external audience might be located in a separate room within walking distance from the studio in which case interaction can be accomplished personally by allowing a member of the external audience to walk over to the studio. The system permits home viewers to participate in quiz shows on the spur of the moment without advance notice and without any requirement for special forms or entry blanks. The system can be superposed upon a variety of game and quiz shows to permit viewer participation without interference with existing show formats, and has the advantage of expanding the television audience, thereby attracting sponsors of the shows. The machine readable card 48, or a one-time coupon which may be outputted by the dispenser 46, may be presented or redeemed for prizes by successful participants at a local store or other business establishment cooperating with the broadcaster.

When applying the methods and systems described to a multi-part task, contestants normally are confronted with a situation, such as questions or puzzles, in which a plurality of entries on the response entering device are required, the total of the responses determining the correctness or acceptability of a contestant's response.

While such an event or operation of such a task is in progress, the responses, entered piecemeal, as well as the applicable response criteria, are stored at contestants' locations. In a game shoe situation, one unacceptable answer may eliminate or disqualify a contestant from winning a prize. The task may be presented all at once, or in parts presented successively and calling for a partial response to each partial task.

The comparison and scoring means can be programmed to perform their functions at each stage of the task, upon completion of the entire task, or following a group of partial tasks. The printer/dispenser normally is programmed to operate at the end of all responses by a contestant to a multi-part task.

The system provides simplicity in the administration of the game by identification of the successful respondents; this is readily accomplished at the dispenser 46 in each remote location by imprinting each card 48 or token with the name of the respondent. If desired, the

5,227,874

21

name of the respondent can also be inputted at the keyboard 44 as are other answers to questions. The questions may include multiple-part questions and may require multiple choice answers, if desired. The questions may require simple answers such as yes or no, a single word such as a number or a color, or a plurality of words as in a phrase or narrative. Operation of the score counter 104 for various choices of answer permit a scoring of partially correct responses and those meeting a predetermined response criteria. In its simplest form, the keyboard may be provided with only two keys to answer yes or no, while in a more complex form, the keyboard may include the alphanumeric character keys for entering words or phrases, as well as other symbols.

If, as an example, a respondent must select a number from the numbers 1 through 9, and if the completely accurate answer is 5, the comparator unit may be programmed so as to accept any number between 4 and 6, or 3 and 6, etc.

The response entering device 44 may be provided with keys, buttons, levers, or other means for indicating a response, which response can have an assigned meaning. It may be a shorthand entry, standing for a word, a phrase or a sentence. A response unit may be constructed as a dedicated unit for a specific purpose as for playing a game, in which case a key may generate a specific type of response or responses.

By way of alternative embodiments of the invention, it is noted that the comparator 116 may output a multiple-bit digital word wherein the additional bits are provided by the memory 106 dependent on the specific answer stored in the memory 106, which answer is compared to the response within the buffer store 114. For example, if two possible responses would be regarded as correct, but one of the two responses is preferred, then the comparator 116 would output an additional bit for the preferred response. The additional bit would be passed by the gate 112 to advance the count of the counter 104, thereby to increase the score by a larger amount when the preferred response is entered at the keyboard 44.

The formatting and reformatting can provide for various ways of weighting the responses of home contestants, such as straight line additions, geometric and exponential progressions, or computations of scores based on formulas incorporating discrete groups of responses. Thus, score counter 104 may be replaced with a microcomputer (not shown) which is responsive to commands from the memory 108 for combining inputs from keyboard 44, memories 106 and 108, and capable of reflecting the time element, to serve, in effect, as an evaluator of complex answers.

According to the present invention, questions may be transmitted from the central station, to which more than one acceptable answer may be given, the answers varying in the degree of difficulty from the respondent's standpoint. As an example, a question may call for naming a minimum of two European cities, the names beginning with the letter M, this being difficulty level 1. Difficulty level 2 might call for four such cities and difficulty level 3 might call for six such cities, all answers to be entered within 30 seconds. The particular difficulty level may be specified by the person controlling the transmission, or it may be selected by the individual respondent prior to seeing or hearing the question. In order to enable a contestant to choose a difficulty level, the host may announce or hint at the general nature, or the context of the question about to be asked.

22

The degree of difficulty will normally determine the value of the prize, etc. The device evaluating the responses may dispense records, e.g. coupons, certificates and the like of different value or in different denominations. For instance, it may issue a 10 cent coupon at level 1, and 25 cent coupon at level 2, and a 50 cent coupon at level 3. The coupons may be redeemed in retail establishments, the coupons being similar to those contained in newspapers. It should be understood, therefore, that in addition to the difficulty level set by the host, a higher difficulty level may be superimposed by an individual contestant, as will be disclosed subsequently with reference to FIGS. 6-10.

By use of encryption, the card 48 provides an essentially tamper-proof record. The invention is applicable, not only to home viewers but also to viewers in a public establishment such as a restaurant or school wherein people may participate as teams. The questions may be gradated to be suitable for a variety of audiences varying from those having limited formal education to those having special interests. By use of the timer 110, the studio host can designate the beginning and end of a response interval, and vary the time limit allowed from question to question. In addition, the invention lends itself to the development of further forms of game and quiz shows. The difficulty level can be increased by decreasing an allocated time for response.

It should be understood that individual questions may vary with respect to the nature of the task, the type and particulars of acceptable responses, the difficulty level, the period of time allowed for responding, the kind and range of prizes, the weighting of responses, the composition of the target audience and other considerations.

It should be further understood that normally the announcements to remote participants of levels of difficulty and of time intervals allowed for responding to a task are transmitted and received in a form directly intelligible to participants, such as in open language. If an acceptable response criteria is transmitted, prior to entry of a response by a participant, it is conveyed in coded or otherwise unintelligible form; if it is transmitted subsequent to such entry, it may be conveyed in open language.

As an example in the use of the invention in the educational field, the memories of the response units at the remote locations receive and retain instructional signals from a central transmitting station conveying the correct, preferred, or acceptable response or responses to the task posed by the task-setting message. Upon completion of a task by a respondent, or upon lapsing of the allotted time, the printout mechanism is activated by the instructional signals so as to communicate or so as to dispense in hard copy form the correct or preferred response to each respondent at remote locations. In this manner, a student who receives a printout containing his or her scored response, also receives the "textbook" solution or most desirable response to the task presented. For comparison purposes, the dispenser may provide printed hard copy containing a student's original response.

The foregoing features in the operation of the system of the invention are readily applied to the educational field to encourage both early educational experiences among children as well as for home-study courses for high school and university students. In the educational field, the situation portrayed in the studio and presented on the television screen may be in the nature of a task-setting situation rather than that of a pure question. The

5,227,874

23                                                     24

appropriate response be a brief statement, an equation, or may contain a number of cross-referenced key words or key phrases or symbols. The system of the invention may be implemented also by closed circuit television and cable television as well as by the broadcast situation of FIG. 1. The keyboard 44 at each of the response units 22 may be a standard typewriter keyboard, as noted above, or may include a display of the typed response such as is presently available on some electronic typewriters. Such a display would be useful in the answering of examination questions for home-study programs. It is also noted that the keyboard 44 is representative of a response entry device, and may, if desired, be replaced by other entry devices such as a joystick, switches, or a device responsive to a spoken voice.

Response evaluation means referred to herein may include, when appropriate, as for example in the educational field, scanning devices capable of recognizing symbols, diagrams, charts, formulas, equations and drawings responsive to the response criteria.

In the practice of the invention, the answers given by studio contestants may, for instance, be displayed to the studio audience and/or broadcast to TV-viewers following a predetermined delay, of, say 5–20 seconds. During this 5–20 second period, the data or response entering devices of the stage contestants, or the studio display devices, may be made inoperative, so that no answers may be entered and/or displayed, even if the stage contestants are aware of the questions. Other ways of staggering the "response windows" by 5–20 seconds or more can be devised.

This time lag is intended to make the answers projected on studio screens following the time lag useless to home contestants from the point of view of total time allowed for response. By the time the correct answers are televised, all or a critical amount of the allotted time will have elapsed. This forces home contestants to enter their responses before knowing the responses of studio contestants.

By way of example only, a typical sequence of events as pertaining to a quiz show with studio and home contestants is as follows: TV home viewers and contestants see and hear the questions without delay. However, the questions are presented to stage contestants and the studio audience after a delay of 5–20 seconds. The respective contestants may begin answering questions upon their presentation, subject to time limits. Acceptable responses are presented to everyone, only after the stage contestants have completed their time for response.

To provide attention-attracting action on stage for the studio audience and TV-viewers who are not contestants, the announcer or master of ceremonies can set the stage for the questions, or a performer may walk across the stage to a podium and read the questions to the stage contestants and the audience, thereby consuming 5–20 seconds. The questions are displayed on a screen, visible to all TV-viewers, including home contestants. Other ways of giving home contestants a head start of 5–20 seconds, or more, can be devised. In another embodiment, the responses by stage contestants are entered, but not displayed for a predetermined period of time. Home contestants may be allotted more or less time than studio participants. If there is only one participant or contestant on stage, the quiz show still follows the concept outlined. The studio contestants and/or home contestants may be allowed a choice of different difficulty levels.

As an example, the use of key words and key phrases is illustrated in the context of a game show described hereinafter, which might be entitled "Definitions". the host presents a situation, hints at, or announces a dictionary word and defines the task as one of providing the correct definition or definitions of such word. The dictionary definition, frequently a phrase, is of course an acceptable answer. Using the task word "many" as an example, an indispensable key work that would have to appear in any acceptable response would be the word "number". However, two or more definitions may exist for a task word.

It will be obvious that this type of show lends itself well to evaluating partially correct and less-than-exhaustive responses. Partial credit may be given to definitions that are reasonably close to the dictionary definition. A more complex task in the context of said show might be the definition of the word "set", for which a large number of definitions exist. Cumulative credits may be awarded to contestants listing a plurality of key definition words or phrases.

According to another show format, separate quiz programs for studio contestants and home contestants may be conducted concurrently by the same game show host. He or she may, for instance, conduct one quiz program for studio contestants in the manner described and while the studio contestants ponder their answers may present supplemental, or a separate set of, questions to home contestants, to which the latter respond in accordance with the method of the present invention. Such separate questions for home contestants may be posed by a second or off-stage announcer.

In the United States, Europe and other regions, television programs are frequently broadcast repetitively in different time zones. In the case of game shows, this enables television viewers who are tuned in to such program and who are in a time zone which first receives one such game or quiz show to inform members of an audience in another time zone of the correct responses to tasks or questions, thus ensuring such members in other time zones of winning an award without having independently correctly responded to such tasks. This potential problem resulting from a sequential broadcasting of television game shows in the context of the present invention will now be addressed.

When the awards offered successful contestants are of a monetary value representing, say 10–15 percent of the price of the merchandise, and are designed only to attract buyers to a store, then a sponsor, such as a manufacturer, may choose to ignore the risk of, or may even welcome, having members of an audience in a first time zone provide members in a later time zone, who themselves did not think of the correct answer, with an appropriate response. Awarding such viewer a 10 percent discount is similar to making 10 percent discount coupons available through newspapers and magazines.

A more serious problem may arise when a sponsor or manufacturer offers awards of a larger magnitude. In such instances, it is desirable to employ a method, and such methods are hereinafter described, which permit airing a quiz or educational program presenting tasks or questions calling for different responses in different time zones. This is achieved by a modified version of the methods described above, which modified methods may be practiced with the systems described in this specification and accompanying drawings.

For example, a host or professor may stand in front of a map of the world. He or she verbally poses the ques-

5,227,874

## 25

tion "In which country is the river to which I am point-
ing located?" For purposes of this illustration, the audio
portion of the question, posed by an on-stage or off-
stage announcer, is referred to herein as a "module
question", and normally a quiz show or educational
program comprises many such module questions. The
object of formulating module questions is to be able
easily and economically to substitute such module ques-
tions for each other in the same show, which normally
is taped prior to airing. Such a module question, consist-
ing of the audio portion of the question can easily and
economically be replaced by another audio portion,
while the more costly video portion (the host pointing
to a map) remains the same.

In such a modified method, a part of all of a question
or task presented in a program in one time zone, are
differentiated and are different from the corresponding
question or task asked in a similar program aired in
another time one. This is achieved by formulating at
least a part of a question or task in interchangeable
module form.

Either an entire question may be substituted in a pro-
gram, or a part of a question may be substituted. If only
a part of a question is to be substituted, such part can for
instance be a part or all of only the video portion of a
question. Normally, such interchangeable module ques-
tions will be of approximately the same length, so as not
to affect the overall length of a program.

If a program comprises an entertainment portion and
a game or quiz show portion, the part of the show con-
sisting of questions or tasks may be produced and taped
separately and independently of the entertainment or
other portions of the show. Many forms of implementa-
tion of this method may be devised. The example given
below is illustrative of only one of the alternative meth-
ods which achieve the above mentioned object.

According to a preferred method, a plurality of sets
of different tasks is formulated, using one set of tasks in
one time zone and another set of tasks in another time
zone. Although the tasks may differ in their entirety, a
preferred method is described wherein the tasks differ
only with respect to their audio portion.

In the taping of the show, the video portion is the
same in all tapes, irrespective of the time zone in which
such program is to be aired or transmitted by cable. The
audio and video portions together form a question or
task. The audio -portions of module questions change
from one such program to the next. Thus the host or
professor is seen in all versions of the show to be point-
ing to the same map. He or she will, however, tape a
plurality of oral module questions, only one of these
module questions being used in any one time zone. With
reference to the above example, in which a host points
to a map of the world, another module question may be
"What is the name of the river?" Yet another such mod-
ule question by the host, or off-stage person, may be "Is
the river to which I am pointing among the five longest
rivers in the world?"

The above described example involves the same host
or professor asking a set of questions, each of which
questions must be taped in its entirety. This necessitates
the involvement of the host in asking a set of successive
oral questions, while the video portion remains the
same. In another version of this preferred method, the
module questions, that is the audio portions of each
question, are asked by an off-camera announcer. This
method has the advantage that in the taping of the
show, the host spends only sufficient time in front of the

## 26

camera to ask one question, the host providing such
action in front of the camera as is required to make the
oral module question asked by the off-camera an-
nouncer intelligible. Thus, the host may silently point to
an object, such as a map, for a length of time permitting
an off-camera announcer to pose one module question.
Other module questions asked by the off-camera an-
nouncer and accompanying the same video portion
showing the host, are dubbed or inserted into the appro-
priate part of the tape. In the taping of a quiz show
intended to be aired in four time zones, an off-camera
announcer therefore asks four sets of module questions,
one set of these oral questions being inserted into the
appropriate place in each of the four program tapes
used in transmitting the show in the four time zones.

According to a preferred embodiment of the above-
described methods for use in the different of quiz
programs in different languages, a host announces the
oral module questions in one language. Different oral
module questions are dubbed in, both in the language
originally used by the host and in any other languages
for use in different countries. In such an event the words
and sentences chosen in formulating questions, are such
as to lend themselves to dubbing. Also, the host when
announcing some questions, can face towards a picture
or a map, away from the viewing audience, in order to
facilitate dubbing.

Thus the dubbing technique is an economical method
of achieving the above-mentioned objective of utilizing
the same video portions with a variety of different audio
questions in different time zones.

Yet another example of a simplified version of the
above methods may entail a projection of a scene or the
filming of an object without a host being present. The
object could be a well-known personality, or a picture
of such personality; or an action shot of such personal-
ity may be used. An off-camera announcer may ask a
number of oral or module questions to meet the require-
ments of the number of shows to be shown in different
time zones.

The examples set forth are simple ones and many
different and more complex versions and implementa-
tions of the home quiz show are possible and will occur
to game show producers.

In some instances, such as in market research, the
system described can be employed to identify consum-
ers meeting certain criteria. In that event, the memory
and control elements of response unit 22 are pro-
grammed in accordance with the requirements of the
particular consumer research. Response unit 22 nor-
mally is placed in remote locations, which need not be
homes and can be other private and public places. In an
alternative application of the system, the response unit
22 is equipped with appropriate means capable of limit-
ing the functions of the scoring and evaluation means.
For this purpose, controls and switches (not shown) are
provided, which cause memories 106 and 108, logic
control 118, comparator 116 and gate 112 to selectively
perform only those evaluating functions required for
the specific application. In such an event, dispenser 46
receives only partially processed data and generates a
record of responses entered on keyboard 44 reflecting
responses evaluated only to the desired extent and at
least partially resembling the original information en-
tered by respondents. Respondents are rewarded in one
of the manners previously described, including a mone-
tary prize simply for participating in a test.

27

28

It is a particular advantage of the present system that the kind of data-entering device may vary between different remote locations. Furthermore, the kind of data entering, scoring or evaluating device installed at different locations may vary in accordance with the intended use. Thus, for instance, in selected remote locations, electronic devices of known design may be installed, which are capable of subjecting the raw data entered by respondents to computer analysis.

The invention may be practiced by providing two or more response units at each remote location together with one set of program presenting means. Providing more than one response unit, including means to modify a difficulty level and timing, and including comparison, storing, scoring and dispensing means in, for example, one household, enables two or more family members to become contestants by responding individually to a situation presented by a single television or radio receiver based on a program transmission from a central station. In a public place, a plurality of response units will generate increased and competitive participation by persons present

FIG. 5 shows the buffer store 114, the register 102 and the program memory 108, as well as further details of the dispenser 46 of FIG. 4 to accomplish the imprinting of a response on a recording medium, such as a paper or card, having a prescribed format for the entry of answers. As has been noted hereinabove, such a data entry form or questionnaire, is useful for providing responses by respondents in situations such as contests, educational and advertising promotional or research activities. An example of such a questionnaire 126 is shown in FIG. 5. Therein, blocks numbered 1–6 are provided for entry of responses by members of the audience at the remote receiving stations 16 and 18.

Also shown in FIG. 5 is an enlarged fragmentary view of the keyboard 44, the view showing a keypad with keys for the entry of identifying numerals for identifying the blocks of the questionnaire 126 in which the respective answers are to be entered. The respondent identifies a questionnaire block by holding down a control key Q while typing the identifying numeral on the keyboard 44. The response to be entered in that block is then typed by use of the alphabet keys of the keyboard 44.

The dispenser 46 comprises a decoder 128, a printer 130 and a programmable read-only memory (PROM) 132. In operation, the typed answer and the questionnaire block identification is applied by the keyboard 44 and via the store 114 to the register 102. The contents of the register 102, as described hereinabove, are subsequently transferred to the dispenser 46. The decoder 128 detects the presence of a digital word produced by the control key Q, and thereby decodes the incoming digital signals from the register 102 so as to separate the block identification from the response. The decoder 128 activates the printer 130, upon the appearance of the response, to print the response on the questionnaire 126, the latter having been previously placed into the dispenser 46 by the respondent. The decoder also addresses the PROM 132 with the block identification, whereupon the PROM 132 outputs the block location to the printer 130 to direct the printer 130 to print the response at the correct location on the questionnaire 126. Information with respect to the layout of the questionnaire 126 is loaded into the PROM 132 by the program memory 108 as directed by the instructional signal on line 122 or 124 of FIG. 4.

Alternatively, the block location data and the responses may be stored on the card 48 for printing out at another location, such as the facilities of an advertiser or a company providing the promotional activities. The response may include a narrative text, in which case the comparator 116 may be employed to signal the presence of key words in the response, which have been previously entered into the data memory 106.

By way of further embodiments of the invention, it is noted that the dispenser 46 may include a group of trays 134 each of which stores a separate set of forms such as the questionnaire 126 upon which a response is to be printed. The trays 134 are activated by a control signal from the program memory 108 to present a blank form to the printer 130 to be imprinted with the response. Information with respect to the desired form to be employed in response to a task-setting situation is loaded into the program memory 108 by the instructional signal on line 122 or 124, whereby an instructor or the host 50 in a classroom or in the studio 14 designates the requisite form for use in preparing the response. The completed form, or questionnaire 126, exits a slot 136 of the printer 130. The completed questionnaire 126 may be provided on any suitable recording medium which serves as a hard copy such as paper, plastic strip, or plastic card.

As was shown with respect to FIG. 4, the score counter 104 is under control of the program memory 108. This permits the score counter 104 to activated and deactivated by commands transmitted via the instructional signal. In the outputting of the foregoing questionnaire 126 from the printer 130 with words printed in the appropriate blocks, a score can also be imprinted upon the questionnaire 126 upon activation of the counter 104, which score is omitted upon deactivation of the counter 104.

The embodiments of the system of FIGS. 6–10 provide further capability to the system of FIGS. 1–5 for conducting a quiz or game-type television show with both local and remote audience participation. The embodiments of FIGS. 6–10 provide for selection of difficulty level, evaluation of response based on key words and phrases, interaction between members of the remote audience and the program host as by use of telephone communication, and adaptation of the program by the host to the interaction by modification and reformatting of response criteria as by altering a basis or mode of scoring and a period of time allowed for response. As with the system of FIGS. 1–5, the present system of FIGS. 6–10 can also be employed with radio programs. Descriptive material relating to the program can be transmitted over the video and/or the voice channels of the television transmission. In particular, it is noted that much of the system description provided in FIGS. 1–5 applies also to the system of FIGS. 6–10 but, that additionally, the system description presented in FIGS. 6–10 shows the use of at least two separate signals, in the instructional signal group, for providing answers and evaluating the answers under control of both the program host and the remote viewer.

At the discretion of the television program conductor, or other person assigned for this purpose, and that of individual viewers, different difficulty levels may be applied to individual questions, it being understood that answers to more difficult questions or answers to the same questions at higher difficulty level may carry with them larger awards. However, even if only one set of response criteria is established for a task, it is under-

29

30

stood that such response criteria carry a specified or implied difficulty level. Each successful respondent may be issued a printout or similar hard copy displaying the value of the award and containing a code which is verifiable over the telephone by a central station, or without the use of a telephone, by a cooperating store or merchandising center, for issuing an award.

FIG. 6 shows a further embodiment of the invention having greater versatility in the evaluation of learning situations and the scoring of games and contests by means of a system 200. In the system 200, a central station 202 includes a studio 204, such as a television studio, and broadcasts programs to many remote receiving stations, one such station 206 being shown by way of example. Each of the receiving stations 206 includes means, such as a television screen 208, for observing a broadcast program, and means by which persons in a remote viewing audience can respond to situations presented in the studio 204. The response means is shown as a response unit 210 which, as will be described hereinafter, includes circuitry for evaluating and recording responses entered by persons in the viewing audience.

A television program is conducted in the studio 204 by a host 212. While various types of programs may be employed in conjunction with the study of specific subject matter, for example, a course in advertising or packaging, in which there is a display of a specimen 214 of merchandise, or other subject of interest, to members of a remote television audience 216 located at the remote receiving stations 206, a game program employing a television game 218 is presented by way of illustration of the invention.

The use of a game is a recognized technique in the teaching of children, as well as older persons, in a classroom. The object of the study or program, designated herein as specimen 214, might be an article, such as furniture or clothing, normally offered for sale, or other type of object such as a painting or animal in the case of study of such subject matter. For example, in a study of architecture, the "specimen" would be a model of a building, and in a home-study course of geography, the "specimen" would be a map or other teaching aid. In the case of services being offered, the specimen may take the form of an advertisement of such services. Each receiving station 206 is provided with a television system 220 which receives broadcast transmissions 222 of the televised game show for presentation on the television screen 208.

In the studio 204, the host 212, and an associate who may be off-camera, is provided with two keyboards 224 and 226, respectively, for entering appropriate responses to situations posed by the game 218 (response criteria) and for entering appropriate guidelines for scoring the responses (scoring mode). The response criteria may consist of specific delineating or parametric information. The game 218 and the specimen 214 are viewed by a television camera 228 which provides video signals for the broadcast transmission 222. It is to be understood that, in addition to the remote audience 216, a local or studio audience (not shown) may be present within the studio 204 for participating in the game 218. The host 212 addresses the local audience and the remote audience by means of a microphone 230, the microphone 230 providing an audio signal for the broadcast transmission 222. In this example of the television game, a first video signal is transmitted to the remote audience to present a picture of of the game situation, this signal being followed, preceded or ac-

companied by an audio signal in which the host describes the task to be performed by the remote audience, which task may be the answering of specific questions in a designated fashion. As described above, when confronted with a time zone problem, one or more off-camera announcers ask a number of questions in the form of the oral or module questions, which module questions are then selectively inserted into the tapes of television programs to be broadcast successively in different time zones. Alternatively, the second signal describing the task may be transmitted over the video channel by use of a display in front of the studio audience, the display having the questions set forth in large lettering which is read readily.

With reference to both FIGS. 6 and 10, the central station 202 provides for a modulation of signals of the instructional signal group outputted by the keyboards 224 and 226 for the predetermined responses and scoring criteria within the audio channel to occupy narrow spectral bands in the upper portion of the audio spectral band. The system 200 is readily described in terms of four or more signals, the first signal being the television signal portraying activity in the studio 204. The second signal provides the description of the task to be performed by the studio and/or the remote audience. The studio scene and the task carried by the first two signals are presented diagrammatically in a typical time sequence by a graph shown alongside the camera 228, it being understood that the time sequence may be varied since the task announcement may precede or accompany the studio situation. The third signal carries the designated criteria for a response or range of responses entered by the host 212 upon the keyboard 224, such criteria being, by way of example, key words to be entered by the respondents. The fourth signal provides the scoring mode or guidelines entered by the host 212 upon the keyboard 226, such scoring being, by way of example, that an answer of the word "fish" is worth three points while an answer of the word "salmon" is worth five points. Additional examples of response criteria and scoring mode are discussed herein.

As example of a further signal, a fifth signal providing a verification code for use in verifying a printout of awards at a remote station may be sent subsequently along the same channel employed for transmission of the scoring criteria. The passbands of the third and the fourth signals, namely the response criteria and the scoring mode signals respectively, are indicated in FIG. 10, both of these passbands being much narrower than the passband of the audio spectrum, and carrying signal amplitude of relatively low levels, as compared to the audio signal, so as to avoid any interference with the transmission of the voice of the host 212. Since four separate signal channels are provided for the first four of the foregoing signals, these signals may be transmitted in any desired time sequence including a concurrent transmission of a plurality of these signals. One or more of the signals of the four channels may be retransmitted with an updated message, such as a reformatted scoring mode, to adapt the game program to new scoring instructions by the program conductor, or to audience responses, thereby to provide interaction between the host and the remote audience.

The central station 202 further comprises two signal processors 232 and 234, the summer 236, a combiner 238, a transmitter 240 and two oscillators 242 and 244 coupled respectively to the processors 232 and 234. The microphone 230 is connected to a first input terminal of

5,227,874

**31**

the summer 236. The processor 232 is connected between the keyboard 224 and a second input terminal of the summer 236 for encoding designated response signals outputted by the keyboard 224, and for modulating the signals onto a carrier frequency $F_1$, which carrier frequency lies in the response signal band of FIG. 10.

Similarly, the processor 234 is connected between the keyboard 226 and a third input terminal of the summer 236 for coding scoring mode signals outputted by the keyboard 226, and for modulating these signals onto a carrier frequency $F_2$, the carrier frequency $F_2$ being within the score signal band of FIG. 10. The summer 236 combines the response and the score signals with the audio signal of the microphone 230 to output a sum signal to the combiner 238. The combiner 238 operates in a well-known fashion to combine the audio signal of the microphone 230 with the video signal of the camera 228 to output a composite television signal to the transmitter 240 for transmission via antenna 246 as the broadcast transmission 222.

Each of the processors 232 and 234 are constructed of the same components, these components being an encoder 248, a register 250, a modulator 252, a band-pass filter 254, and a clock 256. The operations of both of the processors 232 and 234 are the same and, accordingly, only the operation of the processor 234 need be described, it being understood that this description applies also to the processor 232.

In operation, the encoder 248 digitally encodes signals provided by respective keys 258 of the keyboard 226. The clock 256 outputs both a high speed clock signal and a low speed clock signal to the register 250. The high speed signal has a relatively high pulse repetition frequency for strobing bits of a digital signal outputted by the encoder 248 at a relatively high speed into the register 250. The bits of the digital signal are than outputted from the register 250 at a relatively low rate to the modulator 252 in response to strobing of the register 250 by the low speed clock signal. This arrangement of the high and low speed clocking allows a command to be entered at the keyboard 226 rapidly by the host 212, and then to be transmitted relatively slowly as a component of the audio signal. The slow transmission minimizes the requisite width of the score signal passband (FIG. 10). The modulator 252 may employ a suitable form of modulation as is commonly employed, such as amplitude modulation or phase modulation, for modulating the digital signal on the $F_2$ carrier. The modulated signal outputted by the modulator 252 is then coupled via the filter 254 to the summer 236, the filter 254 limiting the spectral components of the modulated signal to the desired passband of FIG. 10. In the same manner, the processor 232 digitally encodes signals entered by keys 260 of the keyboard 224, and modulates the digitally encoded signals of the designated response upon the $F_1$ carrier.

The television system 220 comprises a receiver 262, three demodulators 264, 266, and 268, a speaker 270, two band-pass filters 272 and 274, and two oscillators 276 and 278. Also shown in FIG. 6 is a telephone circuit 280 including a telephone at the remote station 206 and a telephone at the central station 202 which enable interaction in the form of direct communication between a member of the remote audience 216 and a person at the central station 202. The telephone at the central station 202 enables members of the remote audience 216 to communicate, when desired, with the host 212, for instance, to furnish their names for announcing

**32**

on the air. The telephone circuit 280 is presented as a conveniently implemented form of communication system, it being understood that such communication is an optional feature and not essential to the practice of the invention, and that other forms of communication systems may be employed.

In operation, the receiver 262 receives the broadcast transmission 222 via an antenna 282, and outputs the received signal to the demodulator 264. The demodulator 264 operates in a well-known fashion to separate the audio and video portions of the television signal, the audio portion being applied to the speaker 270 and the video portion being presented on the television screen 208. Members of the remote audience 216 hear the voice of the host 212 on the speaker 270, and view the progress of the game 218 and other activities of the studio 204 on the screen 208. The filters 272 and 274 separate, respectively, the response and score signals from the audio spectrum and apply the signals, respectively, to the demodulator 266 and the demodulator 268. The oscillator 276 provides the $F_1$ carrier to the demodulator 266 for demodulation of the response signal to recover the designate responses. Similarly the oscillator 278 provides the $F_2$ carrier to the demodulator 268 to enable the demodulation of the score signal to recover the scoring mode criteria. The response signal is applied by the demodulator 266 to the response unit 210 via line 346. The score signal is outputted by the demodulator 268 to the response unit 210 via line 348.

FIG. 7 shows a modification of the system 200 of FIG. 6 wherein the third and fourth signals, respectively, for the designated response and scoring mode criteria are transmitted in the video portion of the television signal rather than in the audio portion of the television signal. In FIG. 7, the modified system 200A comprises a central station 202A and a television system 220A which contains some of the components presented in the system 200 of FIG. 6, and has further components which provide for an interlacing of the third and the fourth signals with the television video portion by insertion of the third and the fourth signals within the time intervals allocated for the television vertical retrace. The system 200A is understood to include, when desired, the telephone circuit 280, the game 218, and the specimen 214 which have been deleted in FIG. 7 to simplify the presentation of the system 200A.

In the central station 202A, the signals outputted by the keyboards 224 and 226 are digitally coded by encoders 284 and 286, respectively, and applied via an OR circuit 288 to a register 290. The station 202A further comprises a modulator 292 and a summer 294 which operate with the combiner 238 and the transmitter 240. The television camera 228 includes a well-known vidicon 296, oscillator 298 for production of a carrier frequency, and timing and synchronization circuitry 300.

In operation, the encoded response criteria and scoring mode signals of the keyboards 224 and 226 are stored in the register 290 from which they are applied to an input terminal of the modulator 292. The modulator 292 is activated by a pulse signal on line 302 provided by the timing circuitry 300 during each vertical retrace interval in the generation of the television picture frame at the camera 228. The modulator 292 receives the encoded keyboard signals and modulates these signals onto the carrier provided by the oscillator 298, this carrier being the same carrier employed for carrying the television video signal. Thereby, the modulated keyboard signals outputted by the modulator 292, and

33

the television video signal outputted by the camera 228 are on the same carrier, and are summed together by the summer 294. The output signal of the summer 294 contains both the video and the keyboard signals interleaved with each other. The output signal of the summer 294 is then combined with the signal of the microphone 230 by the combiner 238 and transmitted via the transmitter 240 to a remote receiving station 206A in the same fashion as was described for the system 200 of FIG. 6.

The broadcast transmission from the central station 202A is received by the receiver 262 and applied to the demodulator 264 which separates the audio and video portions of the broadcast transmission, the audio portion being applied to the speaker 270, and the video portion being applied to a television monitor 304 which includes the television screen 208. The monitor 304 includes well-known synchronization and timing circuitry 306 which is employed in converting the broadcast video to a picture presented on the screen 208, the timing circuitry 306 also providing a gate pulse signal on line 308 which is to be used for identifying the retrace interval so as to enable extraction of the designated response signal of the keyboard 224 and the scoring mode signal of the keyboard 226.

The television system 220A further comprises a clock 310, two gates 312 and 314, a demodulator 316, a register 318, a switch 320, a flag detector 322, and two registers 324 and 326.

In operation, the video signal outputted by the demodulator 264 is applied also via the gate 312 to the demodulator 316 which operates in conjunction with a carrier reference signal provided by an oscillator 328 to demodulate the signals of the keyboards 224 and 226. The operation of the demodulator 316 is opposite to the operation of the modulator 292 in the sense that, by way of example, if the modulator 292 employs phase modulation, then the demodulator 316 demodulates phase modulation.

The signal on line 308 activates the gate 312 to pass the modulated keyboard signals occurring during the retrace intervals, and to block the video signal appearing at all times other than during the retrace intervals. If desired, a similar gate (not shown) may be included within the monitor 304 for excluding the modulated keyboard signals from the monitor 304. Such signals appearing during the retrace intervals should not interfere with the operation of the monitor 304 because of the synchronization signals normally present in televised transmissions, which signals gate off the screen 208 during retrace intervals, as is well known.

The signal on line 308 also activates the gate 314 to conduct clock pulses from the clock 310 to the register 318 during each retrace interval. The clock pulses are employed to clock the digitally encoded keyboard signals from the demodulator 316 into the register 318. Included within each of the digitized keyboard signals is a digital flag which identifies whether a signal is the designated response signal of the keyboard 224 or the scoring mode signal of the keyboard 226. The keyboard signals are communicated from the register 318 via a switch 320 to the registers 324 and 326. The detector 322 detects the presence of the flag on digital signals outputted by the register 318, and operates the switch 320 to steer the designated response signals of the keyboard 224 to the register 324, and the scoring mode signals of the keyboard 226 to the register 326. The registers 324 and 326 provide the keyboard signals to

34

the response unit 210 for operation of the response unit 210 in a manner to be described.

With reference to FIG. 8, the response unit 210 receives the designated response criteria signals and the scoring mode signals, the signals being stored in memory for evaluating answers of the members of the remote audience 216 (FIG. 6) in responding to tasks set forth in the studio area. In order to facilitate explanation of the response unit 210, the memory which stores data of the designated response criteria and the scoring mode, is shown as three separate memories, namely, a program memory 330 which stores instructions for operation of the response unit 210, a response-criteria memory 332 which stores a set of data-defining acceptable or designated responses to be used as a reference against which audience response is to be judged, and a further scoring program memory 334 which stores coefficients or values of difficulty levels employed in the scoring of audience responses. A timing unit 336 is employed for interjecting a scoring factor based on the amount of time required or allowed to generate the response, and to apply zero credit in the situation wherein a member of the remote audience fails to respond within a predesignated time interval. The response unit 210 includes four decoders 338, 340, 342, and 344 which extract various portions of the digitized designated response criteria signal and scoring mode signal for application to individual ones of the memories 330 and 332, the timing unit 336 and the memory 334. The decoders 338 and 340 connect lines 348 and 346, carrying the scoring-mode and response-criteria signals, respectively, to the memories 330 and 332. The decoders 342 and 344 connect from line 348, carrying the scoring mode signal, respectively to the timing unit 336 and the memory 334. The decoder 344 may be coupled directly to the memory 334, or via an OR gate which will be described with reference to FIG. 23. To facilitate the present explanation of this embodiment of the invention, it is presumed that the decoder 344 is connected directly to the memory 334.

Also included within the response unit 210 is a control logic unit 350, a clock 352 which provides clock pulse signals to the control logic unit 350 and the timing unit 336 and an OR circuit 354 which couples the decoder 342 to the control logic unit 336. A keyboard 356 and, if desired, a display 358 coupled thereto interact with the control logic unit 350 for the entry of responses, the display 358 showing a member of the remote audience what symbols have been typed on the keyboard 356 during the generation of a response.

The response unit 210 further comprises a dispenser 360 of cards 362 and/or tape 364, or similar recording medium, which are imprinted with marking reflecting awards, if any, for responses entered by a member of the remote audience upon the keyboard 356. For example, the dispenser 360 can accept a preprinted form which may be inserted by a respondent and removed from the dispenser 360 after imprinting. Also, the response unit 210 comprises a buffer store 366, a register 368, a scoring logic unit 370, two comparators 372 and 374, two registers 376 and 378, two multipliers 380 and 382, a summer 384, an accumulator 386 for accumulating scores, and an accumulator 387 for accumulating values of a succession of awards. In operation, the program memory 330 and the control logic unit 350 operate together in a manner similar to that of the program memory 108 and the control logic unit 118 of FIG. 4. The program memory 330 stores information as to the

5,227,874

35

number of possible responses, the number of questions, and also stores instructions for commanding the dispenser to print out messages in accordance with scores based on responses to questions and other tasks set forth in the studio 204. The memory 332 stores possible answers to questions and tasks, such as colors of objects displayed in the studio 204, sizes of such objects, sentences or phrases describing events in history, science, music, art or literature, listings, names and similar information which may be transmitted via the response criteria signal to the remote stations. The timing unit 336 includes counters and memories as will be described with reference to FIG. 9 for outputting appropriate factors or coefficients for use in scoring responses based on time of response. The memory 334 stores designated time intervals which are to be inputted as preset signals to the counters of the timing unit 336, and also stores factors to be applied in the scoring or grading of responses based on level of difficulty. Such level of difficulty information is transmitted from the central station via the scoring mode signal to the remote stations. After presentation of a task in the studio 204, the host 212 indicates the beginning of a time interval for audience response by pressing a key on the keyboard 226, this resulting in the transmission of a start signal to the response unit 210. The decoder 342 decodes the start signal and applies the start signal via the OR circuit 354 to initiate timing in the timing unit 336, the start signal proceeding through the timing unit 336 to the control logic unit 350 to initiate operation of the logic unit 350. Operation of the three memories 330, 332, and 334 is under control of the logic unit 350.

In one type of question-response situation, the host 212 gives a contestant a choice of questions to which the contestant is to respond. For example, two or three groups of questions may be presented on the television screen 208. The answers to all of the questions are loaded into the memory 332. The contestant indicates a selection of a group of questions by means of the keyboard 356, a selection signal then being outputted by the keyboard 356 to the logic unit 350 to address the memory 332 to provide the desired set of answers for evaluating the contestant's response.

While various forms of responses may be desired for specific situations which may be depicted in the studio 204, two situations of particular interest are those wherein a response is to be evaluated based on a significant element of the response such as a series of words, as in a phrase, or by examination of key words present in a phrase or sequence of sentences to be provided as a response. The response unit 210 is provided with dual channel comparison to score responses based on observation of key words or on observation of full text. One of these channels is composed of the comparator 372, the register 376, and the multiplier 380. The other of these two channels is composed of the comparator 374, the register 378, and the multiplier 382. Both of these comparator channels operate in the same fashion.

The first comparator channel is employed for evaluating responses based on the presence of a key word. This is accomplished as follows. A member of the remote audience presses a key-word logic unit the keyboard 356 to alert the control logic unit 350 that a key word is to be entered. The key word is typed on the keyboard 356 which then places the key word in the buffer store 366 and, preferably, also presents the key word on the display 358 to ensure that the key word is spelled correctly. The buffer store 366, under control of

36

the logic unit 350, presents the key word to one input terminal of the comparator 372. The memory 332 presents the designated key word to the other input terminal of the comparator 372. The comparator 372 compares the designated key word with the response, and outputs a logic-1 signal to the register 376 to indicate a favorable comparison. If the key word of the response differs from the key word of the memory 332, then the comparator 372 outputs a logic-0 signal to the register 376. The memory 334 outputs a predetermined number of points of credit to the register 376 for an at least partially correct or acceptable response. The outputting of the logic-1 signal from the comparator 372 strobes the register 376 to receive the credit from the memory 334. The number of points of credit are outputted by the register 376 to the multiplier 380 to serve as a factor or coefficient in computing the score for a correct answer. The timing unit 336 outputs a further factor to the multiplier 380 based on the amount of time consumed to produce the response. The multiplier 380 multiplies together both the acceptable-answer coefficient and the time-consumption coefficient to output a product to the summer 384, which product is the score for the response. The amount of credit in the credit factor outputted by the timing unit 336 is dependent on the amount of time; in the event that a maximum time interval is exceeded, the timing credit is zero which results in a score of zero being outputted by the multiplier 380.

By way of alternative embodiments, it is noted that the multipliers 380 and 382 may be replaced with summers, in which case the score would be based upon the sum of the acceptable-answer coefficient and the time-consumption coefficient. The actual range of numerical values of the score will differ, depending on whether multiplication or addition of the acceptable-answer coefficient and the time-consumption coefficient is to be employed in the construction of the response unit 210. Either embodiment of the response unit 210 produces a readily understandable score; the embodiment to be employed is simply a matter of preference in desired range of score values.

In the same fashion, the comparator 374 compares a full text, as in a series of words composing a phrase, which text is compared by the comparator 374 against the text entered at the keyboard 356 by way of response. The corresponding scoring factors are applied by the memory 334 and the timing unit 336, respectively, to the register 378 and the multiplier 382. The comparator 374 strobes the register 378 to apply a scoring factor to the multiplier 382 to apply a scoring factor to the multiplier 382 to the summer 384. A sequence of scores outputted by the summer 384 in response to a sequence of responses to a task or game situation presented in the studio 204 are accumulated by the accumulator 386. The output of the accumulator 386 is the total score, which total score is inputted both to the dispenser 360 and to the scoring logic unit 370. The accumulator 386 is reset by the control logic unit 350 (at terminal R) in accordance with commands of the scoring mode signal. Thus, the total score outputted by the accumulator 386 may be the result of response to questions of a single task or of a sequence of tasks as may be commanded by the program host.

In the scoring logic unit 370, the total score is program memory 330. The scoring logic unit 370 outputs a command signal to the dispenser unit 360 when the respondent's score meets the response criteria or is in a designated range, and the dispenser 360 prints the total

37

score. Also, when the total score is within an acceptable range of score, the logic unit 370 directs the dispenser 360 to print a monetary award, or other designation of award on either the card 362 or the tape 364, and may activate a bell to signal success. Sounding of the bell may also be used to direct a respondent to begin the next task. Dispenser 360 may be designed for either one or both types of printouts. If desired, the tape or card may be perforated to allow a portion thereof to be retained by a contestant while the balance would be presented at a redemption center for an award. The award and other information, such as time limits for redemption, instructions to the merchant and a coded validation signal, are applied by the memory 330 to the register 368 for inclusion in the printout of the dispenser 360. By way of example, the validation signal may be encoded with the time of day and date of the television program and be combined with a number identifying the remote station or user. The identity of the remote station is supplied by an encoder 388 (which may a thumbwheel digital encoder) to the register 368 for inclusion within the printout of the dispenser 360. The buffer store 366 also connects to the register 368 to permit imprinting at least a portion of the actual response in a printout of the dispenser 360. Printers 390 and 392 within the dispenser 360 can provide for imprinting in the form of alphanumeric and symbolic indicia, or by means of bar code or color code. By way of example, the printers 390 and 392 may be constructed as dot-matrix printers. If desired, printer 390 may be constructed to output the printed message on a magnetic strip (not shown) of the card 362.

The keyboard 356 is provided with a "text" key as well as a "word" key to enable a respondent to answer in the text mode or in the key-word mode. By the inclusion of alphanumeric keys, as in a standard typewriter keyboard, a person may respond by entering key words or phrases. A respondent may answer a question in significantly less time than is allocated for the question, in which case the respondent may wish to indicate task completion before the full allotted time has elapsed, or before the host 212 (FIG. 6) tells the audience to proceed to the next question. In this case, the respondent pushes the "next answer" key or button on the keyboard 356 resulting in the transmission of a strobe signal along line 394 to an input terminal of the OR circuit 354 to restart the timing unit 336 for the next question and answer. Also, in the event that there is a choice of questions and responses, each at a different level of difficulty, the respondent employs the "difficulty level" button on the keyboard 356 to signify, via the control logic unit 350, to the program memory 334 that an answer of a designated difficulty is being attempted. Thereby, the memory 334 in conjunction with the timing unit 336 can provide proper scoring factors for various conditions of response such as accuracy and a shortening of the time interval set by the host. Generally, in determining the value of award to a successful contestant, some or all of the following factors are taken into consideration, namely, the quality of response as evidenced by accuracy, responsiveness, comprehension and comprehensiveness, as well as speed of response and difficulty level.

Normally, the difficulty level announced by the host will be "difficulty level one", with which a certain award is associated. Correspondingly greater awards may be announced for correct answers at higher difficulty levels. The choice of selecting such higher diffi-

38

culty level rests with the contestants and may, where a choice of subject matters is offered, be made after the host has announced the general subject matter or the nature of the next question.

After participating in a number of games or other projects, each of which has resulted in the awarding to the respondent of a prize or award of significant monetary value, it may be desirable to total the value of all of the awards for a grand total award. The accumulator 387 provides this function. The accumulator 387 is connected to the scoring logic unit 370 to receive success ones of the dollar amount of the respective awards, or other measure of value of the awards such as a credit toward free trips by an airplane or days on a cruise. The accumulator 387 sums the values of the successive awards and, upon demand from the scoring logic unit 370, outputs the grand total award via the logic unit 370 to the dispenser 360 to be imprinted on a hard copy record dispensed by the dispenser 360.

FIG. 9 shows details of the timing unit 336 of FIG. 8, the timing unit 336 comprising two counters 396 and 398, and two memories 400 and 402 wherein each of the memories 400 and 402 is preferably a read-only memory (ROM). The counters 396 and 398 are preset, as noted above, by signals from the program memory 334 of FIG. 8. The counters 396 and 398 count clock pulses supplied by the clock 352. Each of the counters 396 and 398 counts down from address, respectively, the memories 400 and 402. Output counts of each of the counters 396 and 398 also serve as address signals for operating the program memory 330. Counting by the counters 396 and 398 is initiated upon application of the start signal from the OR circuit 354, the start signal being outputted to the control logic unit 350. Each of the memories 400 and 402 is loaded with appropriate values of credit to be applied to responses, respectively, for key words or numbers and full text. For example, a question answered by a key word in ten seconds might receive a time credit factor of ten points, while a 20-second response time might receive only three points, and any response beyond a half minute might receive a zero points resulting in a zero score. It is noted that a count by either of the counters 396 or 398 from its preset value down to zero automaticallay terminates an allocated predetermined time interval and results in an outputting of zero score.

The foregoing circuitry allows the response unit to operate, if desired, by presenting a predetermined credit, based on time to respond and on accuracy of response by way of example, to a contestant at the time when a question is asked. Deductions in score are made for excessive time, incomplete answers or inaccurate answers, by way of example. This is accomplished by the counters 396 (FIG. 9) which count down with increasing time to address the memories 400 and 402 to output a time dependent credit. Inaccuracies effect the final score by virtue of the operation of the comparators 372 and 74 (FIG. 8). An incomplete answer, due to a failure to answer certain parts of a question, results in a reduced output from the accumulator 386.

With respect to the system and methodology of the invention, communication with the home audience by the normal television channels of electronic transmission includes signals broadcast on television frequencies via cable including fiber optics or satellite. A typical example in the propagation of such electronic signals would be that transmission to a communication satellite which, in turn, transmits the signals to ground receiving

**39**

sites adapted to send the signals either from broadcast stations over the air or via cable to cable subscribers. These signals include the first two signals of Group One mentioned hereinabove, namely the program and the task signals, received by the television receivers at each of the remote locations at which a television viewer is located. Encouragement of as many viewers as possible to participate is accomplished by allowing the television viewers to become contestants who participate in a quiz program or other audience-participation program on the spur of the moment and in the middle of a program wherein the participants win prizes.

A number of versions of the invention in the operation of a sweepstakes system will now be described. According to one embodiment, instructional signals transmitted to all remote locations include signals which, if matching, or bearing a correlation to, symbols on said hard copy record, qualify a participant for a special or sweepstake prize. If, for example, a coupon having previously provided alphanumeric or other symbols is issued to a participant who has entered an acceptable response, such participant qualifies for a sweepstake prize if the said symbols on such coupon are the same or have a correlation, namely, a defined relationship to certain sweepstakes symbols. The symbols on the coupon may be in the form of preprinted sequential numbers, and the sweepstakes symbols may be transmitted from a central location as part of the instructional signals directing the printer to print the sweepstake symbols. In that event, a successful contestant discerns immediately whether he or she has qualified for a sweepstakes prize. Alternatively, the sweepstakes symbols are provided to a place where winning records are redeemed, such as banks or supermarkets, and a person presenting a coupon for redemption learns only at this place and point in time that he or she has won a special prize or sweepstake.

The term "correlation" refers to a predetermined relationship of alphanumeric or other symbols provided on hard copy records and identifying sweepstake awards, whether or not such relationship is expressed in mathematical terms. Thus, the indicia identifying a winning coupon and a sweepstake award may be deemed to be correlated if they are identical or if they meet a predetermined mathematical formula or other definition. The specific correlation entitling a coupon holder to a sweepstakes prize may be known or discernible only at a redemption center. In such an instance, a contestant having been issued a winning coupon will ascertain whether or not a sweepstake prize has been won only after presenting a winning coupon at a supermarket or other redemption center.

Even if the sweepstakes symbols are transmitted to the home of a contestant and are immediately printed on a winning coupon, the following method may be employed to compel such contestant to visit a redemption center, such as a supermarket in order to ascertain whether he or she has won a sweepstakes prize. This is achieved by selecting and providing sweepstakes symbols which are not identical to the symbols of a winning coupon, but bear a previously identified relationship. As an example, if a stipulated percentage of a plurality of alphanumeric elements on a winning coupon matches the elements of sweepstakes symbols, a sweepstakes prize may be awarded. Such prize can be larger, if a larger number of elements comprising the award symbols is matched by the sweepstakes symbols.

**40**

In another modification of the method, the winning coupon symbols and the sweepstakes symbols may have no discernible relationship. Any desired correlation between the sets of symbols may be devised, such as a zero relationship, wherein the two sets of symbols have no common elements, or a previously defined formula may be employed wherein for example the symbols are numbers and the sweepstake number is half the winning coupon number.

Sweepstakes symbols determined at a central location may be provided electronically or otherwise to redemption centers, together, when required, with a formula for identifying an acceptable correlation with symbols on a winning coupon, thus identifying such a coupon as one qualifying for sweepstakes prize.

According to the method of the invention, the number of prizes awarded and their values are set by the sponsor of the program, and normally are set so as to optimize the financial return to the sponsor or broadcaster. Normally, in a quiz program, a plurality of tasks will be presented. Each task is formulated in such form that the task setting message may be electronically transmitted from the central location as the second signals or second set of signals of the aforementioned Group One to be received by the viewers at the remote locations. It is noted that all of the signals comprising Group One may be transmitted at the same time, such as by being part of the same pictorial presentation. A simple illustration of such presentation would involve a celebrity appearing before a television camera, holding a sign reading "Who am I?".

Typically, these tasks comprise questions to be answered by viewers who wish to become contestants. The tasks may differ with respect to fields of knowledge, memory skills and reaction speed, literacy, comprehension, expression and experience required, and other aspects. The time allowed viewers to respond to a task may vary. The task may take any form of questions including single-answer questions and multiple-part questions. The questions may also call for one or more multiple choice answers. There may be a requirement that, with respect to a specific task, a minimum number of responses must be provided by participants. The questions may also be open-ended in the sense that viewers can not completely answer a question within an allotted time, a practice common in aptitude tests. A task could, for instance, involve a listing of a large number of names or other data in response to a question to which the answers are more numerous than can be answered within the prescribed time. Normally, the host announces the period of time allowed for entering answers at the time a question is posed. At substantially the same time, the host or other person aiding in the program, may also announce or hint at the general subject area of the next question, the purpose of such announcement being to enable a contestant to elect a higher difficulty level to apply to a favored subject area. Thus, the response criteria may consist of a simple requirement to be met by a respondent, or may comprise a plurality of independently variable elements.

Questions may also be asked by a host in conjunction with television advertisements or "commercials". In such an event, a host or off-camera announcer may first direct the attention of the audience to the fact that the next question will deal with an aspect or feature of the product or service about to be displayed or offered. Awards may also be announced. This type of incentive will significantly increase viewers' attention and recall.

**41**

Questions may also be visually posed to the television viewers by displaying the questions on electronic boards or on other display means. Alternatively, the host may silently point to an advertised item of merchandise to insure that participants are paying attention to the television commercial, in which event a question may relate to such merchandise. The awarding of prizes to viewers who correctly answer questions relating to goods or services shown in a preceding commercial is believed to greatly enhance consumer recall.

It is noted that a question asked with reference to an offered item may call for no more than a simple mention of the specimen displayed, or of specific features thereof. There is little or no difficulty in responding to such question posed to the viewers, so that in effect, the viewers are simply verifying that they are tuned in to the desired program. This method can be employed when discontinued items, or "loss leaders", are intended to lead customers to a store, in which case more valuable prizes ar awarded for relatively easy answers.

The range of difficulty levels needs no specific limitation. As an illustration, one may consider the task of listing within a period of 20 seconds as many countries as possible that are members of the United Nations.

The award or prize won by a successful contestant is computed in accordance with the response criteria and the scoring basis or mode which may be formulated by the host or program conductor. As noted above, the response criteria and the scoring mode or basis are transmitted from a central station to remote locations through the response-criteria and scoring-mode signals of the aforementioned Group Two. Specific and different response criteria may be set for each question, and may include a different time period allowed for such response. The instructional group of signals, Group Two, conveys the data constituting an acceptable answer or range of answers, as well as the value of the award to be given a successful contestant based on the applicable difficulty level, the accuracy and completeness of the answer to be provided. The elements of the response criteria may be varied from question to question.

The instructional group of signals, Group Two, may also contain, as a subset, additional command signals such as the above-noted validation signal to permit certification and verification of an award claimed by a contestant or member of the remote audience. Such data typically consists of alphanumeric information appearing on the contestant's printout to facilitate verification, but may also consist of coded data or symbols which are machine-readable in the place of redemption.

The instructional group of signals may also contain, as another subset, further additional command signals addressed to the scoring circuitry, which additional signals convey data governing the issue of the printout and its terms, including place of redemption and time limitations. A printout from the dispenser 360 may also serve as a voucher to be exchanged for a ticket at a theater or sporting event.

The invention may be employed for conducting a sweepstake with results dependent on skill and knowledge of contestants. The printout provides a record of responses to insure that those who have successfully responded to an earlier question are properly responding to a later question. Awards for the sweepstake can be based on a selected difficulty level, so that those who are more knowledgeable get higher winnings.

**42**

As an example of various forms of programming which may be employed, questions are displayed on an electronic board seen by the television viewers. Alternatively, a question appears on a display board in the television studio and a plurality of numbered answers appear on a separate display so that a television contestant only needs to enter the number of the selected answer believed to correspond to an acceptable answer and to the response criteria. The latter type of visual presentation is particularly suitable for game shows involving multiple choice answers. Particularly successful, or otherwise selected participants, may engage in a personal dialogue with the host.

It is noted that members of the studio audience may also participate in the quiz program. In such event, one display may contain questions for the home viewing audiences, while the studio contestants may be asked a different set of questions. In such a situation, effectively, two separate quiz programs are being conducted substantially concurrently.

In conducting such television program, provisions may also be made to announce and/or display to the television audience information regarding awards that are to be won at different difficulty levels. This information may be provided before, during, or after the corresponding question has been asked, although it normally is made known to viewers at approximately the time that the question is asked. As an illustration, a split television screen technique may be employed wherein part of the screen displays information and/or pictures relating to the question being asked, and another part of the screen displays a table having tabulated information showing a relationship between difficulty levels, and available prizes or discounts from the base price towards the purchase of certain merchandise. If desired, a portion of the split-screen presentation may be hidden from the studio audience. The host announces the number of difficulty levels and the general subject area relative to each question. The host may also announce the base or minimum difficulty level applicable to a specific question so that each contestant has sufficient time to elect to respond under the conditions of the difficulty level set by the host or under conditions of a higher difficulty level. In accordance with the foregoing elected situations, requisite command signals of the instructional signal group, Group Two, are transmitted for directing the dispenser to print out such tabulated award data. Successful participants may be informed of the fact that they have won an award via the audio or video portion of the television signal, or by directing the dispenser to print out a message describing the award. The record or other signal by which a contestant is informed of the outcome of his or her response may be simply "award" or "no award" announcement, or a similar simple notification.

As a further feature in the construction of the invention, the scoring-mode signal generated at the keyboard 226 (FIG. 6) for use in the program memory 330 and scoring logic unit 370 (FIG. 8) may include a delay signal interposed by the host which delays operation of the bell as well as a printing out of notification of award by the dispenser 360 until after a determined time interval. This encourages contestants and viewers to continue watching the television program until the program, or a portion thereof, has been completed.

It is also noted that the card 362 with data encrypted by use of bar code or color code or magnetic recording can be machine readable. This permits use of the card in

5,227,874

43                                                              44

an automatic dispenser of merchandise at a store wherein such merchandise is dispensed. The dispensing machinery would include a well known card reader and verification circuitry which may operate with a personal identification number known only to the contestant to insure that the merchandise is dispensed to the correct person. It is also noted that the pertinent information can be given over the telephone to allow for purchases by mail.

Another interaction between members of the remote audience and the host is accomplished by means of the optional two-way communication afforded by use of the telephone circuit 280 (FIG. 6) in combination with the signal channels of the television transmission. For example, the host 212 may be a professor conducting a home-study course. The host presents a set of examination questions to home students via the television screen, and transmits various possible responses and scoring criteria via lines 346 and 348 (FIG. 8) to the response unit 280. Students may call in via the telephone circuit 280 to inform the host that the questions relate to material not yet fully covered in the course. The host then operates the keyboard 224 (FIG. 6) to reformat or modify the possible responses, transmitted via line 346, so that the students can give an acceptable response based on the material already covered in the course. In addition, the host operates the keyboard 226 to reformat the mode of scoring to provide a different distribution of score points for various key words and phrases. Further alteration in the mode of scoring can accomplished, by the host, by operation of the keyboard 226 to alter the amount of time allocated to each question. The difficulty levels stored in the memory 334 may also be altered or reformatted by the host so as to provide a curving of the score distribution to give extra credit to those students who studied course materials in advance of the present curriculum. The foregoing example in the teaching of a home-study course shows an aspect in the methodology of the invention in which a succession of instructional signals relating to designating acceptable responses and scoring criteria to be applied to responses may be transmitted from the central station 202 to remote receiving stations 206. In a general case, such a succession of instructional signals would be interleaved with communications from persons at the remote stations 206 to the central station 202 to enable the response criteria to be modified to fit the needs of the remote audience. This provides further interaction between the host and the remote audience. Similar interaction is possible between a person conducting research and members of a focus group or other sample populations. This type of interaction is helpful in eliciting consumer reactions in qualitative research and other reaction eliciting programs.

As a further example in the modification of scoring criteria, the studio audience and the remote audience may be engaged in a program for the development of foreign language skills. The host, in this case a language instructor, may submit a set of questions requiring responses in the form of phrases for describing situations depicted in a studio game. If members of the studio audience experience difficulty in answering the questions, then the host would use the keyboards 224 and 226 to modify the scoring criteria, before complaints from the remote audience arrive via the telephone circuit 280. In this example, a succession of instructional signals may be transmitted without direct interaction with the remote audience, and with modification of response criteria and/or scoring mode being based on response of the studio or external audience. In this way, the format of acceptable responses can be updated at the response units 210 in the remote stations 206 in anticipation of remote audience needs. The response unit 210 stores the modified scoring criteria in the memories 330, 332 and 334, the contents of these memories being updated with each transmission of an instructional signal. The operation of the response unit 210 in scoring answers entered by a contestant to a language development game, or other form of game, is based on the most recently transmitted instructional signal.

By way of further embodiment to the invention, it is noted that the tape 364 (FIGS. 6 and 8) outputted by the dispenser 360 of the response unit 310 may be imprinted with a bar code, as portrayed in FIG. 6. The bar code may be read by a scanner 404. The reading of the scanner 404 may be transmitted to a receiver 406 at the central station 202 via modems 408 and 410 connected to the telephone circuit 280. Further example in the communication from a receiving station at a remote location to a central station will be described with reference to FIG. 22 wherein information as to a person's response can be outputted from the response unit 210 as digital signals and transformed by a modem to a signal format suitable for transmission via a telephone circuit, such as the circuit 280. The use of modems and a telephone circuit serves as an example in the practice of the invention for communication electronically from a remote receiving station to a central station, it being understood that other forms (not shown) of electronic or electro-optical communication may be employed.

The foregoing examples in the use of the invention show that the system and methodology of the invention are adaptable to the needs of members of the remote audience. Adaptation can take place by interaction with members of the remote audience, as well as by anticipation of the needs of the remote audience based on observation of responses of the studio audience. This enhances the quality of audience participation, ensures better success in accomplishing the purposes of the television games, and elicits greater satisfaction on the part of both studio and remote audiences.

With reference to FIGS. 1 and 6, it is noted by way of alternative embodiments of the invention that the use of both audio and visual channels, and the use of both television and radio transmissions permits various transmission arrangements to be employed. For example, instead of employing one central television transmitter and one central radio transmitter, as shown in FIG. 1, a network of such transmitters can be employed for transmitting the program from the studio 14 throughout an entire country. In the case of the transmission of the instructional signal by radio, in a network transmission, individual radio stations might alter the instructional signals for different scoring criteria and rewards in different geographic areas while all geographic areas would receive the same television program and task-setting messages. By way of further variation of transmission arrangements, the voice signal of the announcer at the studio can be stopped, and replaced by voice signals at the radio transmitters of the various geographic areas to allow different task-setting messages to be generated audibly at the different geographic areas along with the different instructional signals at the various geographic areas. These variations of transmission arrangements provide a flexibility to the implementa-

5,227,874

45

tion of the invention so as to adapt the task-setting and scoring to needs of local areas.

It is also noted that the invention can be employed even in the situation wherein television may not be available to some members of the remote audience. With reference to the receiving station 16 of FIG. 1, in the absence of any television transmission (possibly due to mountains) or in the absence of television sets, the host 50 (FIG. 3) would describe audibly and fully the program situation by use of the microphone 56, and would also present the tasks audibly by the microphone 56. Thereby, both the audio description and the instructional signals would be transmitted by radio channel.

Also, the microphone 56 may be shut off in which case all task-setting messages would be indicated visually, as by signs and posters, on the television screens of the receiving stations. In this case, the audio channel would be used only for the instructional signals while the program would be conducted silently on the television screens.

Furthermore, the program can be conducted silently, as above, with occasional audio commentary and/or background music, a television format commonly employed by cable television news services. In this case the program and task-setting messages would be transmitted by television with visual presentation of the tasks by signs or posters with the microphone 56 being used only for the occasional comment and playing of background music.

The foregoing situation can be modified further by the substitution of the normal television program format by presentation of a television screen showing only lines of alphanumeric characters, similar to that of a printed portion of a magazine or newspaper. Such a format is used frequently in cable television news by broadcasts employing a channel known as an automated channel. With reference to FIG. 6, the automated channel can be implemented, by way of example, by use of a display system including a character generator (not shown) for generating the text, and a screen (not shown) for presenting the text in front of the camera 228 to be televised. Or the television signals may be generated by a suitably programmed computer (not shown). With respect to the implementation of the invention for broadcast of a quiz program by use of an automated channel, the following observations are noted.

Normally, automated channels are used in cable television to provide information in visual alphanumeric or graphic form, utilizing a character generator, and transmitting news updates, financial news, program guides, catalog-shopping and price information, weather information and the like. If computer type storage is provided at receiving stations, text displayed in this manner on screens at receiving stations may be scrolled in a desired direction. A voice or music audio portion accompanies the visual information.

The automated channel type of television broadcast lends itself well to the presentation of questions and falls within the scope of the present invention. A program of the type described, which soon will be available as HOMEQUIZ, a trademark of Response Reward Systems of Vero Beach, Fla., and may consist entirely of questions, or the questions may be interspersed with the types of information listed above. As an example, a question is displayed on the screens at remote locations for the period of time allowed for answering the question, after which the data entering devices do no accept contestants, responses. The correct of a series of accept-

46

able answers then appear on the screens for an interval of time enabling contestants to ascertain whether they have won an award as evidenced by a printout emitted by the dispenser. Alternatively, correct answers may be provided orally by a program conductor. Such broadcast requires only very limited studio facilities and is economical to produce. In this and other types of programs, the electronic equipment at remote locations can be very simple, providing only for "yes" or "no" answers, or can be as complex as is desired.

The type of question and answer broadcast on automated channels lends itself particularly well to education and research. In the field of education, after a time interval allowed for answering a question has expired, a correct answer may be provided orally or visually by the program host, and may be accompanied by extensive explanations and narratives. This method still enables students to mail or deliver examination papers dispensed to them by the electronic printer in the above-described dispenser to an educational institution conducting the test. Such examination forms have printed thereon each student's scored answers.

The use of automated channels permits the implementation of the methods described in a highly economical manner, particularly in the area of education of children. Incentives can be provided to children to take an interest in subjects to be taught by rewarding successful answers to questions which dispenses tokens, such as coupons, carrying an award of interest to children of the age group addressed. The increasing familiarity of children with computer keyboards makes the use of data entering devices a simple task. In the field of use of research, free-standing questions on automated channels may be interspersed with questions pertaining to research conducted. Some questions on automated channels are phrased so that the answers will provide statistically or otherwise meaningful responses, while other questions contain a challenge inherent in answering such a question. For example, a question may require personal judgment, special knowledge, or characterization.

As a further example, a demographic researcher may intersperse between questions regarding respondent's income and expenditures the question "What is the average annual per capita income in your county?". A successful respondent wins an award in order to encourage wider participation in such a survey. In market research, the ability to leave a printed text on a cable television screen for a period of time, and to accompany a question with an oral explanation will not only make respondent's answers to such questions easier and therefore more reliable, but will make the conducting of surveys or automated channels a very economical method of reaching unprecedented numbers of respondents.

The methods and systems described above may advantageously be employed to attract television viewers to interactive programs, sometimes referred to as "Videotex" programs, in which prerecorded listings and information pertaining to merchandise and services are displayed on the TV-screens of viewers.

Typically, in the operation of such programs, prerecorded listings of available products would be televised and displayed on the TV-screens of remote viewers. The homes of such viewers would be wired, permitting individual ones of said viewers, utilizing well-known means for electronically transmitting signals to a central receiving station, to indicate a category or item of mer-

47

chandise or services of particular interest, regarding which a viewer wishes to receive additional information. Such interactive means may transmit viewers request signals over wires or over the air. The additional information may include pictures of merchandise selected, prices, costs, performance characteristics, capacities, capabilities, sizes, colors, accessories, warranties and descriptions. Viewers might also select listings of product groups, similar products within a specified price range, products offered by one company or in one retail outlet, or firms offering a specified product within a geographic area. A request for more detailed information may, for example, produce a full page of specifications, along with a picture or pictures of one specific item of merchandise.

In a typical embodiment of implementing such a method, a manufacturer of goods or a supplier of services is given the opportunity to contract with the producer of an interactive broadcast program for the insertion of questions among the product data and offerings comprising the television program. Such questions can for example be interspersed between announcements pertaining to products offered by suppliers. The knowledge on the part of TV-viewers that meaningful prizes will be awarded for satisfactorily answering questions will result in attracting additional TV-viewers. Commercials by suppliers of products may be inserted into the listings and questions may relate directly to the commercial shown, which commercial may be a still photograph, A question may follow such a commercial. TV-viewers may be informed prior to the commercial that a question will follow the next commercial and will deal with the commercial. This technique will ensure that the television audience will pay close attention to such a commercial, especially if a valuable prize may be won at one of the aforementioned difficulty levels. Thus, the method described can be a potent advertising and promotional tool in the context of such an interactive program. Prizes awarded TV-viewers may be discounts on the products offered during the show.

Frequently, in television programs listing items of merchandise and services available to viewers, sometimes referred to as Videotext, interested viewers who are potential buyers have the opportunity to request additional or supplemental information over cable connections such as cable or telephone connections used for home computers. The purpose of such additional information is to help potential buyers make up their minds whether the item is of interest. Additional listings requested can be progressively more detailed and can provide information of interest pertaining to an item of merchandise or services, such as information where such merchandise or services may be obtainable, alternatives and competitive items and specifics such as prices, size, colors, capacities, performance, and other related information. It is in the interest of the producers of such shows which are frequently sponsored by advertisers, to induce viewers to call up additional information in the form of lists, specification sheets, pictures and other pertinent data. It therefore is an object of the method described to hold viewers interest and to induce them to request more detailed and specific information which may lead to a purchase decision. To achieve this, one or more questions are interspersed in successive presentations of said items of merchandise or services. The method follows and employs the steps enumerated in connection with the methods hereinbefore described. The question and the response criteria, as well as the

48

ultimate answer to such a question are transmitted over the cable connection used in the television transmission.

In order to further induce participation in such television shows, the methodology of awarding prizes can be based on the required accumulation of credits for acceptable answers, i. e. on the requirement that, in order to win a prize, a participant must enter an acceptable answer to two or more questions. In such an instance, if a viewer answers a question correctly, the credit for such an acceptable answer is computed and stored at a viewer's remote location. If the producer of the show has determined that more than one acceptable answer is required to win a prize, viewers are informed, as part of the television program, that either a certain number of acceptable answers must be entered or that a certain cumulative total of credits must be earned to qualify for a prize. The scoring mode in this instance provide for coefficients in computing a total score which becomes progressively larger with each subsequent question. For instance, a viewer who continues to watch the program and ultimately answers three questions in an acceptable fashion, which can only be accomplished having called up at least two additional presentations of the offer, may win ten times the amount of the prize that would have been won for answering only the first of the three questions correctly.

The system provides for storing and accumulating credits for acceptable answers until either the end of the program or until either the end of the program or until the total number of questions has been reached. The producer of the show may announce to the viewers at any stage of the program how many questions will be asked and what scoring mode will be employed in the event more than one question is answered, including additional credits earned by answering questions at higher difficulty levels.

By way of further example, a television game show is conducted by another method providing at a central location the previous described transmitting facilities and providing at TV-viewers' remote locations response units, including comparison and scoring circuits with provisions for allocating credits at different difficulty levels. A plurality of questions is asked in the course of the show, acceptable answers being defined by response criteria at a basic difficulty level and at least one higher difficulty level, at which an acceptable answer earns a larger number of credits. Negative credits are allocated to answers not meeting the response criteria at a higher difficulty level elected, even if doing so at a lower level.

The method is further characterized by not instantly awarding prizes for each accepted answer, but to accumulate credits for all of the accepted answers entered by a TV-viewer in the response unit, based on the scoring mode which allocates a predetermined number of credits to each acceptable answer at the applicable difficulty level. A TV-viewer, by not specifically electing a higher difficulty level, in effect elects to respond at the basic difficulty level. Individual ones of the TV viewers are informed of credits earned or lost and also are informed of the monetary value of credits. At the end of the question and answer period, a recording device in the response unit provides winners with a record of total credits, which record may be a printed token, such as a coupon, or may be a magnetized card.

The method provides for penalizing a contestant for not answering or for unacceptably answering a question, irrespective of the difficulty level by deducting

5,227,874

49

50

credits determined in accordance with the scoring mode from the accumulated credits of such viewer. The response criteria may be transmitted as an unobtrusive portion of the TV-signals, by optical means, over voice channels, or other means. The total number of credits earned by a viewer and a verification number or code provided on said record in accordance with instructional signals transmitted as fourth signals, may be phoned in by a contestant and the host announces a winner or winners near the end of the show.

FIGS. 11-18 disclose an alternative system of the invention wherein material generated at the studio of the central station is recorded for later playback to one or more receiving stations. By way of example, the receiving stations may be located in hotel rooms or at desks in a classroom wherein the program deals with educational material. As further examples, the receiving stations may be located at seats in a vehicle of public conveyance such as an aircraft, or in an auditorium. The receiving stations may be equipped with television receivers in which case the recording may be a video recording in the form of the widely-used video cassette recording. The sound portion of the program would be heard by earphones. Alternatively, the receiving stations may be equipped for audio playback only, as by use of earphones in an aircraft, in which case the program at the studio must be formatted by audio description of the task so as to adapt the program for audio recording. In the case of the video recording, the circuitry employed at the central station and at the receiving station, as disclosed in the foregoing embodiments of the invention, may also be employed in this embodiment of the invention. In the event that an audio-only recording is to be utilized, then the equipment of the central station and of the receiving stations must be modified slightly so as to accommodate this embodiment of the invention modified for audio-only. In the case of a video recording, the video signals include synchronization signals which ensure that a playback of the recording is an accurate representation of the original program. However, in the case of an audio-only recording, the system of the invention is modified, preferably, to include a synchronization signal to insure accuracy of a playback even if the playback recorder speed differs somewhat from the recorder speed during the recording of the program.

In the ensuing description, FIG. 11 shows the use of a prerecorded edition of a program performed in a studio as disclosed above in FIGS. 1, 3, 6 or 7. The receiving stations of FIG. 11 are equipped for a video playback or an audio-only playback. FIG. 12 shows a system employing equipment, previously described in FIGS. 6 and 8, by way of example, to provide a video playback to the receiving stations of FIG. 11. In FIGS. 13 and 14, there is disclosed an alternate system for providing an audio-only playback to the receiving stations of FIG. 11, the system of FIGS. 13 and 14 also employing the equipment previously disclosed in FIGS. 6 and 8, but including further the addition of a fixed-frequency tone, $F_3$, for use as a synchronization signal and which is located in the upper end of the audio spectrum along with the frequencies $F_1$ and $F_2$ previously disclosed in FIG. 10. FIGS. 15, 16 and 19 show a further modification of the audio-only system wherein the scoring and response criteria signals of FIGS. 6 and 8 are transmitted as unintelligible burst code signals between intelligible voice signals, rather than by modulation of the scoring and response criteria signals on set carrier frequencies as disclosed in FIG. 10. FIGS. 17, 20 and 21 show a further modification of the audio-only system wherein voice signals, a synchronization signal, and the storing and response criteria signals may be transmitted simultaneously on separate tracks of a recording medium. With either the video or audio-only recording and playback, it may be desirable to employ a central dispenser of hard copy of respondents' answers as at a central console disclosed in FIG. 11; a system for connecting individual response units to the central dispenser being disclosed in FIG. 18. The systems of FIG. 11-20 will now be described in further detail.

With reference to FIG. 11, there is shown an aircraft cabin 500 provided with receiving stations 502 and a central console 504. While numerous receiving stations 502 may be present in the cabin 500, three such stations are shown by way of example. FIG. 11 also shows a floor 506 and a vertical partition 508 of the cabin 500. Each receiving station 502 comprises a seat 510 supported by legs 512 upon the floor 506. The partition 508 separates the console 504 from the stations 502.

The console 504 includes the television system 220 and viewing screen 208, described above with reference to FIG. 6, and the dispenser 360 described above with reference to FIG. 8. Included with the dispenser 360 is electrical circuitry 514 which includes a digital communication system 516 (FIGS. 11 and 18) which connects the dispenser 360 to the receiving stations 502. The screen 208 permits an aircraft attendant to monitor the program being played back for passengers sitting in each of the receiving stations 502. The program is recorded initially by a video cassette recorder 518 (including a playback capacity), also shown in FIGS. 3 and 6, connected at an input to the television system 28 or the television system 220 for providing video recordings of the program produced at the central station 12 (FIG. 3) or the central station 202 (FIG. 6). If desired, the recorder 518 may be connected to an output of the central station 12 or 202. Alternatively, the recorder 518 can be formed in a more simple fashion without the need for demodulation and modulation circuitry if the recorder is to be connected to the output terminal of the combiner 70 (FIG. 3) or the combiner 238 (FIG. 6). With the alternative form of recorder, playback is accomplished by connecting output terminals of the recorder directly to the television station 208 and to the speaker 270 in FIG. 6.

In the case of an audio-only recording, an audio recorder 520, which includes a playback capacity, would be connected to the output terminal of a summer 236A as will be described with reference to FIG. 13. Either the recorder 518 or the recorder 520 is to be employed with the console 504 in FIG. 11, depending on whether a video or audio-only recorder is to be employed. By way of example, the video recorder 518 is shown in FIG. 11 connected by an input cable 502 to an input terminal of the television system 220. Knobs 524 are provided on the console 504 for operation of the television system 220 and for selection of operating functions of the dispenser 360.

Each receiving station 502 further comprises a television screen 208A which is mounted upon the back of a seat 510, or on the partition 508, for viewing by a passenger sitting in a seat 510. The screens 208A function in the same fashion as does the screen 208. The mounting of a screen 208A to the back of a seat 510 may be accomplished by means of a swivel mount 526 which enables the screen 208A to be swung to a stowage posi-

5,227,874

51 52

tion conveniently located away from a passenger. The screen 208A is employed only for the video playback, and is not needed for an audio-only playback. Also included within each receiving station 502 is a dispenser 210A which employs components previously disclosed in the description of the response unit 210 of FIG. 6, and may be modified as will be described hereinafter to facilitate its use in a receiving station 502. Also provided in each of the receiving stations 502 is a set of earphones 528 by which a passenger listens to the audio portion of the program produced at the central station 12 (FIG. 3) or 202 (FIG. 6).

The earphones 528 are connected to the TV system 220, in the case of a video playback, in the same manner as is the speaker 270 (FIG. 6) or, connected to the TV system 28 (FIG. 3) as is the speaker 86. This interconnection will be described in further detail in FIG. 12. The TV screens 208A are connected electrically via coaxial cable 530 to the TV system 220. Connection of the console 504 to the earphones 528 is made by an electrical line 532, the line 532 being connected via an armrest of a seat 510 to the corresponding earphone 528. Signals for activating the response unit 210A in each of the stations 502 is provided by an electric line 534 which connects with the console 504, connection of the line 534 being made by way of the armrest of a seat 510 to the respective response unit 210A. Both the earphones 528 and the response unit 210A are connected via flexible lines 536 and 538, respectively, to an armrest of a seat 510. The line 538 is an electric line, while the line 536 may be either an electric line or an acoustically conducting tube, connected by a transducer of electric to sonic signals in the armrest, as is frequently employed in passenger aircraft.

The connections of the screens 208A, the earphones 528 and the response unit 210A to the T.V. system 220 of the console 504 are disclosed further in FIG. 12. Therein, it is seen that each of the earphones 528A is connected in parallel to the speaker 270 so that a passenger can hear in the same fashion as was disclosed for a respondent in the description of FIGS. 3 and 6. Similarly, the screens 208A are connected in parallel with the screen 208 to enable a passenger to view a televised program in the same fashion as was described for a respondent with reference to FIGS. 3 and 6.

Each of the response units 210A is connected via the two lines 346 and 348 to the TV system 220 in the same fashion as was disclosed for connection of the response unit 210 to the television system 220. In this way, in the viewing of the program, the listening to the host of a program, and the entering of responses is accomplished in the cabin 500 in the same fashion as was disclosed for respondents at the remote receiving stations disclosed hereinafter with reference to FIGS. 3 and 6. The connection of the video recorder 518, during playback, is the same as was disclosed with reference to FIGS. 3 and 6 during a recording mode. FIG. 12 also shows that a response unit 210 may be connected, if desired, to the TV system 220 in the console 504 to enable the attendant to practice responses along with passengers who are playing TV games. Alternatively, if desired, the response unit 210 may be deleted from the central console 504. It is noted also that the screens 208 and 208A and the interconnecting cable 530 would not be employed in the case of an audio-only playback of the program of the central station 202 (FIG. 6).

By way of alternative embodiment, it is noted that recording/playback apparatus, such as the recorder 518

could be combined with a response unit 210A in the manner of a small, portable unitary structure to allow a person to play a game or other subject matter privately at a location of convenience. A similar, but larger, unitary structure is provided, as discussed above, in the connection of the response unit 210 to the TV system 220 in the console 504 for enabling the attendant to practice responses along with passenger who are playing TV games.

In a typical embodiment of the invention, a video tape is employed to display a map of the general area over which a plane is flying. An accompanying audio message provides questions to passengers wishing to participate, the questions pertaining to the geography, topography, demography, history, industry, resorts, sports and any other aspect of the region. It is an advantage of this method that the ground does not have to be visible to passengers, who will see the ground by video-tape presentation. Such programs can be sponsored by groups interested in promoting one or another aspect of natural or man-made resources of the area, such as Chambers of Commerce, historical societies, resorts, airlines, commercial sponsors, tourist offices of states and the like. A plurality of audio tapes pertaining to the same map, but containing different questions, may be prepared and used alternatively. Other variations and combinations may be devised.

In the foregoing embodiment, the video or audio tape serves as the recording medium upon which the program, tasks to be performed, appropriate answers against which responses are to be gauged, and scoring criteria are stored. However, in the practice of the invention, it is contemplated that other forms of data storage may become available to serve as the storage medium, such as optical discs and electronic circuitry such as a read-only memory.

According to another embodiment, each passenger is given a printed topographic map, which may or may not be of the region over which a plane flies or through which a mass transportation vehicle is traveling. Audio questions pertaining to the names or any other features not shown on the map have been prepared and stored on alternative tapes. The audio questions are received through headsets. Travelers responses can be marked on the maps, which can be evaluated and scored as described in the context of educational tests. Alternatively, contestants may enter their answers on a keypad, and the individual answers are evaluated and scored as described hereinabove. The methods described can easily be adapted for use in a variety of public locations, such as hotel rooms, restaurants, game arcades, auditoriums, trains, buses, and airplanes.

With reference to FIGS. 13 and 14, there is shown a modification of the central station 202 (FIG. 6) and the interconnection with the response unit 210 (FIG. 6 and 8) which enable the response unit 210 to operate with an audio-only recording of the program provided in the studio of the central station 202. The single host 212 of FIG. 6 is replaced in FIG. 13 with an announcer 540 and an instructor 542. The announcer 540 provides a verbal description of a scene in the studio, such as a description of the specimen 214 (FIG. 6) by speaking into a microphone 230A. This verbal description takes the place of the televised picture provided by the camera 228 (FIG. 6). The instructor 542 (FIG. 13) explains the task and instructions for responding to the studio situation by speaking into a microphone 230B. It may be advisable, in order to facilitate response by respondents

53                                                                    54

in the aircraft cabin 500 (FIG. 11) to employ both male and female voices at the microphones 230A–B so that a respondent can more readily distinguish between a description of the scene and an instructional message. For example, the instructor 542 may be a male and the announcer 540 may be a female. Electric signals outputted by the microphones 230A–B are combined together in a summing amplifier 544 and applied to an input terminal of a summer 236A which functions in the same manner as the summer 236 of FIG. 6. Also included in the system of FIG. 13 are the keyboards 224 and 226 of FIG. 6, as well as the signal processors 232 and 234 of FIG. 6. In FIG. 13, an output terminal of the summer 236A connects with an input terminal of the audio tape recorder 520 for recording the verbal messages of the announcer 540 and the instructor 542. The tape recorder 520, in this embodiment of the invention, may employ a recording medium having only a single recording track.

In the central station 202 of FIG. 6, oscillators 242 and 244 were employed to provide reference signals at frequencies $F_1$ and $F_2$ for operation of modulators 252 of the signal processors 232 and 234. Additional oscillators 236 and 278 were employed in the TV system 220 (FIG. 6) to provide the corresponding reference signals for demodulation of the response and scoring criteria signal. However, in the audio-only system of FIGS. 13 and 14 wherein the playback speed of the tape recorder 520 may vary during playback from the speed employed during recording, it is desirable to synthesize the reference signals at the frequencies $F_1$ and $F_2$ from a single reference signal recorded on the recording medium. Thereby, demodulation is accomplished accurately independently of playback speed. The single reference signal which serves to synchronize the playback and recording functions is provided by a clock 546 (FIG. 13) and a filter 548. The clock 546 outputs a periodic train of rectangular clock pulses, which clock pulse train is filtered by the filter 548 to transform the pulse train into a sinusoidal waveform at the pulse repetition frequency of the pulse train. This frequency is designated $F_3$ in the drawing.

The system of FIG. 13 further comprises frequency divider 550, a mixer 552, and two filters 554 and 556. The frequency divider 550, which may include a pulse counter (not shown), operates in a well-known fashion to output a pulse train at a lower frequency, designated $F_d$. The signals at the frequencies $F_3$ and $F_d$ are applied to input terminals of the mixer 552 to output signals at the sum and difference frequencies, these signals being captured by the filters 554 and 556 to provide the reference signals at the frequencies $F_1$ and $F_2$. The frequency $F_d$ is equal to the difference of frequency between the frequency $F_3$ and either of the frequencies $F_1$ and $F_2$. The signals at the frequencies $F_1$ and $F_2$ are applied to the processors 232 and 234 which operate in cooperation with the keyboards 224 and 226 to output coded modulated signals to the summer 236A in the same fashion as has been described earlier with reference to FIG. 6. The synchronization signal at frequency $F_3$ is also applied to an input terminal of the summer 236A. These signals are summed together along with the signals of the microphones 230A–B to provide a composite signal which is outputted by the summer 236A and recorded on a recording medium of the recorder 520.

In FIG. 14, a receiving system 558 interconnects a response unit 210 with an output terminal of the audio recorder 520. The receiving system 558 of FIG. 14 takes

the place of the TV system of FIG. 6 in providing an interconnection between the response unit 210 and a televised signal received at either the antenna 282 or from the video recorder 518. In FIG. 14, the receiving system 558 employs the synchronization signal at frequency $F_3$ to regenerate the reference signals at frequencies $F_1$ and $F_2$ for use by the demodulators 266 and 268. Both the receiving system 558 and the TV system 220 include the band-pass filters 272 and 274 and the demodulators 266 and 268 which function in the same manner in both the TV system 220 and the receiving system 558. In FIG. 14, the receiving system 558 further comprises the filters 548, 554, and 556, the frequency divider 550 and the mixer 552, all of which have been described previously with reference to FIG. 13. Also included in the receiving system 558 is the speaker 270 which has been described previously with reference to the TV system 220 of FIG. 6.

In operation, an output signal of the recorder 520 is applied simultaneously to the filter 548, to the filters 272 and 274 and to the speaker 270. The filter 548 extracts the synchronization signal at the frequency $F_3$ from the composite signal outputted by the recorder 520. The filters 272 and 274 extract the spectral bands of the response and scoring criteria signals, respectively for applying the signals to the demodulators 266 and 268, respectively. An output signal of the filter 548 is applied as the synchronization signal for operation of the response unit 210, and is also applied to the frequency divider 550 and the mixer 552. The frequency divider 550 operates to provide the lower frequency $F_d$ to the mixer 552 which outputs sum and difference frequencies to the filters 554 and 556 to attain the reference signals at frequencies $F_1$ and $F_2$. By way of example, in the construction of the frequency divider 550, a division ratio of 40 may be employed such that, by way of example, if the frequency $F_3$ has a value of 20,000 Hz, then $F_d$ has a value of 500 Hz and the frequencies $F_1$ and $F_2$ are separated by 1,000 Hz. The division ratio of 40 is given only by way of example, it being understood that other ratios may be selected in accordance with desired spectral bandwidth and separation of the response and scoring criteria signals. The reference signals at the frequencies $F_1$ and $F_2$ are employed by the demodulators 266 and 268 in the same manner as was described with reference to FIG. 6 for outputting the response and storing criteria signals on lines 346 and 348, respectively, to the response unit 210. The response unit 210 and the speaker 270 may be located in the console 504 of the aircraft cabin 500 (FIG. 11) if desired for convenience of an aircraft attendant, but need not be provided in the console 504 insofar as the practice of the invention is required. For simplicity, the response unit 210 and the speaker 270 have been omitted from the console 504 in FIG. 11. In FIG. 14, output signals of the receiving system 558 are provided along lines 532 and 534 respectively to the earphones 528 and response units 210A at the receiving stations 502 of the cabin 500. The audio recorder 520 may be provided with a speed control knob 560 so as to match the playback speed to the recording speed for accurate reception of the voice signals from the speaker 270.

During playback of the game program of the aircraft cabin 500, the announcer 540 provides a detailed description of the scene in the studio. The instructor 542 asks the questions and sets an interval of time for response. During the response interval, neither the instructor 542 or the announcer 540 are speaking. Thus,

5,227,874

55

there would be the absence of any sound during the response interval, which situation might possibly confuse a respondent as to whether or not his earphones were still operative. Accordingly, it may be desirable to play softly background music from a music source 562, such as a tape recorder, the music being received by the microphones 230A and 230B for transmission to the respondents. Either the announcer 540 or the instructor 542 may operate the keyboard 224 and 226.

In FIG. 6, a telephone circuit 280, as has been described previously, serves as a means for interaction between a respondent and personnel at the central station 202. Also, in the case of FIG. 11 with the recorded playback in the aircraft cabin 500, a form of interaction is possible. Such interaction is attained by a respondent commenting to a flight attendant that the questions are too hard, or that the response intervals are too short, or that further description of the specimen 214 (FIG. 6) is required. The flight attendant then responds by replaying a portion of the recorded program to provide the additional description, or, alternatively, advances to another portion of the recording medium to provide for simpler questions. As a further alternative, the flight attendant may insert another audio tape cassette into the recorder 520 to provide a further version of a recorded program in which longer response intervals have been provided, or wherein other forms of questions have been provided.

FIGS. 15 and 16 show an embodiment of the system wherein encoded response and scoring-criteria signals are transmitted as rapid bursts of sound, which are unintelligible to a respondent. The burst of sound is transmitted between intervals of speaking by the announcer 540 and the instructor 542. A time sequence demonstrating the transmission of such response and scoring criteria between spoken messages of the announcer 540 and the instructor 542 is presented in the timing diagram of FIG. 19. The system of FIG. 15 includes the two microphones 230A and 230B, the summing amplifier 544 and the keyboards 224 and 226 which have been described with reference to FIG. 13. Output signals of the keyboard 224 and 226 are applied respectively to encoders 248A and 248B which function in the manner described for the encoder 248 of FIG. 6. The encoders 248A and 248B also incorporate identifying signals for digital words to distinguish between response criteria of the keyboard 224 and the scoring criteria of the keyboard 226. The identifying digital words are attained from digital signal sources 564 and 566, respectively. Output signals of the encoders 248A–B are applied to memories 568 and 570, respectively.

The system of FIG. 15 also includes the clock 546 and the filter 548 which function in the manner previously described with reference to FIG. 13. Two read-out circuits 572 and 574 connect between an output terminal of the clock 546 and input terminals respectively of the memories 568 and 570. The memories 568 and 570 may be constructed as shift registers or random-access memories. Each of the read-out circuits 572 and 574 is responsive to clock pulses of the clock 546 for reading out data store in respective ones of the memories 568 and 570 at a rapid rate, for example, 1200 bytes per second wherein each byte is composed of eight bits in a well-known fashion as is commonly employed by modems in the transmission of computer signals over telephone lines. Such digital signals are clearly audible but unintelligible to a person listening to a telephone line carrying the signals. Answers to questions can be

56

given in a relatively few seconds, the transmission of which may be divided up among several bursts each of which is less than one second duration. Similarly, scoring criteria can be transmitted via a relatively few number of short-duration bursts of the coded signals.

The bursts of data transmitted from the memories 568 and 570 are coupled via a section 576A of a switch 576 to a summer 236B which functions in the same manner as the summer 236 in FIG. 6. Switch section 576A is operative to select alternatively output voice signals of the summing amplifier 544, output data of the memory 568 or output data of the memory 570. A second section of the switch 576, namely section 576B, is ganged to the section 576A to be operative therewith for activating one of the readout circuits 572 and 574. Activation of a readout circuit 572 or 574 is accomplished by grounding a control terminal of the readout circuit by the switch section 576B. The switch 576 is operated either by the instructor 542 or the announcer 540 when either one of them pauses in speaking. An earphone 528 connected to an output terminal of the summer 236B enables the instructor 542 or the announcer 540 to hear the burst code sound so as to operate the switch 576 upon completion of a data burst. The synchronization signal outputted by the filter 548 is also applied to an input terminal of the summer 236B. The output signal of the summer 236B is applied to the audio recorder 520 for a recording of the audio addition of the program.

FIG. 16 shows interconnection of an output signal of the audio recorder 520 with a response unit 210B which is a modification of the unit 210 adapted for receiving the response and scoring-criteria signal within a common spectral portion of the audio band. Also included within the system of FIG. 16 are a low-pass filter 578 and a high-pass filter 580. The two filters 578 and 580 separate the relatively high frequency synchronization signal from the data-burst signal outputted by the memories 568 and 570. The data-burst signal is coupled via the low-pass filter 578 to the response unit 210B. The input circuitry of the response unit 210B is similar to that of the response unit 210 of FIG. 8 in that four decoders are employed. However, in FIG. 8, the four decoders connect with data on two input signal lines 346 and 348 while, in the case of the system of FIG. 16, all of the decoders are coupled to a single input data line 582. In the response unit 210B, the four input decoders 338A, 340A, 342A, and 344A operate in the same fashion as the corresponding decoders 338, 340, 342, and 344 of FIG. 8; however, the decoders 338A, 340A, 342A, and 344A of FIG. 16 also are responsive to the identifying words obtained from the digital source 564 and 566, (FIG. 15) to identify signals as being response or scoring-criteria signals. Data signals outputted by the low-pass filter 578 and the synchronization signals outputted by the high-pass filter 580 are applied via line 534 to the response unit 210B in the same fashion as has been described earlier with respect to the response units 210A of FIGS. 12 and 14. Audio signals outputted on line 532 from the recorder 520 are applied to the earphones 528 in the same fashion as has been described above in FIGS. 12 and 14.

Synchronization of the response units 210, 210A and 210B are accomplished, as shown in FIG. 8, by applying synchronization signals to an input terminal of the clock 352. In the absence of the synchronization signal, the clock 352 is a free-running clock. However, in the presence of the synchronization signal, an output pulse train of clock pulses of the clock 352 is generated in

synchronism with the synchronization pulse. FIG. 17 shows the use of an audio tape recorder 520A having a recording tape medium with a plurality of recording tracks thereon. The stylized representation of the recorder 520A includes four recording/playback heads 584 connected respectively to upper terminals of the summing amplifier 544, the clock 564, the encoder 248A, and the encoder 248B which have been described above with reference to FIG. 15. Each of the heads 584 is located above a corresponding recording track 586 in a tape recording medium 588. The medium 588 is rolled upon a roll 590 driven by a transport (not shown) for passing the medium 588 beneath the heads 584. Playback circuitry 592 connects with the heads 584 and to the transport for operating the recorder 520A to play back recorded signals.

The signals played back are outputted by the circuitry 592 to the earphones 528 (one of which is shown in FIG. 17), and via lines 346 and 348 and the synchronization signal line to the response units 210A (one of which is shown in FIG. 17). Herein, the response-criteria signal and the scoring-criteria signal have been recorded on separate tracks so as to be coupled via lines 346 and 348 to the response unit 210A. Similarly, separate tracks are employed for the synchronization signal and the voice signals. The use of the four separate tracks 586 permits the voice signals outputted by the amplifier 544, the synchronization signal of the clock 564, the response criteria signal outputted by the encoder 248A, and the scoring criteria signal outputted by the encoder 248B to be transmitted during time intervals which are independent of each other, including a combination of both serial and concurrent transmissions. This is demonstrated in the timing diagram of FIG. 20 in which the synchronization signal at the second trace of the graph is shown to be continuously present while the response and scoring criteria signals, respectively in the third and fourth traces of the graph, overlap the transmission of the verbal description of the scene and the instructions.

FIG. 18 shows circuitry of the response unit 210A which permits the response unit to communicate via the digital communication system 516. The response unit 510A has the same components as the response unit 210 and operates in the same fashion as the response unit 210, except for the inclusion of the additional circuitry of FIG. 18. The additional circuitry of FIG. 18 may also be included within the response unit 210B. Comparison of FIGS. 8 and 18 show that the dispenser 360 receives input signals from the register 368, the scoring logic unit 370, and the accumulator 386. The additional circuitry comprises a memory 594, a modem 596, a decoder 598, and read-out circuitry 600.

In operation, the memory 594 stores the signals of the registers 598, the scoring logic unit 370, and the accumulator 386. The stored signals are subsequently read out, upon command of the read-out circuitry 600 to the modem 596 which converts the signals into a form suitable for transmission via the communication system 516. The modem 596 operates in both directions, namely, to transmit signals from the memory 594 into the communication system 516, and to direct command signals from the communication system 516 to the decoder 598. By command of the communication system 516, the decoder 598 identifies the command as applying to the response unit 210A at a particular seat 510 of the cabin 500 (FIG. 11), and then directs the read-out circuitry 600 to initiate a reading out of the stored data from the

memory 594 via the modem 596 into the communication system 516.

Also included in the circuitry of FIG. 18 is a modem 602 and a buffer store 604 which comprise a part of the circuitry 514 of the console 504 (FIG. 11). Signals traveling from response units 210A of the receiving stations 502 via the communication system 516 are applied to the modem 602 which reforms the signal into a form suitable for storage in the store 604, after which the signals are applied to the dispenser 360 in the console 504. The buffer store 604 allows the signals received from remote response units 210A to be stored until the dispenser 360 is available for printing hard copy of the results of responses entered into the respective response units 210A at the receiving stations 502. Also, the buffer store 604 allows the signals received from the remote response units 210A to be outputted to the dispenser 360 at a rate commensurate with the operational characteristics of the dispenser 360, which rate may be different from a rate at which signals are communicated via the communication system 516.

Thereby, the circuitry 514 including the digital communication system 516 enables a common central dispenser 360 at the console 504 to be employed for printing out a hard copy of the responses produced at the various receiving stations 502. By use of the central dispenser 360 at the console 504, the apparatus of the response unit 210A at each of the receiving stations 502 may be simplified by deletion of their respective dispensers 360. The deletion of the dispensers 360 from the individual receiving stations 502 simplifies the complexity and physical size of each response unit 210A, and may also reduce the cost of the installation, particularly in aircraft having many receiving stations 502.

A further advantage of the embodiments of the invention employing a prerecorded program is that various versions and formats of the program may be recorded. Thus, a recording with difficult-to-answer questions and a recording with easy-to-answer questions can be prepared. Questions involving a prior knowledge of history, economics, sports or other subject matter can be prepared on the same or separate records. Thereby, the flight attendant has the capacity, in essence, to reformat questions and instructions, as well as the subject matter being described, in response to preferences stated by respondents at the receiving stations. The reformatting of the program, instructional signals, and-/or response and storing criteria are accomplished simply by fast-forwarding the recording tape to a further position, or by replacing the recording tape with another tape. The system of the invention may be installed in schools and hotels, as well as in homes.

An aspect of the invention combines the eliciting of an answer with the eliciting of a prediction. An example would be a sports event which has taken place a relatively long time prior to such a broadcast, say the U.S. Open Golf Championship held 10 years prior to the broadcast. A film of the tournament is shown and the prediction/response solicited pertains to the number of strokes taken by the eventual winner of the Championship on the third, par three hole, by way of example. This method permits a person with a good memory to recall the outcome of this event, i.e. responding to a question, the answer to which is known. But at the same time, the method permits a person not having observed the Championship, but having a knowledge of the game and the players, to make an educated guess or prediction.

5,227,874

59                                                          60

FIG. 21 shows an audio recorder 520B which is an alternative embodiment to the recorder 520A on FIG. 17. The recorder 520B includes a recording medium 588A having five tracks 586 as distinguished from the four tracks 586 on the medium 588 in FIG. 17. FIG. 21 has many of the components present in FIG. 17, namely, the two microphones 230A and 230B, the clock 564, the keyboards 224 and 226, the encoders 248A and 248B, the earphones 528 and the response unit 210A. In FIG. 21, a set of five heads 584 are employed for recording electric signals on the five tracks 586. A second set of heads 584 are provided for playback of the signals recorded on the track 586. The same or a different set of the heads 584 may be employed for recording and playback as may be convenient in the construction of the audio recorder 520B. The two microphones 230A and 230B are connected by amplifiers 606 and 608 to the respective heads 584 for recording signals of the microphones 230A–B. Another two amplifiers 610 and 612 are connected to the corresponding playback 584 for coupling recorded signals of the microphones 230A and 230B, respectively, via a switch 614 to an earphone 528. Also provided is a summing amplifier 616 which sums together the signals of the microphones 230A–B, as outputted from the recorder 520B, and applies the sum signal via the switch 614 to the earphone 528.

The switch 614 provides a respondent at the receiving station 502 with the option of listening to either the description of the scene as provided by the announcer 540 (FIG. 13) at the microphone 230A, or the instructions for responding to the task as set forth by the instructor 542 at the microphone 230B, or to a composite of the two speeches of the announcer 540 and the instructor 542. The embodiment of FIG. 21 allows statements by the announcer and the instructor to be made independently of each other such that these statements may be made serially or concurrently. In addition, the respondent has the option of listening to either one of these statements independently. It should be noted also, that while FIG. 11 demonstrates the use of only a single recorder for all of the respondents, in the case of the audio recorder, it is possible to provide a separate audio recorder for each respondent whereby each respondent can play back those portions of the recording requiring further attention. In such case, connection will be provided as shown in FIG. 21 wherein each recorder is outputted to a single earphone and a single response unit rather than to a set of earphones connected in parallel and a set of response units connected in parallel.

FIG. 22 shows a further embodiment of the invention employing recording apparatus, such as the recorder 520 of FIGS. 13–15, for prerecorded tasks and instructional signals. This embodiment employs a call-up system 618 wherein a person, or contestant, wishing to play a game or involved with an educational experience, by way of example, simply employs a telephone 620, preferably a push-button telephone, to call a number, such as a so-called "900" number employed by telephone companies in the United States (public telephone service wherein the caller is automatically billed for the call plus other charges relating to the nature of the service being provided by the called party for the caller). After connection is made via a private switchboard 622, the contestant activates buttons 624 on the telephone to start the tape recorder 520, stop, rewind and fast forward the tape recorder 520. Also included within the system 618 is the receiving system 558 previously described with reference to FIG. 14, and the

response unit 210 of FIG. 8. Outputted signals from the tape recorder 520 are received by the system 558 and applied to the response unit 210.

The recording is based on the system described in FIGS. 13 and 14 wherein all control signals (instructional signals) for the response unit 210 are transmitted in the upper spectral portion of the audio band, this being above the spectrum of the tone signals generated by the telephone. Therefore, both types of signals, the tone and the instructional signals, can coexist at the same time without interfering with each other. Each channel of the switchboard 622 includes, in addition to the recorder 520, a decoder 626, a low pass filter 628, a modem 630 and a receiver 632. In each channel, the low-pass filter 628 protects the decoder 626 from the instructional signals, and allows only the tone signals to reach the decoder 626. The decoder 626 translates the tone signals into digital command signals to activate the recorder 520 for responding to commands from the telephone push buttons 624 in a manner similar to the operation of an automatic telephone message recorder.

A private home or other location of a contestant may serve as a remote station which includes a telephone 620, a response unit 210, and a receiving system 558 as described above. Also included is a modem 634 for connecting the response unit 210 to a telephone line 636 which interconnects the telephone 620, as well as the modem 634 to the switchboard 622.

The system 618 of FIG. 22 operates in a manner analogous to the operation of the airborne system of FIG. 11 except for the primary difference that, instead of relying on the aid of a flight attendant to set up and activate the equipment, the system 618 of FIG. 22 allows a caller who wishes to be a contestant to activate a playback of tape recorder/playback apparatus by simply placing a telephone call. Thereupon, the caller hears the task setting message, and may operate buttons on the telephone to replay any portion of the message which he may have not thoroughly understood. Once a question has been asked along with the transmission of a timing signal to the response unit 210 indicating the start of a response interval, any delay on the part of the caller, such as a replaying of the question, will elicit a logging in of a longer time for the caller's response by the response unit 210 with a consequent diminution in a score to be awarded for the response.

If desired, the system 618 may be operated in conjunction with a central station, such as the central station 202 with studio 204 of FIG. 6. The studio 204 is connected electrically by a message line 638 and a control line 640 to the switchboard 622 to enable the host 212 to communicate by the telephone lines 636 with the response units 210 of the contestants. The host 212 also communicates by the television transmission 222 between antennas 246 and 282 to present a situation, occurring in the studio 204, upon a television screen 208 at each remote receiving station 206B of the respective callers. The central station 202 provides additional flexibility to the operation of the system 618. For example, the host 212 can provide additional information which supplements a description of subject matter provided by the prerecorded message in the tape recorders 520. The additional information may be in the form of a video presentation on the TV screen 208 plus a narrative description.

Further options in the operation are as follows. In the absence of the television transmission 222, the host 212 can speak directly on each of the telephone lines 636 to

5,227,874

61

provide a supplemental verbal description to the telephone 620 of each caller. This is accomplished by sending a control signal from the central station along the line 640 to direct the switchboard 622 to connect the telephone lines 636 to the message line 638. The voice of the host then is carried via the message line 638 to the switchboard 622 which connects the voice to the telephone lines 636.

Also, by use of the control line 640 and the switchboard 622, the host can send a synchronization time signal to synchronize the tape recorders 520 to simultaneously activate the response units 210 of the various callers. For the foregoing purposes, the central station 202 (FIG. 22) comprises an additional keyboard 642 and a tone encoder 644 connected thereto, as well as a microphone 646. The control signals are generated by pressing a specific key or keys of the keyboard 642 to activate the desired function, the keys generating command signals which are converted by the encoder into tone signals which are recognized by the switchboard 622 and the decoders 626 to provide a desired switching function and a desired function of the recorders 520. The microphone 646 is connected to the message line 638 so that the host 212 in the studio 204 of the central station 202 can employ the microphone 646 to speak to the callers. Also, by means of the switchboard 622 a host at the central station 202 can access the recorders 520 to preset them to a specific portion of the recording tape, thereby to regulate the presentation of tasks via the system 618 to a desired level of difficulty. Thus, control of selected portions of the recording tape can be provided alternatively by respondents at receiving stations or by the host at the central station.

The modems 634 are connected to the register 368 and the accumulator 386 (FIGS. 8 and 22) in respective ones of the response units 210 for transmitting data of the responses and the scoring of the respective contestants to the respective receivers 632. Each modem 634 converts the digital signals of the register 368 and the accumulator 386 to tone signals which can be carried by the telephone lines 636 and the switchboard 622, the tone signals being converted back to the digital format by respective ones of the modems 630 to be received by the receivers 632. As noted in block 388 of FIG. 8, identification of the remote station is included within the data outputted by the response units 210, so that the set of receivers 632 can correlate a score with a specific remote station. Thereby, the host 212, or other persons in charge of the quiz show or operation of the prerecorded programs, can be provided with response data which may be used in modifying the questions to be presented at a future time, for announcing winners of a quiz show, for dispensing prizes to winning contestants, and for other such purposes.

If desired, the conducting of the quiz or game show, or other type show, can be accomplished as has been described with reference to FIG. 6, with the switchboard 622 of the system 618 of FIG. 22 being employed only for the recording of test scores or other results communicated by the modems 634 and 630.

One interesting aspect of the foregoing embodiment of the invention becomes apparent in a game show wherein remote contestants, namely, the contestants at the remote receiving stations, participate with the studio contestants in a game to win prizes, the prizes being awarded to both the studio and the remote contestants. As a simple example, consider roulette being played in the studio and observed via television at the remote

62

stations. With reference to FIG. 22, contestants from the remote stations call in to the switchboard before the game starts, and establish a telephonic connection. After the wheel begins spinning, each caller employs the keyboard in his or her response unit to enter numbers, colors or other predictions of the type made by a player at the side of the roulette wheel. A timing signal transmitted to each response unit terminates the interval during which responses may be entered, the interval being terminated before the wheel stops. The criteria for judging the outcome of the prediction, namely the correct response, is then transmitted to each response unit by the instructional signal to enable the response units to compute the scores. The scores are then transmitted via the modems and the telephone circuits to the central station so that winners can be announced to both the studio and the remote contestants. In this way, other games such as chess wherein the next move is to be predicted, or black jack wherein a card is to be selected, can be played by both the studio and the remote contestants. The remote contestants can be located in rooms of a hotel which houses the studio, within a nearby town, at great distance, or all of the foregoing locations.

In the description of embodiments of the invention disclosed in FIGS. 3, 6 and 7, apparatus has been presented for transmitting the instructional signal, by way of example, within the spectrum of a voice channel, and within the vertical blanking interval between frames in the video portion of a television transmission. Yet another form of transmission of the instructional signal which may be useful in the practice of the invention may be employed, this transmission being partially optical and being included within the video portion of the television transmission.

FIG. 23 shows the optical transmission of the instructional signal. This alternative mode of transmission of the instructional signal can be used instead of, or to supplement, the modes previously described, if desired. FIG. 3 shows installation of this optional mode of transmission of the instructional signal. In FIG. 3, an entry unit 648, to be described in detail in FIG. 23, provides the host 50 an additional facility for entry of an instructional signal. The entry unit 648 outputs a signal in the form of a television video signal which is to be combined with the video signal outputted by the camera 54. The combining of the two video signals is accomplished by a video mixing unit 650 which operates in the well known manner, frequently employed in sporting events, whereby two video images provided by two separate cameras, such as a view of a tennis player preparing to serve and a receiver preparing to return the ball, are presented side by side on a television screen.

The entry unit 648 provides for the encoding of the instructional signal in the format of a sequence of colored spots which appear on the television screen 20 along with the picture provided by the camera 54. The colored spots are located at the side of the screen 20 so as to avoid interference with a viewing of the picture provided by the camera 54. In the TV system 28, an optical detector assembly 652 is positioned alongside of the screen 20 to read and decode the colored spots, and to output the instructional signal in the format of an electrical signal suitable for use by the response unit 22 or 210.

FIG. 23 shows details in the construction of the entry unit 648 and the detector assembly 652, and shows in simplified fashion the interconnection of these two elements via a communication link 654 which represents

5,227,874

63

the system connection of FIG. 3. The TV system 28 of FIG. 3 has been simplified in FIG. 23 which shows only the television screen 20 and the components of the detector assembly 652. The entry unit 648 comprises a keyboard 656, an encoder 658 which may be fabricated of a read-only memory (ROM), a register 660, a clock 662, a matrix 664 of light-emitting diodes (LED's), and a television camera 666. The LED matrix 664 comprises three clusters 668 of light-emitting diodes 670. There are three diodes 670 in each cluster 668, one of the diodes being red (R), a second of the diodes being green (G), and a third of the diodes being blue (B).

In the TV system 28, the screen 20 shows three of the colored spots, identified by the numeral 672, and located at a side region 674 of the screen 20. The three spots are identified further by the legends 672A–C to facilitate identification of specific ones of the spots 672. Similarly, the clusters are identified further by the legends 668A–C to facilitate identification of specific ones of the clusters 668. The three spots 672A–C correspond to the three clusters 668A–C, respectively, and are produced by action of the camera 666 in photographing the three clusters 668A–C. The three clusters 668 are provided by way of example, it being understood that another number of clusters, such as two or four clusters by way of example, may be employed with an equal number of spots 672 being produced on the television screen 20.

The optical detector assembly 652 which is positioned alongside of the screen 20 to read the colored spots comprises three detectors 676, each of which is provided with a red section (R), a green section (G) and a blue section (B) for detecting the corresponding colors transmitted by the red, green and blue diodes 670 of a cluster 668 to the camera 666. Each of the detectors 676 is coupled optically by a lens 678 to one of the spots 672 for focussing emitted by the spot upon the detector. The detector assembly 652 includes a set of three register circuits 680 coupled to respective ones of the detectors 676. Each of the register circuits 680 comprises a register 682 and an AND gate 684 connected to a terminal of the register 682 for strobing the register 682 to read signals outputted to the register 682 by the corresponding detector 676. Each of the detectors 676 outputs signals on three separate channels corresponding to the red, the green and the blue colors emitted from a spot 672. The detector assembly 652 further comprises a address register 686, a decoder 688 which may be fabricated of a read-only memory, and an optional display 690.

In operation, and with reference to FIGS. 3 and 23, the host 50 has the capability to send an instructional signal or signals by the alternative route of the video channel, plus the optical link at the interface between the screen 20 and the detector assembly 652. This alternate route is implemented as follows. At the entry unit 648, the host enters an instruction via the keyboard 656. The keyboard 656 outputs an address to the memory of the encoder 658 which responds by outputting a code to the register 660. The code may represent a letter of a word, a number, or any one of a plurality of special terms applicable to a task or prediction provided by the studio 14 (FIG. 1), such as the terms "fairway", "bunker", "rough" and "green" as applicable to a game of golf, or "check", "castle" or "capture" in a game of chess. The register 660 is connected to the LED matrix 664 by nine lines 692 which activate respective ones of the diodes 670. Each word of the code has nine elements which are

64

stored in the register 660, the nine code elements being applied respective ones of the lines 692 to activate respective ones of the diodes 670.

In the use of the code, there are six choices of colors or combinations of colors in a cluster 668. The choices are red, green, blue, red and green, red and blue, and green and blue. The combination of all three colors which produces white is reserved for use as a strobe signal for activating the registers 682 in respective ones of the register circuits 680. The six choices per cluster 668 provide a total of 216 color coded words for the matrix 664. Any one of the color coded words may be accessed by use of the keyboard 656. The color coded words are photographed by the camera 666 and then are presented by the screen 20 to the detector assembly 652 for detection of the cluster colors by individual ones of the detectors 676. Each of the detectors 676 output detected colors via a set of three lines to its register 682.

As shown in a graph 694 appended to the encoder 658, the colored words are interspersed among white words. The white words are provided automatically by the encoder 658 after each color word. At each of the register circuits 680, the presence of all three colors in a white word activates the AND gate 684 to strobe the register 682. Thereby, the respective registers 682 are strobed to output their respective color signals to the register 686 to provide the register 686 with a complete detected code word. The code word in the register 686 is applied as an address for the memory of the decoder 688 to output the alphanumeric symbol or word which was intended by the host 50 to be transmitted as part, or all, of the instructional signal. The alphanumeric symbol or word is presented on the display 690 to be seen by a contestant at a remote receiving station 18. The alphanumeric symbol or word is presented also to the response unit 22 (FIG. 4) via line 696 or to the response unit 210 (FIG. 8).

The white and colored code words of the graph 694, are depicted as pulse signals having a predetermined duration. The duration be selected as a matter of convenience. However, it is noted that the camera 666 includes a vidicon which scans the clusters 668 with a sequence of scan lines (horizontal rows with reference to the screen 20) which extend in the direction from the cluster 668A to the cluster 668B. In accordance with normal television practice, there is an interlacing of pairs of scans to produce image frames at a rate of thirty frames per second. The clusters 668 have a width equal to at least a few line scans so that, within an interval of one sixtieth of a second, a few scans have been made of all the clusters 668 to provide adequate opportunity for the detectors 676 to detect the presence of a color. The region 674 extends beyond the spots 672 to provide a dark apron to prevent extraneous light from the screen 20 from entering the lenses 678 to impinge upon the detectors 676. The pulse duration for the light signals outputted by the cluster diodes 670 may be one sixtieth of a second for maximum data rate, and may be longer if desired. It is possible to have a still higher data rate by allowing only one scan line for each pulse, but it may be desirable to use a slower data rate for better signal to noise ratio.

In the response unit 22 of FIG. 4 the instructional signals of the decoder 100 and the detector assembly 652 are applied via an OR gate 698 to the memory 108. The OR gate 698 allows the instructional signals to be applied alternatively or in supplementary fashion to operate the memory 108 in the manner described previ-

5,227,874

65

66

ously with reference to signals outputted by the decoder 100. In a similar fashion, the signals from the detector assembly 652 an be applied (not shown) also to the memory 106 if desired.

In the response unit 210 of FIG. 8 the instructional signals of the decoder 344 and the detector assembly 652 are applied via an OR gate 700 to the memory 334. The memory 334 has been selected by way of example, it being understood that the signals of the detector assembly 652 can be applied, if desired, to another of the memories of the response unit 210. The OR gate 700 allows the instructional signals to be applied alternatively or in supplementary fashion to operate the memory 108 in the manner described previously with reference to signals outputted by the decoder 344.

The display 690 (FIG. 23) is useful for a contestant in that it allows the contestant to have information, in addition to that presented on the screen 20, which may be significant for determining the contestant's response. For example, there may be an increase in the amount of scoring points to be awarded for a task of higher difficulty level which would encourage the contestant to take a chance and select the higher difficulty level.

With reference again to FIG. 22, it is noted that utilization of the telephone system therein for carrying out the invention can be accomplished in an advantageous manner by employing the telephone system to collect and dispense funds for participants in games, wagers, contests, and other projects by the simple expedient of crediting or debiting the accounts of telephone subscribers who participate in the practice of the invention. This permits virtually instantaneous payment of an entry fee to a game, or a bet on the outcome of an event, by way of example, and dispensing of an award in the form of a token or card having a monetary value or by crediting a player's telephone account with cash. The use of the telephone system for this purposes will be described now with reference to FIG. 24.

FIG. 24 presents a diagram useful in explaining the use of the system of FIG. 22 for transference of funds in the practice of the invention. A central telephone facility 702 connects via a communication link 704 with a telephone subscriber's station 706 (typically the subscriber's home) and to the subscriber bank 708 or other financial institution, by way of example. Via line 710, the subscriber can authorize the central facility 702 to charge the subscriber's account at the bank 708. A response unit 210 (shown in FIGS. 6 and 8) is located at the subscriber station 706. A central broadcast and monitoring facility 712 provides a broadcast presentation 714 with a broadcast signal transmitted to the subscriber station 706 to be observed by the subscriber. The subscriber responds to the broadcast transmission by entering a response in the response unit 210. Outcome criteria signals are transmitted via line 716 directly to the response unit 210. A coded signal transmitted via line 636 (described in FIG. 22) from the central telephone facility 702 can be employed to activate the response unit 210.

The response unit 210, in terms of the presentation of FIG. 24, may be regarded as a subscriber subsystem providing functions described hereinabove. These functions are the decision entry provided by the subscriber-contestant upon use of the keyboard of the response unit, comparing of the entered response with the criteria sent by line 716 from the facility 712, the generation of a hard copy card which serves as a token describing the amount of the award and presenting other informa-

tion needed for claiming a prize, and the dispensing of the token by the response unit 210.

A number of methods in accordance with aspects of the invention will now be described, the methods utilizing the electronic circuitry described herein. It is noted that the systems of the various aspects of the invention can be used to conduct contests, such as quiz shows wherein the answers to questions are known at the time the questions are asked. The systems however, also lend themselves to conducting games, contests or tasks involving predictions of the outcome of future events, including games of chance. While the methods for conducting such programs on radio or television programs vary, they all have the important common capability of informing members of the remote audience without delay whether the responses, predictions or gambles have met with success. The success may be defined as an acceptable response to a task or question, an acceptable prediction or the outcome of an event, or the winning of an award in a game of chance. When desired, each successful member of the audience may be issued a token or an award or prize virtually instantly after the success becomes known. The token may include a monetary prize. Its is noted that all of the methods described utilize electronic equipment at the locations of the viewer or listener to evaluate responses, and to award successful participants. The system does not require central computers, thereby obviating the need for simultaneously processing large numbers of viewer responses at a central location.

Many events, including games, can be implemented by the methodology of the invention. Such events take place on large and small defined areas ranging for instance from an 18-hole golf course to a football field and baseball diamond, and to a chess board. All of these areas have the characteristic in common of being able to be subdivided so as to identify portions thereof or locations thereon. Locations can be identified with the aid of grids with coordinates or other identifying plan to implement the methodology of aspects of the invention.

Frequently, in the course of a game, an object is moved by a person, and a prediction may be made as to the location to which the object moves. In some sports events the object moved is the body of the athlete himself. A TV-viewer follows the progress of such a game or contest and enters a prediction of an outcome on an entering device by identifying the area or point at which the object is anticipated to come to rest, or is to be placed by a person addressing the object. Such an observer normally can follow the unfolding of the event on a TV-screen. Following the event, such as in a football game, a track and field event, or a move by a chess player, the producers of the TV-show identify the actual location to which the object has moved. Coordinates of the location or other identification signals are transmitted to remote sites of the TV viewers, so as to permit comparing the actual location with the predicted location entered by television observers. Response criteria for evaluating the outcome of the predictions are similar to the previously described criteria of the instructional signals.

The prediction entering device prevents entries at or after the point in time when the object being addressed, moves, or when a participant, such as an athlete, commences action. The comparison and scoring circuits of the aforementioned entering and evaluating devices at remote locations identify and score acceptable predictions as defined by the instructional signals. A success-

67 68

ful participant is informed, when desired by a dispensing of printed coupons or magnetized cards, as previously described, immediately following the relevant event or move of an object.

In televising such an event, the producers superimpose a grid or coordinates on the television picture for the purpose of enabling observers to identify areas or points broadly or with as much specificity as is desired or practical under the circumstances. Such a grid is helpful in making predictions and in identifying outcome locations. A grid may be subdivided into portions of different dimensions.

It is advantageous that the above-described predictive method can be applied to a large variety of events and games in which an object is moved once or repeatedly, such games including, by way of example, baseball, football, golf, and chess. Depending on the size and configuration of the playing area, the area may be subdivided into larger and smaller portions. A prediction of a smaller portion of the area to which an object may move, and therefore a more difficult prediction, is rewarded with a prize of greater value than a prediction pertaining to a larger portion. For example, a prediction in a golf match may pertain to the location of a hit ball on large areas, such as a fairway or rough, or on smaller areas, such as on the green, or even in the cup. Predictions may relate to the ultimate outcome of two or more intermittent events, such as the location of a golf ball after three strokes, the position of a chess piece after two moves, or the total number of hits of a baseball player at the end of five innings. To provide for such cumulative outcome predictions, data storage means as previously described, are included in an observer's evaluating device.

Events included in a broadcast contest to which predictions relate may be presented visually or audibly. In an aspect of the practice of the invention, a host or commentator asks for one or more predictions and if a plurality of predictions is available, a TV-viewer selects a prediction. If there exist two or more predictions, outcome criteria are provided for evaluating the response of an observer or contestant to all relevant outcomes, the outcome criteria being conveyed to remote locations after an announced event, or events, has occurred. In another embodiment, outcome criteria are conveyed relative to outcomes of events not specifically made known or announced by a host, such as the final order in which horses cross the finish line at the end of a race. This enables a TV-viewer to elect to predict an outcome not previously mentioned in the transmission from a central station, in the hope that outcome criteria relative to the prediction will nevertheless be conveyed and that a correct prediction of such unannounced event will be rewarded with a prize.

In case a participating TV viewer elects to predict the outcome of an event not specifically identified or announced by the host, the participant runs the risk that there will be no transmission of outcome criteria signals pertaining to that participant's prediction, thus ruling out all chances of winning a prize. It therefore is the twofold task of a TV-viewer in such a situation to anticipate which unannounced event hopefully will be provided with outcome criteria, and that the participant will correctly or acceptably predict the outcome. Awards for such successful predictions will be correspondingly higher.

In view of the fact that in the above described example the outcome criteria are conveyed to remote locations following the event to which the criteria relate, the success or outcome criteria may be transmitted in uncoded and visually or audibly intelligible form. When conveyed, in such open language, the response criteria can serve to inform members of the remote audience of the event which was selected for inclusion in the contest and to advise the members of the outcome of the event.

A further use of the invention in conjunction with telephone facilities, as disclosed in FIG. 22, will now be described. Dedicated telephone lines such as the so called "900" numbers in the United States, or so-called PIN (person identification number) or ANI (automatic number identification) lines, are used with increasing frequency to request and obtain special services. These services include a wide range of information and data which the telephone systems are capable of providing, the systems being adapted to automatically playback specific recordings or to provide answers to specific inquiries.

According to an aspect of the present invention, a tape playing facility is provided at a central telephone station as a subscriber service. Tapes with prerecorded audio or audiovisual recordings are played back to receivers at remote locations over cable or over dedicated telephone lines, using modems when required.

In a preferred embodiment, a question and answer game is conducted, and a user of or subscriber to the telephone service who answers a question in an acceptable manner receives an award as heretofore described. To conduct such a game, the contents of a tape are formulated and recorded, including one or more sets of messages. Each prerecorded message set comprises a question and an instructional signal conveying answer criteria defining at least one correct or acceptable answer.

The question is received in a form intelligible to humans and normally is accompanied by an indication of the period of time a respondent has to enter a response on a data entering device. If the response or answer criteria are transmitted prior to the expiration of the allowed time interval, they are in coded or unintelligible form. If the response criteria are transmitted following the time interval, they can be in open language or other intelligible form. In the latter case, response or answer criteria may consist of the actual correct answer or answers.

The answer criteria may include scoring instructions. If different levels of difficulty are available, the scoring instructions convey the methodology or mode of computing the amount of a prize awarded for acceptable answers at different levels of difficulty.

At remote locations of members of the telephone audience, as described above, members are provided with an electronic response and evaluation unit, which as a minimum, includes a response entering device, means for comparing an entered response to an acceptable response, a timing device and means for informing a user of the telephone service of an earned award. It is understood, of course, that communications equipment is available to a user for contacting the central facility providing the service, in order to request the playback of a tape. Appropriate means for audibly and/or visually presenting the contents of the tape and for informing contestants of an award are provided.

In those instances where response criteria are received at remote locations after the time interval allowed for responding to a task has expired, the response criteria can include signals conveying one or more cor-

5,227,874

69

rect or acceptable responses in both an instructional form and in an informative form. The signals, when in instructional, normally unintelligible digital form, are capable of activating and controlling circuits, such as the scoring elements of the response units and, when converted into informative, intelligible form serve to notify game participants of winning answers. When response criteria or responses are transmitted prior to the end of the allowed time interval, transmission is rendered unintelligible by coding or changing the speed of transmission of the signals. Depending on the time of transmission before or after the elapsing of the time interval, the answer criteria therefore may be unintelligible or may comprise the actual acceptable answers in open language.

According to a preferred embodiment of the method, a question and answer game is prerecorded on a magnetic tape as previously described. A question is posed and a time limit, for example, of ten seconds is announced in open language, visually and/or audibly. At the same time a participant's electronic unit is directed by instructional signals to accept an entry by a participant for the following ten seconds and then to evaluate the entered response in accordance with response criteria. During these ten seconds, there is either no recording or, if desired, a musical recording provided on the tape. Following expiration of the ten second time interval, one or more acceptable and previously recorded answers are announced in open language. The comparison and scoring means evaluate a participant's entry relative to the transmitted response criteria. A successful respondent is informed in a known manner, which can include the dispensing of a monetary prize as described. Questions and answers may be at two or more difficulty levels as described hereinabove.

In the operation of the system, a dedicated telephone line may be coupled to a playback device which plays back one specific tape or one of a specific group of tapes selected by a subscriber to the telephone service. Thus, by calling a number, the caller will automatically receive a playback of a particular tape. The equipment at a subscriber's remote location comprises a sub-system, including the equipment for two-way communication between the remote location and the central facilities and further including the elements of the response unit for entering and evaluating answers. The two way communication equipment may include means not only for directing a multiple digit call to a dedicated number, but also for automatically activating means controlling the tape playback mechanism. The sub-system may include means requiring only the lifting of a receiver or the pushing of one button to activate the playback of a tape at a central location for transmission to the caller's location.

When desired, the equipment at a subscriber's remote location includes previously described means for selecting one of several difficulty levels chosen by a contestant, answers at a higher difficulty level being rewarded with a larger prize. And, as previously described, means are provided for generating a hard copy record of an award earned by a participant, these means being capable of printing on a coupon or magnetizing a plastic card so as to indicate the value of an award, normally a monetary prize. The response unit in cooperation with a modem (FIG. 22) may transmit data indicating the amount of a prize won by a participant over the two-way communicating system to a central location where the amount of the prize is stored. The operators of the

70

telephone service can make payment of a prize amount to a winning subscriber in any fashion, including the crediting of the account of a winning participant with the amount of a prize, such credited amount being carried on the ledger of the operator and reflected in billing the winning subscriber.

The method and system may be modified so that every time a subscriber dials a dedicated number, such a call automatically authorizes the operator of the service to charge an amount to the caller, which amount can be on a per use basis, on a time basis, or ca be determined by the caller.

When desired by a participant, a prize amount can be electronically transferred by the subscription service to a bank account of the participant so that the amount of the prize is immediately available to the winner in such a game.

In another version of the present invention, members of a remote audience wager on the outcome of an event. Members can place bets on the accuracy of their respective predictions, but do not necessarily play against other members of the audience.

Using a two-way communication system a participant, who has a line of credit with an operator of a televised event, may choose a specific event and stipulate the amount of a wager on the outcome of the event on which the participant wishes to bet. Events, the outcome of which can be predicted, include sports, elections, polls, and other kinds of happenings, the outcomes of which are capable of being defined in terms of results, scores, points, decisions, and other measurements.

With reference to FIGS. 22 and 24, the system employs traditional telephone facilities at a central location which may be operated by a telephone company, a subscriber service, or by other facilities operators. The facilities are contacted by a person wishing to place a bet on the outcome of an event, such contacting being done by conventional communication means. The person contacting such central facility in order to initiate a wager, may be referred to as an observer, subscriber, wagerer or bettor. In contacting such a central facility, the observer of an event to take place authorizes the central service organization to charge the observer either a previously stipulated amount, an amount determined by the real time use of the facility, or an amount stipulated by the observer, such as is the case if the amount of the wager is fixed by the wagerer. The amount charged to or authorized by the wagerer is billed to him directly, but may also be debited by the central subscriber service to the wagerer's bank account.

Following authorization by the subscriber, the operator of the central service initiates the playing of a recording or the transmission of a broadcast and activates a sub-system of the subscriber, normally located at the subscriber's home. In addition, the service operator accepts a bet on a specified outcome of an event, such acceptance being done by a human operator or through electronic communication. Thus, for example, within a bettor's line of credit, a bettor who dials a "900" number and additional digits, can place a bet and, by dialing a specific number of digits, the event and amount of a bet can be specified by the subscriber.

At a central location, which may be the same as or different from that at which the central telephone facility is located, events are broadcast to subscribers' remote locations and the outcomes of events are moni-

5,227,874

71                                                                          72

tored. Broadcast signals of such events are transmitted to and received at remote locations, so that subscribers can follow the progress of events as they unfold. Outcome criteria signals defining the outcome of an event in absolute terms or in relation to the predictions and wagers are transmitted to subscribers at remote locations.

The response unit at a subscriber's location informs the subscriber of a successful prediction by generating and dispensing to a successful bettor a token of a winning bet, such token being a printed coupon or magnetized card. The response unit also scores a winning prediction in accordance with an applicable difficulty level.

Payments computed and payable to or by a bettor can be debited or credited to a bettor's account or monthly statements, or can be reflected directly on the bettors bank account. Alternatively, when a winning token is generated and dispensed, the token which has the amount won indicated thereon, can be submitted for credit to the operator of the service, to a bank, or to another redemption center.

Following authorization of applicable charges, a subscriber's sub-system can, when appropriate, be made operative by signals sent over telephone wires or by another form of communication, including wireless and cable systems. According to another aspect of the method, the subscriber's sub-system can be activated by the subscriber, and a hard copy record of a successfully predicted outcome is dispensed to the observer of an event. This method is preferred when subscribers do not wish to place bets, as may be the case in a home or in a public place in which members of a family or friends are gathered, or when betting is illegal. Records issued in such an instance have no commercial value unless validated by a verification number or a code which is only provided upon a subscriber's having authorized an appropriate charge by the central telephone or subscriber service. Verification data are transmitted to remote locations via a communication link such as a telephone line or cable.

As an example of operating the system, two central facilities are provided, one being a telephone subscriber service and the other being a station televising a sports event, such as a boxing bout. Viewers are informed that they can wager on the outcome of each round or on the final outcome of the bout, the wager being a win, lose, or draw. Viewers also are informed that boxer A is a favorite over boxer B and that a successful wager on boxer B will be rewarded with 200% of the amount of the wager, whereas a successful wager on boxer will be rewarded with 125% of the amount of the wager. Subscribers to the telephone service then dial a dedicated number, including additional digits specifying a chosen round and/or the final result and the amount wagered on each outcome.

Viewers watch the event on television and at the end of each round and/or of the bout, instructional signals are sent from the central broadcast facility to remote locations defining each outcome and providing scoring instructions to subscriber response units for computing the amount won by a successful subscriber.

The invention may be applied to a game which is conducted from a central location and enables players at remote locations to win prizes delivered instantly at each player's location. Prizes normally take the form of tokens redeemable for cash.

In an adaptation of the system described, players are provided with a response unit and recording medium for the outputting of hard copy with a recording of identifiable data. A first set of data has been provided on the recording medium prior to delivery thereof to the players. The data may be presented as alphanumeric or other symbols. For example, a set data may comprise a combination of six letters and numbers which have been prerecorded on a tamper-resisting recording medium.

The recording medium may consist of a paper tape divisible into sections or it may consist of a plastic card having data magnetically recorded thereon. In any event, such token or recording medium is capable of being placed in the response unit for the purpose of having recorded thereon at least one additional second set of alphanumeric data or symbols. Signals from a central station serve the purpose of conveying data and controlling the printer of the response unit.

In the operation of such a system, a second set of data may comprise, for example, six letters and/or numbers selected or picked at random at a central location. Signals conveying the data are electronically transmitted to remote locations. Transmission can take place over the air or by wire. The central transmitting facility is adapted to activate and direct the printers to print the second set of data. The printer also is directed then to print a third set of data on the recording medium, the third set of data consisting of a verification code or number.

The recording medium, which in this instance is a paper tape, can be separated into sections, each section containing the first and second sets of numbers or letters, as well as the verification code.

A player therefore receives a recording medium with at least three sets of data, which data may be readable by individuals and/or may be machine readable.

If the game is played as a lottery, a winning recording medium is one which has two sets of alphanumeric data or other symbols, which either match completely, match partially, or have some other previously defined correlation. Partially matching sets of data can be rewarded with small prizes which become larger as more of the digits match. Other forms of correlation can be established, whether mathematical or not, including for instance multiples and fractions.

When desired, the central transmission facility can instruct the printer to record additional information on the recording medium. The response unit compares the two sets of alphanumeric or other data mentioned, computes the amount of a prize in accordance with instructional signals transmitted from a central location, and indicates the amount of the prize on the recording medium.

According to a preferred embodiment of the method employed in the system described, a player is able to discern whether two sets of alphanumeric data on the recording medium are a match, a partial match, or have some other correlation; but the player may not know the amount of the monetary prize presented on the outputted recording medium. The medium, which may be a printed coupon or a magnetized card is delivered by a winning player to a redemption center where the player is informed of the size of the prize. Such a redemption center may be a place of business, for example, a store in which such a prize evidenced by a printed coupon or magnetized card may be redeemed for cash and/or merchandise. This method of informing players that they have won a prize, without knowing its

amount, is utilized to attract buyers to a place of business. The above method and system permit conducting a game similar to a lottery by retail businesses, which game is purely a game of chance and in which players at home may participate without charge to them.

Yet another feature of the invention is demonstrated with respect to FIG. 14 which allows for a replaying of a previously recorded program without further replay of previously recorded of response criteria including an acceptable response and a scoring mode. This is useful in the case of an advertiser who provides a program of a situation about which questions may be asked, the program being recorded along with response criteria on a tape for distribution to members of the public. However, possibly for reasons of awarding only one prize per tape to successful respondents, the advertiser wishes to conduct a question and answer procedure only once so that prizes can be awarded only once. But, the program situation which typically includes descriptions of a advertised products may be played back numerous times.

This feature may be demonstrated, by way of example, by constructing the recorder 520 of FIG. 4 with both a playback head 718 and a record head 20 disposed alongside the path of a tape 722 upon which the foregoing program and response criteria have been recorded. This is accomplished by providing the recording medium of the tape 722 with a first recording portion which stores the program situation including advertising information (or other data), and a second recording portion which includes the response criteria. The distinction between the two portions of the recording medium is shown diagrammatically in FIG. 14 by use of a set of dots at 724 on the tape 722 to identify the second portion of the recording medium. Included in the second portion is a digital code which commands a disabling of the recorded response criteria data after the response criteria has been played back. The tape 722 moves, in a direction shown by an arrow, from the playback head 718 to the record head 720. As the second region at 724 moves past the playback head 720, the digital code is retrieved along line 346 and decoded by a decoder 726 also located in the recorder 520. Upon receipt of the digital code, the decoder 726 records a disabling signal upon, or erases, the second portion of the recording medium so that the response criteria originally recorded thereon can no longer be used. Alternatively, the recording of a disabling signal may be replaced by a step of physically impairing the integrity of the second recording portion.

With reference to FIG. 25, and in accordance with a further aspect of the invention, it is desirable to provide a respondent with the capacity to select an area of interest in the program transmitted from a central station to a remote receiving station. This area of interest may pertain to answering questions relating to specific parts of the subject matter presented in the transmitted program, or to the nature of awards which may be provided to successful contestants. By way of example in the nature of the questions requiring a response, the questions may be directed to historical aspects of the material being presented on the program, or may be directed to the manner of construction of items presented in the program, or to the cost of the items. For example, in a program devoted to the merchant marine in which both new an old forms of ships are presented, questions may be of an historical nature directed to when and where certain forms of ships were employed.

Or the questions may be directed to the manner of construction of ships in both ancient times and the present time. Questions might also be directed to the cost of buying a ship and the cost of maintaining a ship. During the presentation of the ship program advertisers may display, by way of example, merchandise such as clothing to be worn on cruises and on other vacations. Coupons awarded to successful contestants may specify a discount towards specific styles of the clothing or, alternatively may provide a discount to certain marine products shown in the program or, by way of further example, toward theater tickets.

A specific type of award is associated with specific types or categories of questions which a contestants may select in order to avail himself or herself the benefit of a preferred category of award. Thus, a contestants choice of area of interest may be based on the subject matter of the questions or on the nature of the award. This capacity for selecting an area of interest greatly increases the chance that a contestant will participate, and that the contestant will redeem the coupon. Fortunately, as will be shown in the ensuing description, this aspect of the invention can be practiced with a response unit, such as the response unit 22 of FIG. 4, the response unit 210 of FIG. 8, or a response unit 800 to be described in FIG. 26, with no more than a minimal change relating to the addressing of memories therein.

The addressing of the memories is demonstrated in FIG. 25 with respect to the response unit 210 of FIG. 8. As has been explained hereinabove with reference to FIG. 8, command signals entered at the keyboard 356 are operative via the control logic unit 350 to activate the memories 330, 332, and 334. In the foregoing description of the system 200 of FIG. 6, or the system 200A of FIG. 7, the central station transmits a televised program plus answering instructions, scoring criteria and a message to appear upon a coupon to a remote station wherein the response unit 210 operates with the answering instructions, the scoring criteria and the coupon message upon activation by a contestant. In particular, it is noted that the transmission of answering instructions, the scoring criteria and the coupon message relate to a single set of questions in only one area of interest, such as the area A indicated in the memories 332, 334 and 330, respectively. However, in the practice of this aspect of the invention wherein the contestant can select areas of interest, the central station sends also additional sets of answer instructions, scoring criteria and coupon messages for other areas of interest such as the area B and the area C shown in FIG. 25. While only three areas of interest are shown, it is understood that more areas may be employed if desired. Also, by way of example, four questions are shown in FIG. 25, it being understood that more questions may be provided if desired.

To practice the invention, the response unit 210 is provided with the capacity to store the requisite information for a plurality of interest areas to enable the respondent to choose an area of interest. In the operation of a response unit 210, the respondent first selects the area of interest, after which the response unit 210 functions in the same manner as has been described with reference to FIG. 8. The selection is accomplished by entering at the keyboard 356 a letter, or other symbol, designating the desired area of interest. The entered letter, as shown in FIG. 25, serves to address the appropriate regions in each of the memories 330, 332, and 334, so that the response unit 210 can then function in accor-

dance with the coupon message, the response criteria and the scoring criteria of the selected area of interest. The response unit 210 compares responses of the respondent with the acceptable answers stored in the memory 332 to identify an acceptable response, scores and times responses in accordance with data stored in the memory 334, and outputs a coupon with redemption and advertising data thereon in accordance with information stored in the memory 330. If desired, the response unit 210 may be provided with a dedicated selector device, such as a selector switch 802, shown in the simplified view of the keyboard in FIG. 25, for addressing the memories.

The capacity to select an area of interest is particularly useful for the merchandising of products with the aid of a game show broadcast from the central station 202 of FIG. 6, or transmitted in prerecorded fashion by use of the recording apparatus presented in the cabin 500 of FIG. 11 or the system 618 of FIG. 22. The respondent plays the role of a contestant in the game or quiz program, and also acts as a potential shopper for merchandise presented in the program. By use of the selector switch 802, the shopper selects the area of interest having the product of interest. The shopper then plays the game or quiz in earnest to receive a coupon which facilitates purchase of the product by redemption of the coupon. If desired verification codes may be imprinted on the coupon in a manner described hereinabove. A product may also be selected prior to responding to a task, subject of course, to entering an acceptable answer or prediction.

FIG. 26 shows the response unit 800. The response unit 800 provides the functions of the response unit 210 of FIG. 8 by use of a computer 804 which replaces certain components of the response unit 210, namely, the comparators 372 and 374, the registers 376 and 378, the multipliers 380 and 382, the summer 384, and the accumulator 386. The computer 804 is operative with a memory 806 which provides the program for performing the functions of the replaced components, and also connects with the control logic unit 350 for interaction with the memories 330, 332 and 334, the timing unit 336, and the buffer store 336. The computer 804, which may be constructed as a microprocessor, outputs signals to the dispenser 390 and to the scoring logic unit 370 as does the accumulator 386 in FIG. 8. Also, the computer 804 can provide data on the display 358 via the control logic unit 350.

An advantage in the use of the computer 804 is that the memory 806 may store algorithms for providing more complex routines for a more versatile scoring of the responses than is possible with the response unit 210 of FIG. 8. For this purpose, it is desirable to provide the memory 806 with an external replaceable storage medium such as a tape which may be mounted on a card, a dedicated replaceable read-only memory (ROM) chip, or a floppy disk so that scoring can be customized to match the product selected by the respondent shopper. The memory may be provided with advertising data and redemption instructions as well as verification material to be placed on the coupon awarded to the successful respondent shopper. This enhances the merchandising capabilities of this method of the invention wherein the respondent selects areas of interest. Also, by virtue of the connection of the computer 804 to the dispenser 390, the computer can direct the imprinting of specific material on the coupon in accordance with specific instructions of an advertiser or merchant.

In some cases, it may be desirable to provide the functions of comparing responses with acceptable answers, identifying acceptable responses, and scoring the acceptable responses at a central station such as the central station 202 of FIG. 22. This is accomplished by providing the system 618 with a response evaluation unit 808 connected to the switchboard 622. The response evaluation unit 808 includes the computer 804 and the memory 806 of FIG. 26 so as to be able to perform the functions of comparing, identifying, and scoring. By virtue of the connection of the evaluation unit 808 to the switchboard 622, the functions of the evaluation unit 808 are provided to the central station 202 in response to signals from the remote stations. For example, these functions could be disabled in the response units 210 of the remote stations and provided by the central station with the response evaluation unit 808 employing algorithms not available to the remote stations.

FIG. 27 shows a flow chart of the program for operation of the computer 804 of FIG. 26. Operation begins at block 810 wherein the computer receives instructions from the program memory 330 via the control logic unit 350. Then at block 812, the computer reads the keyboard 356 via the buffer store 366 to determine what entry may have been made by the respondent. If no entry has been made, operation loops back to the block 812 for a subsequent reading of the keyboard. If an entry has been made by the respondent, such as the entry of a response to a question, the computer reads the memories 332 and 334 at block 814 for response and scoring criteria or instructions.

The procedure advances to block 816 wherein a comparison is made between the respondents answer with acceptable responses stored in the response memory 332. This is followed by an identification of correct and partially correct answers of the respondent. At block 818, the computer performs the scoring function giving full credit and -partial credit in accordance with the scoring instructions stored in the memory 334. This is accomplished by using the scoring criteria including difficulty level, timing of response, and key word or full text credit where applicable in accordance with the nature of the response to the question. Then at block 820, the computer tallies previous scores from previous answers in a set of answers, if applicable to the questions at hand, this function having been done by the accumulator 386 in the response unit 210 of FIG. 8.

The computer again checks the keyboard at block 822 to see if there is a further entry. If there is a further entry, operation loops back to block 814. If there is no further entry after a predetermined interval of time, operation proceeds to block 824 for determination of the award. Then, at block 826, the computer signals the scoring logic unit 370 to command the dispenser 360 to issue the coupon. The coupon is imprinted with material based on instructions and data stored in the program memory 330, and may also contain data stored in the supplemental memory 806.

The teachings presented in the preceding embodiments for the systems and methods of the invention are applicable generally to the selection aspect of the invention providing the product choice and choice of area of interest. The following discussion amplifies the description of the practice of the selection aspect of the invention to provide a full appreciation thereof.

In many instances, local or regional suppliers of goods and services develop their own and highly fo-

5,227,874

77

cused marketing priorities. As an example, a local re-
tailer may wish to dispose rapidly of certain excess
inventory or of perishable goods. Nationally broadcast
programs may not be the most suitable forum for such
promotions.

Frequently, suppliers prefer to sponsor a coupon
program directed at local or regional audiences. Until
now, however, local newspapers have been the only
forum of any consequences available to such local spon-
sors for detailed product offers.

The discounts or prizes are in many instances applica-
ble to merchandise sold in stores and supermarkets.
Specifically included are children's stores. When de-
sired, the products to which a discount applies may also
include such items as admission tickets, travel tickets,
total accommodations, subscriptions, vouchers, per-
sonal and any other marketable services, including ser-
vice agreements.

The components of the several systems and methods
for practicing the invention will now be described.

A central broadcasting facility includes the normal
elements for transmitting a program. For purposes of
illustration, the invention will be described in terms of
television, but is equally applicable to radio.

The television program is received and presented on
standard TV-receivers at viewers' remote locations.
The program includes one or more tasks, such as ques-
tions. Members of the broadcast audience who wish to
become contestants on the spur of the moment are in-
formed of the time allowed for a response to each an-
nounced task.

Each task is accompanied by one or more predeter-
mined acceptable responses. Instructional signals con-
veying response criteria defining acceptable responses
are electronically transmitted from a central facility to
remote locations, said signals being referred to as re-
sponse criteria signals. They include data conveying the
allowed period of time and mode for scoring an accept-
able response, i.e. for assigning a calculated value to the
prize coupon dispensed' to a successful contestant. The
response criteria are received at remote locations and
may be modified or reformatted by a conductor of the
program from task to task.

The electronic transmission can be done in any
known manner: it can be on a radio frequency, via opti-
cal or light impulse codes, via cable, vertical blanking
intervals or other means.

If desired, a task, such as a question, may be answered
at one or more levels of difficulty. If there is more than
one level of difficulty, the lowest or base difficulty level
normally is selected by the broadcaster and a higher
difficulty level may be selected by a respondent. Means
for such selection are provided to the broadcaster and
to each member of said audience.

Another group of predetermined signals is transmit-
ted from a central broadcasting facility to remote loca-
tions conveying a listing of or information pertaining to
the products of sponsors of such a broadcast. The term
"product" includes goods and services whether specifi-
cally promoted in the course of such a broadcast, such
as a commercial, or only appearing in the product lis-
ting of a sponsor. The information conveyed by these
broadcast signals is referred to as product signals and
comprises prices, specifications, sizes, capacaties, col-
ors, packaging and other characteristics, as well as
availability and discounts applicable to specified prod-
ucts. Product signals may also include "sales", "spe-
cials", free samples and any other information pertain-

78

ing to such products and deemed useful by a sponsor.
The product information is modified or reformatted as
determined by a sponsor.

Members of the broadcast audience are equipped
with means for receiving and presenting the broadcast
program, which includes tasks or may essentially con-
sist only of tasks. Members of said audience have means
to receive the response criteria signals and the product
signals, the data for both being stored in appropriate
storage means at members' locations. The product sig-
nals can include all the promotional data mentioned.
Product information may be presented to viewers on a
standard TV-set or on a separate screen or display. In
addition, members are provided with means to enter a
response to a task, such response data also being stored
at members' locations.

The response criteria data product data, when modi-
fied, replace or supersede any previously stored data of
the same nature. Response criteria include, when de-
sired, a formula for placing a value on an acceptable
response, referred to as scoring mode.

The means provided at members' locations for dis-
playing the latest product list and other information
desired by sponsors permit sponsors or broadcasters to
delete, substitute, add or modify information. Audience
members are equipped with means for individually se-
lecting from said product list a product they prefer and
intend to purchase. Said selecting means may be sepa-
rate, or may be associated with the means for entering a
viewer's response to a task.

The equipment provided at each remote location
normally includes signal receiving means and presenta-
tion means for the program, task and product informa-
tion; signal receiving means for response criteria; enter-
ing means for response and product selection; data stor-
age means; comparing and scoring means; and means
for generating and dispensing a prize token.

The above mentioned means at contestants' locations
may conveniently be combined into a response unit.

The methods described lend themselves well to nar-
row-casting. The term narrowcasting is defined as the
ability to transmit product or service information to a
select group of members of a broadcast audience. The
present method described, which dispenses prizes to
individuals intending to purchase a specified product or
products, narrowcasts product information because
only viewers with a discount incentive will use the
product information. Conversely, product information
will use the product information. Conversely, product
information can be utilized only by viewers who have
earned a prize through skill and have qualified for a
discount applicable to a selected product.

A response entered by a member and stored, if neces-
sary, is compared by comparison means with the appli-
cable response criteria. A winning contestant's prize is
calculated by scoring means on the basis of the applica-
ble scoring mode. The product selection and a winning
respondents score 'are outputted to a device at each
contestant's location for generating a permanent record,
such as a coupon, which, when dispensed, has provided
thereon an indication of the prize and of the chosen
product, including any sales or redemption information
the advertiser wants the shoppers to have. At least one
scoring mode or base is always required and used in
order to determine the value of a prize. In some in-
stances, only one mode of scoring may be desired. This
is the case if only one fixed award is to be made to
winners obviating the computation of a score. An exam-

ple would be a "true or false" type of answer. Such a single fixed award is made to all successful participants in case a sponsor intends to introduce a new product, in which event winning contestants are given the opportunity to select a free sample from a number of different available products. The chosen product is then specified on a prize coupon.

The device for generating a permanent record normally comprises a printer capable of printing or otherwise marking on a substrate, i.e. the recording medium, the award information, product information, redemption terms and a verification number; the record, such as coupon, includes commercial messages, including advertisements and announcements of special events and prizes. When desired, prizes may be awarded to a successful contestant over and above the award for an acceptable response; examples being "blind" or sweepstake prizes.

The term "prize" is intended to include all forms of rewards, such as cash, prizes, discounts, free merchandise, other financial and non-financial benefits, certificates, recognition or benefits. The terms "prize" and "discount" as used herein may occasionally be interchangeable.

The term "redeem" is intended to include the collection of a prize by delivering or presenting a coupon personally, through the mail, or other forms of obtaining a prize or discount upon surrendering or in exchange for a coupon.

The term "sales outlet" is intended to include retail and public stores, redemption centers, catalog centers and all sales location whether accessed in person or by mail.

The word "conductor" or "host" as used for instance in the term "conductor of a broadcast transmission" is intended to include the individuals engaged in the operation of formulating a message or program for broadcasting on behalf of an advertiser, manufacturer, store or sponsor.

The term "dissimilar" is intended to include the meaning of different and non-identical.

The term "shopper" is intended to include individuals who are potential or perspective buyers of products and services.

The term "scoring basis" is intended to include complex scoring based on a formula, credits earned, difficulty level, time consumed and other criteria, as well as an automatic or fixed scoring basis, such as a single and universally applicable score as would be applied to a "yes or no" answer. An example of a fixed scoring basis would be a 10% discount prize for every correct answer entered within the allowed time limit.

A "correlation" of alphanumeric or other symbols may take the form of a complete or partial match or any other mathematical or predetermined correlation thereof.

The term "listing" as in "product listing" is intended to include the names of products, their specifications, prizes, discounts and other product information.

The term "matching" is intended to include any predetermined correlation of alphanumerics or symbols.

The term "superior" as in "superior response" is intended to include answers, response and predictions that are more accurate, more comprehensive, more responsive or entered within a shorter period of time.

The term "acceptable response" is intended to include answers to questions and prediction of events which are wholly correct, or sufficiently or in part

correct, or which otherwise qualify for a prize, discount, recognition or award.

The term "conjointly" as used herein refers to the transmission and reception of electronic signals and the presentation of a task-setting message and of product information conveyed by said signals in combination, taking place partially or entirely concurrently or following each other so as to form a joined presentation.

The signals electronically transmitted and conveying task messages are referred to as the task-setting signals. The signals, electronically transmitted and conveying the response criteria are referred to as the response criteria signals. The signals electronically transmitted and conveying a product list or product information are referred to as product information signals. The signals electronically transmitted and conveying the outcome criteria of a prediction are referred to as outcome or success criteria.

The product signals may include information regarding additional or special discounts or other prizes over and above, and unrelated to, the coupon prize. For example, a product listing may include under one or more products the statement "The purchase of this product doubles your coupon prize". This form of direct marketing gives managers a great deal of maneuverability including sales on short notice. These types of messages presented to shoppers for instance on a TV-terminal, or LCD-screen, or appearing on prize coupons, can be modified upon a seller's instructions on very short notice, such as through telephonic instructions by a store manager to a broadcast station which transmits the response criteria and other instructional signals.

Typically, the printer includes means for storing a recording medium, for instance a continuous paper tape which, following the printing of a coupon, is severed or divided into coupon sections. According to the present invention, the device includes known means capable of dispensing tokens, such as coupons of larger or smaller size, depending on the amount of text printed on such coupon and having desired configurations. When desired, for example in the case of an educational quiz as described below, the printer can be designed for the presentation of graphics or it can take the form of a telefax device capable of depicting pictures, drawings and the like.

Using the present methods and the systems described, a broadcaster or a sponsor formulates task sets, the sets each comprising task-setting and response criteria signals, being broadcast successively. Tasks may be interspersed in programs or program segments and may be broadcast individually or intermittently. Each task is accompanied by one or more acceptable responses. One acceptable response may apply to more than one task, such as the answer "yes" applying to a number of questions. A task-setting message can comprise a question requiring an answer, or a solicitation or request for a prediction of the outcome of a future event. Operationally, these two types of task-setting messages and shoppers' responses thereto are treated similarly, except that in the case of a question-, the period of time allowed for entering an answer normally is fixed, whereas in the case of a prediction, the entering or further entering of predictive information or the modification of predictions is not necessarily inhibited after a fixed period of time, but is inhibited prior to or at approximately the time of the occurrence of the event.

5,227,874

81

The response or outcome criteria signals are broadcast from a central location, which may or may not be the location of the task broadcast. The product information signals normally are broadcast but may be broadcast from another central location. The product signals may be modified at any time as directed by a sponsor.

In the operation of the system described, a retailer prepares a listing of products selected for sales promotion in the target market. The products selected may be designated by name, but often are numbered and may be divided into categories. The products listings displayed at members, locations are grouped accordingly. If the product listing of a sponsor is lengthy, it can be displayed to members in successive segments or groupings. This is achieved by the use of known display and scrolling devices. Members' display devices may also be adapted to display and re-display successive listings of products or lists of numbered products in different categories as and when desired and such additional lists may be called up in sequence by a member of the broadcast audience until a desired product category and/or a specific product is displayed which a member intends to buy.

When preferred, the entire presentation of product information can be performed on television. In that event, the product listing can be shown on the television screen and the instructional signals are transmitted on the audio sideband frequency of the TV-program. Alternatively, the product listing can be shown on a liquid crystal display or on a small, separate, passive TV-screen. Both the passive terminal and the response unit include comparison, scoring and printing circuits receiving their radio command signals via a TV-audio or radio sub-carrier.

Using the split-screen television technique, the product information can conveniently be displayed along with other portions of the TV-program. This method is particularly easy and economical to implement on an automated cable channel, which for example can display concurrently a question and a product list.

The selected product is identified by touching numbered buttons on a respondent's entry device, or by other means. This selection is outputted to and is stored in a memory coupled to the printer or to means for computing the coupon value. The coupons may carry the same percentage value, but a different value in absolute terms, depending on the price of the merchandise. For example, for the same correct answer or prediction a $5.00 item selected by a contestant may be subject to a $.50 discount, whereas a $2.50 item is subject to a $.25 discount, the computation being performed by scoring means. In order to accommodate a variety of differently priced products, the coupon value can be expressed in terms of a percentage discount applicable to any product selected by a member.

If a higher difficulty level is chosen, the absolute monetary award or the percentage of the discount is raised. As an example, at the basic or first level of difficulty, the discount is 10%, at level two it is 15% and at level three it is 20%.

The response unit may include a self-contained memory which lists products for long term use. Memories of this kind, such as boards or cards for use in the response units, may be in interchangeable form for substitution in the response unit as required. For example, when a member receives a new coupon tape, whether in the mail or through personal pickup at a store, a sponsor may utilize the opportunity to provide such a member

82

with a revised memory board which is supplied to such member along with the new tape and inserted in or connected to the response unit. Such revised memory is valid until replaced. Normally, the product listings assign numbers to individual products for use by shoppers. The response units at members, remote locations may be equipped with a memory capable of retaining all of the product items of a retailer for a predetermined period of time. Products may be numbered permanently or on an ad hoc basis. Periodically, say every day, the retailer conveys a listing of the names or numbers of products selected for promotion on that day. A sponsor's product listing may be stored in a memory for extended periods of time. The memory may be part of the display means permanently storing product information. The shopper is provided with control means to activate the screen displaying such listing at any time and further is provided with means to enter and indicate one or more items of interest to such shopper in the near future.

The selection of said item is stored in a memory coupled to the means informing shoppers of items chosen by the sponsor for promotion. The display and selection means are further provided with comparing means and alarm means, visual or audible, to inform or alert a shopper when the item of interest to the shopper is one chosen by the sponsor to which a prize is applicable. This method enables shoppers to wait until an item on a shopper's marketing list is announced as one eligible for a special prize and then attempt to qualify for such a prize by responding to a question. In such an event a shopper's product selection is entered prior to the entering of an answer or prediction.

Prize coupons can be redeemed at a sales outlet specified on said coupon; other provisions may appear on coupons, such as dates and terms of redemption. A discount or other prize specified on a coupon may be made applicable to a group or mixture of products which includes the product specifically selected by the contestant, as well as other products to be promoted. Coupons may be redeemed in person, by mail, or by telephone using the validation code on the coupons to verify its authenticity.

In an alternative embodiment, contestants' display means are directed by the product signals to display only the names or numbers of product items selected by a sponsor from the comprehensive listing of products permanently stored in the memory of the response units. The product numbers thus displayed and applying for example to a "special" on sale the same day may be changed easily and quickly. A sponsor may provide printed lists of all products to viewers, each product being permanently numbered so that a viewer can relate a broadcast product number to a specific product.

When preferred, the entire presentation of product information can be performed on television. In that event, the product listing can be shown on the television screen, using for example the split screen or window technique, and the instructional signals can be transmitted on the audio sideband frequency of the TV-program. Alternatively, the product listing can be shown on a small, separate, passive terminal screen, which can be part of the response unit.

The methods provide, when desired, for an announcement of product information by the host of a TV-broadcast. This embodiment is preferred when the information is to be particularly emphasized or relayed to the public as quickly as possible. In that event, the

5,227,874

## 83

host indicates to members of the broadcast audience the products or the reference numbers applying to specific products, so that a contestant, by touching appropriate buttons on a keypad of the response unit, can designate the product which is to be identified on the coupon dispensed to a successful contestant. An on-stage or off-stage announcer can orally describe the product and related information, while the corresponding visual information can be retained on the screen for as long as is desired.

The present invention has applications in areas other than the traditional promotion of commercial merchandise. An example is an inventory of perishable produce which will have to be discarded, unless sold within 48 hours. A "special" on such produce can be announced on very short notice, the produce carrying a 40% discount if purchased within 48 hours. The following day, the discount provided on prize coupons can be raised to 75%, if the produce is purchased that same day. It is evident that a store manager will prefer to salvage 25% of the retail value of a product to a total loss. As an additional promotion device, the basic level of difficulty in answering a quest-ion can be dropped, so as to generate an even larger number of prize winning shoppers. As an additional illustration, in the example, a product selection may be left unchanged for all tasks presented, or may be changed when the desired number or quantity of products has been reached to which the prizes won by such a member are applicable. The system can be adapted to permit contestants to select more than one product to be specified on a prize coupon, provided all of such products are included in the listing of products eligible for discounted purchase.

A prize can be made available to a shopper in the form of a coupon carrying a discount on a product or in another form, such as a cash prize, a credit or other benefit collected personally, by telephone, or through the mail.

In an alternative embodiment of the present method, the broadcaster or organizer of a program composes and provides to viewers product listings supplied by a plurality of sponsors. In such an event a program initiator periodically collects information from several local suppliers with respect to the products each of them wishes to promote. Based on such information, the program initiator or broadcaster than prepares a composite listing of appropriately numbered products available from a plurality of suppliers, which listing is announced and/or displayed to the remote audience on their display screens. The response criteria signals instruct the printer to output a hard copy record stipulating the sales outlet at which the products of the respective sponsors can be purchased using a discount token.

Thus, the latest product information can be conveyed to members of the remote audience and can be updated at any time. A sponsor can alter the instructional signals by making a telephone call to the local FM-station. This adds a great deal of flexibility to the promotional efforts of regional producers and local retailers. Obviously, the principle of the systems and methods described can be applied also to national broadcasts. In that event, the sponsors of an advertising campaign or program lists only products to be promoted on a nationwide basis.

It will be clear from the description of the coupons that, apart from carrying a prize, the coupons can serve a an effective direct marketing tool having advantages which no other form of promotion can match. The methods of the present invention make it practical and

## 84

economical to combine the delivery in a shopper's home of a promotional hard copy record representing a financial award with sales information of specific interest to the winner of the prize at the time of receipt. The fact that the contestant has specified a product selected for intended purchase signifies that such a shopper is likely to visit the sponsor's store and examine the coupon and its other promotional messages closely. Being in the store and exposed to another product promoted on the coupon, the contestant will at least seriously think about the other products promoted.

As an example, a dispensed coupon can carry a discount on a first product selected by a TV-viewer and, in addition, can carry a "buy one, get one free" message regarding a second product, the latter product being much more likely to be purchased once a shopper has entered a sales outlet than if the product had been the subject of a free-standing magazine insert.

Thus, a prize coupon carrying a discount on a first specified product and redeemable in a specified sales outlet, can be utilized to attract a shopper to said sales outlet in order to induce said shopper to purchase a second product available in the same sales outlet, said coupon carrying an additional discount or prize on a second product.

Coupons dispensed to winners normally bear a verification number or code. When desired, sweepstake or other prizes may be awarded in addition to the prizes applicable to scored responses, such additional prizes being awarded to a small number of winners determined in any suitable fashion.

Such additional prize information is conveyed to members, locations through the transmission of additional response criteria signals. For example, if the verification code consists of six digits, the last three digits in their specific order may constitute the "lucky number" of the day, if matched by a 3-digit number chosen by a sponsor on that day, entitling the holder of the winning coupon to an additional prize upon redemption of the coupon in a sales establishment or other specified location. The three digits chosen by the sponsor or broadcaster can be revealed at the place of redemption, or can be transmitted with the response criteria signals. The number of such additional prizes, which can range up to the value of sweepstake prizes, is controllable. In the above instance, the number of winning coupons is one per thousand coupons dispensed.

The fact that a prize coupon is issued only to contestants who have won it through skill, make it legally permissible in many locations to attach larger or even sweepstake prizes to such coupons. The delivery of a prize-winning record at a sales location preferably is tied to the personal delivery thereof, but may also be performed by using the mail or telephone.

The present invention combines practical, psychological and financial inducements to bring about an increased rate of coupon redemption by television viewers and radio listeners. A member of the broadcast audience who has selected a product because its purchase is timely, and who wins a discount prize through personal skill, and who will save on the purchase of the product, is very likely to redeem such a prize coupon by buying the product at the specified sales outlet.

A number of additional methods intended to induce TV-viewers to redeem coupons will now be described. The instructional signals directing the response units at viewers' locations to generate a token, such as a coupon, direct the coupon generator or printer to generate and

5,227,874

85

dispense to one successful contestant more than one coupon at a time. Multiple coupons may be awarded for superior responses. For example, a total prize may be awarded in the form of three coupons redeemable upon purchase of two or more items or kinds of merchandise, or a total prize may be awarded consisting of two identical coupons for the same merchandise. Additional coupons and cash prizes may be dispensed for one acceptable response at a high difficulty level or for an exceptionally comprehensive answer. If more than one coupon is awarded for one response, the two or more coupons may have different values, redemption dates or places of redemption, in order to increase the number of shoppers attracted to sales establishments on any given day or to induce a shopper to visit a place of redemption more than once.

In another embodiment of the methods described, coupons dispensed to winners of an award are provided with first code symbols, said symbols varying from coupon to coupon, an example being consecutive six-digit numbers. The first code symbols may have previously been provided on said coupons, for instance on the coupon tape prior to the insertion of said tape into the coupon generating means. The first code symbols can also be provided on the coupons at approximately at the time of or subsequent to the printing of the prize indication. The first and second codes together constitute a winning combination if they match or bear a predetermined correlation, said correlation having been determined by an organizer of the broadcast, such as a sponsor, or advertiser. As an example, in the case of a six-digit number code, a correlation may be determined to exist if the last three digits on such a coupon match. Other code forms may be devised. Winning codes or code combinations normally are not intelligible, i.e. not identifiable as a winning code, by a contestant at his location and are revealed to a shopper only at the place of redemption of the prize coupon.

A code may be alphanumerical and/or comprise other symbols, which code is only machine-readable at the place of redemption, so that the bearer of such a coupon will not know whether a prize coupon caries an additional prize until and until and unless said coupon is redeemed. The opportunity of winning an additional "blind" prize, the value of which is not discernible by a contestant who already has won a prize through skill, i.e. by correctly answering a question, will in many instances be the decisive factor that will make the holder of such a coupon decide to visit a store or other place of redemption. A coupon may carry a discount applicable to the price of a first selected product as described, and in addition, the generating means, such as a printer, may be directed by the instructional signals to provide on the coupon indications of an additional prize or other benefit tied to the purchase of a second product. The second product may be specified by the contestant, it may be specified by a sponsor, or it may be an unspecified product. In the latter case the holder of such a coupon will be able to purchase the selected product at a discount and apply the additional prize to a second product selected once the shopper is in the place of redemption.

In another use of the invention, a combined method is employed to raise the redemption rate of coupons pre-printed in magazines, newspapers, free-standing inserts and the like, hereinafter referred to as preprinted coupons. The following examples illustrate a number of

86

uses of the response unit of the invention in combination with the above mentioned preprinted coupons.

A hard copy record generated at a shopper's location bears a stipulation to the effect that, upon presentation of a specified or otherwise identified preprinted coupon together with the generated record, the shopper is entitled to an additional prize. The prize may be specified on the generated record, or it may be a "blind prize" which is revealed to the shopper only at the place of redemption of the preprinted coupon. It may also be printed on the coupon contained in the free-standing insert. In another version of the method, the preprinted coupons are provided with an identification, such as an alphanumeric or other code. Coupons dispensed to a prize-winning shopper by his or her response unit also are provided with an alphanumeric or other code. A shopper presenting a preprinted coupon and a prize-winning coupon having matching or correlated codes is entitled to an additional prize, which may be a sweepstake prize. The value of the additional prize is disclosed to such a shopper only at the sales outlet. All of the methods described will raise the redemption rates of coupons.

If desired the steps of comparing entered responses to the applicable response criteria and of identifying and scoring prize-winning responses can be performed at a central location, in which event shoppers' entered responses are electronically transmitted to a central location, such as by telephone and modem. In such a situation, means for comparing, identifying and scoring are provided at a central location, these means operating in the manner described previously with respect to the response unit at a remote station. Instructional signals governing the generating of a hard copy record are then electronically transmitted to shoppers' locations, at which location said records are generated and dispensed. The instructional signals can be transmitted to shoppers' remote locations in any known manner, such as on an FM-radio frequency, or, in television transmissions through the vertical blanking intervals, through TV-audio or video sub-carrier signals generated by subliminal light impulses.

In all instances, however, hard copy records are generated and dispensed at shoppers' remote locations.

According to the present invention, scrambling devices may be provided as part of the response units at shoppers' locations; such scrambling devices of known design are activated and controlled by instructional signals transmitted from a central location. It is the function of said scrambling devices to scramble in random fashion alphanumeric data transmitted, so that when desired, the codes printed or otherwise provided on the hard copy records of a multitude of shoppers randomly differ from each other. In that manner, shoppers in a geographically limited area will receive tokens such as coupons bearing dissimilar or non-identical alphanumeric or other codes. The method of randomly rearranging or disturbing the order of numbers and other symbols transmitted, permits the organizer or sponsor of a broadcast to limit the distribution of prizes to a restricted and somewhat controlled number of television viewers, thus limiting the financial exposure of such sponsor. When broadcasting to a larger audience, the financial exposure of a sponsor can be statistically determined within a narrow range by following the scrambling procedure described.

The product list may be presented to shoppers at their remote locations by transmitting instructional signals

5,227,874

87                                                                                          88

from a central location directing the printers of the response units to print the names or numbers of a plurality of products on the prize coupon generated and dispensed as described. The shopper having received such a coupon displaying a listing of several products then indicates his or her choice of product on the coupon in any convenient manner, such as by checking off, circling, filling in a box, drawing a line, etc. The prize carried by such a coupon is applicable to the earmarked product. Thus the coupon itself serves as a product list limited to products from which a shopper can make a final selection after having entered a sales outlet. Thus a winning TV-viewer can take to a store a discount coupon applicable to a product selected by the shopper at the checkout counter from a list of products. In this fashion, the sponsor has the ability to limit the list of discount products and the shopper can make the final selection.

According to a preferred method and configuration of the passive terminal, a participant can program a memory in the terminal by entering the names or numbers of one or more products targeted by the participant for early purchase. The potential shopper can then leave the terminal unattended. When the sponsor of a program includes a product so specified by a shopper among those earmarked by the sponsor for discounts or other awards, an alarm in the terminal is activated so as to alert the shopper to this fact. The shopper then has the opportunity to participate in the game and to win a prize token, such as a coupon, carrying a discount on the selected product targeted by the shopper for immediate purchase. It is virtually certain that such a shopper will redeem the coupon thus obtained.

FIG. 28 shows steps of the method for the selection aspect of the invention. Preparation of materials, including formatting of response and scoring criteria, may be performed by the host at the central station, or prerecorded by the host for transmission to remote stations from the central station, indicated at block 828. Program material including questions and product listings are televised at block 830 to be received for viewing, at block 832, by a shopper, indicated at block 834. A separate communication channel at block 836, such as a sideband of an audio or video portion of the television transmission, provides instructions such as response and scoring criteria, as well as product advertising information in the form of electronic signals to be employed in the operation of a response unit, indicated at block 838. The response unit includes a keypad for entering an answer, memory for storing the various criteria and instructions plus advertising or merchandising matters, computation equipment for evaluating answers, and a printer for producing a hard copy record of the respondents performance.

The shopper selects an area of interest at block 840 at the response unit, and then enters a response at block 842. Upon a successful responding, the respondent shopper receives at block 844 a coupon from the response unit. The coupon provides a discount for selected products, and may carry advertising. At block 846, the shopper transmits the coupon to a redemption center by any one of a variety of ways, such as, by mail or by telephone or in person. Then, at block 848, the shopper redeems the coupon and receives an award such as a discount on the purchase of a selected product.

The foregoing description shows the full versatility of the system and methodology of the invention for allowing contestants at remote stations to participate in

a game, quiz or other form of show, contest, game of chance, or making predictions of the outcomes of unknown or future events, whether the show be live, prerecorded, or partially prerecorded and partially live.

FIG. 30 is a block diagram of a playing station of the system of FIG. 29; and

FIG. 31 is a flow chart showing method steps employed at various components of the system of FIG. 29 for practicing the forgery proof wagering game.

FIGS. 29 and 30 are block diagrams showing a further embodiment of the invention employing a central station and a set of remote stations, similar to those described above, in a system 900 for the conduction of a wagering game in a forgery-proof fashion. The system 900 includes components which are essentially the same as components described above, and includes modifications for adapting the components to the practice of wagering, as in a wagering game. The system 900 includes the central station 202, described above in reference to FIG. 6, and playing stations 206C similar to the remote stations 206B of FIG. 22. Each of the playing stations 206C includes a response unit 800 and a receive system 558 described above with reference to FIG. 26, and a TV system 220 described above with reference to FIG. 6 and employing a screen 208 (FIG. 6) or screen 20 (FIG. 1) for presenting data or a scenario to a person at the remote station. If desired, a scenario or wagering situation may be presented to players via the telephone. Also included in the system 900 are a telephone switchboard 622 and a response evaluation unit 808 described above with reference to FIG. 22, and a central telephone facility 702 and a subscriber's bank 708 described above with reference to FIG. 24. The system 900 further comprises a scoring computer 902, a data facility 904, a redemption facility 906 and an authorization unit 908. In a playing station 206C (FIG. 30) the response unit 800 is connected via lines 346 and 348 to the TV system 220, as shown also in FIG. 6, and optionally via line 696 to a detector 652 at the screen 20, as shown also in FIG. 3. Message and control signals (FIG. 29) are coupled between the central station 202 and the switchboard 622 via lines 638 and 640 as shown also in FIG. 22. Connection of a playing stations 206C (FIGS. 29 and 30) via modems 634 and via lines 636 to the switchboard 622 is shown also in FIG. 22. In FIG. 29 a communication system 910 provides for a broadcast transmission, via a communication channel 912, between central and remote stations, such as the broadcast transmission 222 of FIGS. 6 and 22, or the separate broadcast transmissions by radio and television links of FIGS. 1 and 3. The communication system 910 also provides for communication via the telephone switchboard 622 and telephone lines 636, such as the telephonic communication of FIG. 22.

In the practice of wagering by the invention, a player at a playing station 206C is informed about the nature of the wagering situation as a first step in the usual practice of the invention. The information provided to the player may be only rudimentary, such as a time when wagering may be performed, and a situation wherein a game such as lotto is to be played by choosing one or more numbers. Alternatively, the information provided to a player may be complex such as a situation involving a game show, as has been described above with reference to FIG. 6, wherein at some point in the show, the players at the remote playing stations 206C may be asked to bet on an outcome of the show or some other event. The communication channel 912 is intended to

5,227,874

89

represent various ways in which data can be disseminated to the players at the stations 206C such as by television and/or radio, a radio being indicated at 914 in FIG. 30. It is understood that the communication system 910 includes transmission of the requisite data by various means, in addition to the foregoing broadcast transmission of television and radio, such as by means of a previously recorded audio message employing a recorder 916, in accordance with the practice described above with reference to FIG. 11. Data may be provided even by means of a printed medium 918 such as a newsletter. And, as will be explained below, the communication system 910 includes transmission of the requisite data also by means of a telephone 620.

Additionally, a video cassette recorder (VCR) 920 may be selectively coupled via a first branch of a switch 922 to the TV system 220, in lieu of connection of the TV system 220 to the antenna 282 for receipt of the broadcast transmission 222. Connection of the TV system 220 to the VCR 920 provides data in the manner described above with reference to FIGS. 11 and 12. A second branch of the switch 922 selectively provides for connection of the response unit 800 to the antenna 36 (shown also in FIG. 1) via the receiver 40 and the demodulator 42, or to a receiving system 588 for reception of data via the telephone line 636 as described above in reference to FIG. 22. Data may also be inputted to a player via a telephone 620 connected to the telephone line 636 as described in FIG. 22. The various ways in which data can be inputted to a player at a playing station 206C are represented collectively in FIG. 30 as a data input unit. In the practice of the invention, a record outputted by the dispenser 360 of the response unit 800 may be in the form of a card 362 which is conveniently carried by a player to the redemption facility 906 for receipt of a prize for a winning wager. The carrying of the card 362 to the redemption facility 906 is represented by a dashed line 924. A communication link 926 connects the redemption facility 906 with the data facility 904. A communication link 928 connects the central station 202 with the data facility 904.

With reference to FIGS. 29–31, the operation of the system 900 begins with the preparation of data, at block 930 (FIG. 31), to be presented to a player at a playing station 206C, via block 932, and to be inputted to the response unit 800 at the playing station 206C via block 934. In FIG. 31, the method steps are presented in solid blocks while the locations in the system 900 (FIG. 29) for the performance of the steps are shown by dashed lines enclosing the solid blocks. Typically, the input data is prepared at the central station 202, but may also be prepared at some other location. By way of example, a wagering situation may be based on the outcome of a horse race, as in off-track betting, wherein the identity of the horses varies from race to race. In this case, a host at the central station 202 presents the players with the various combinations of winning situations (to win, to place, to show) and possibly handicaps prior to each race. A televised presentation of a sequence of races may be broadcast directly from the central station to the remote playing stations in the form of a live broadcast or in the form of a prerecorded broadcast, or may be broadcast from some other site distant from the central station but concurrently with the presentation of the host at the central station. Announcers may also present a situation via radio or telephone.

Thus, for example, the program signal transmitted via the communication channel 912 may include a listing of

90

the horses' names and identification numbers while an instructional signal transmitted via the channel 912 would include the odds for each horse and the horse identification numbers plus scoring criteria for categories of win, show and place. If, instead of a horse race, the wagering is based on a televised game show, such as has been described hereinabove, the program and the instructional signals would include the data and instructions as described above, and would include also data and instructions relating to the wagering. For example, studio contestants may be playing a game of geography, and players at the remote stations may be attempting to guess the answers before the studio contestants. Wagers can be placed on the answers. For example, a question may be posed as to which countries border on the Black Sea, and players would enter the names of countries via the keyboard 356 along with wagers that the countries entered are the correct answers to the questions. Prizes can be gradated commensurate with knowledge presented. In a similar fashion, the studio program might involve mathematical calculations which would be performed by the players at the remote stations, multiple choice answers would be provided on the television screen 208 at each playing station, and the players would bet on the right answer. In this case, the outcome of the wagering would depend on the players, skills as well as on luck. In the simplest situation, it is possible to practice the invention without a transmission of data and instructions from the central station 202, as in the case of a game of lotto wherein each player chooses six numbers out of a set of one hundred numbers. In this case, data of the event including the time and rules could be published in a newsletter, and instructions for operation of the computer 804 could be provided in a magnetic medium of the memory 806 (FIG. 26).

As has been described above with reference to FIGS. 4, 8 and 26, the response unit, in its various embodiments, outputs a record such as the card 362 providing data as to a player's response. The outputting of the record is indicated at block 936. The record may include a player's score and identification (I.D.), as well as the serial number of a response unit and other data. In similar fashion, the response unit 800 employed in the conduct of wagering in FIGS. 29–31 also outputs a record such as the card 362 by means of the dispenser 360 to provide information as to a player's wagering. In particular, the number or set of numbers selected by a player, as in a lotto game, the identity of a winning racer, as in the case of a horse race or ski race or boat race, by way of example, or selected elements of a game show which may include an article of clothing or a geographical place or the author of a book, by way of example, is imprinted on the card 362. For ease of describing the invention, the outputted record may be described as the card 362, it being understood that the outputted record may have the form of a tape, coupon, entry ticket or other of various forms as have been described above. The card 362 is conveniently carried by a player to the redemption facility 906 to obtain a prize.

In accordance with a feature of the invention, protection against a forgery of the card 362 is provided. This is accomplished as follows. In addition to the recording of a player's response and identification on the card 362, the response data is recorded automatically also in a storage unit 940 of the data facility 904 via block 938. The storage unit 940 is inaccessible to players and all other persons except for authorized personnel conduct-

ing the lottery or other form of wagering. Communication of the wagering data from the playing stations 206C is accomplished via the communication system 910, particularly via the telephone lines 636 and the switchboard 622 to the data facility 904. Later upon redemption of the card 362 at the redemption facility 906, the invention provides for the process steps of authenticating the record, at block 942, and only after a successful authentication, redeeming the card or coupon at block 944. In the process of authentication, the redemption facility 906 communicates via the communication link 926 to the data facility 904 to interrogate the storage unit 940 to attain the copy of the record, this being followed by a comparing or the data on the record copy of the data facility 904 with the record on the card 362. Any alteration of data on the card 362 will cause a disparity between the two records of data resulting in a rejection of the card 362. Thereby, the system and methodology of the invention are rendered forgery proof.

In a typical wagering situation, the entering of data by a player (block 932) into the response unit 800 is accomplished within a preset amount of time allocated for the response, after which the response unit 800 refuses further entries in accordance with commands of the instructional signal as described hereinabove with reference to FIGS. 4, 8 and 26. Alternatively, or additionally, following an announced point in time, command signals may be transmitted from the central station 202 directing the switchboard 622 to terminate transmission of further entries to the storage unit 940. Thereafter, in accordance with the process of the invention, a host at the central station 202 announces the winning entity such as the winning number or set of numbers of a lotto game or the answers to a game of geography or other form of game, at block 946, and broadcasts the winning entity to players at the remote playing stations 206C via the communication system 910. Additionally, the winning entity is communicated to the response units 800 at the playing stations 206C via the communication system 910, and to the data facility 904 via the communication link 928 for storage in the storage unit 940. Communication of the winning entity to the response unit 800 is indicated at block 934 (FIG. 31), and communication of the winning entity to the data facility 904 is indicated at block 938.

The winning entity includes a reference element against which a player's response can be compared to determined the correctness of the response. The reference element is established, typically, by the host at the central station 202 at block 948 for transmission to the evaluation unit 808. For example, in the case of a lotto game wherein a player is to select six numbers from a set of one hundred numbers, the reference element would comprise the six numbers to enable the evaluation unit 808 to compare a player's response to the six numbers. In the case of a race, the reference elements of participating racers can be one, two, three and so forth. Alternatively, if the wagering game required a player's response to fall within a range of values, such as in a case wherein a player is to guess the average summer temperature in Alaska, then the reference element would provide the average temperature and the requisite range of values to enable the evaluation unit 808 to compare a player's response with the designated average value, and also to determine if the player's response falls within the range. Utilization of the evaluation unit 808 is accomplished by continuing the inventive process

at block 950 wherein each player's response is compared to the reference element. Each player's response and the reference element are coupled, respectively, from the data facility 904 and from the central station 202 to the evaluation unit 808, and the result of the comparison is fed from the evaluation unit 808 back to the data facility 904 for storage in the storage unit 940.

The invention provides for still further evaluation of a player's response in the form of a scoring of the response at block 952 by use of the scoring computer 90 in accordance with instructions from the central station 202 provided at block 954. Data for the scoring computer 902 is provided by the data facility 904. This additional evaluation is useful in the foregoing example in which a player wagers on the value of the average summer temperature in Alaska. The instructions at block 954 may provide for a highest score to a player who selects the correct value of the temperature, and lower nonzero scores to all players who have selected temperatures falling within the designated range. Additional score points may be awarded, by way of example, for player responses closer to the correct value than an average deviation of selected values from the correct value. Thus, the scoring computer 902, in this example, would compute the average deviation of selected values from the correct value, in the process of scoring the responses. In the case of a race, such as a horse race or a sailing race, the scoring computer 902 would evaluate the odds based on the responses of all the players, and then employ the odds in computing each player's score.

With respect to the magnitude of a wager entered by a player, the magnitude may be expressed as a dollar amount or an amount of points, or an amount of gifts to be presented by an advertiser, by way of example. The scoring computer 902 also multiplies the amounts wagered by the players' scores to obtain the total prize or award due each player. In the event that the amount of prizes to be awarded is based also on the total amount wagered, as in the case of a purse at a horse race, then the scoring computer 902 also calculates the total amount wagered for computing the amount of each prize. Suitable programs for operating the computer 902 to accomplish these calculations are well known, and need not be described herein. The resulting scores and magnitudes of prizes are stored in the data facility 904, and are also transmitted to the central station 202 for subsequent transmission to the response units 800 at the playing stations 206C. At each of the playing stations 206C, the dispenser 360 of the response unit 800 imprints upon the card 362 data as to the amount of the prize. The card 362 is now ready for presentation at the redemption facility 906, and the data facility 904 has a copy of the data on the card 362 to permit the authentication step to proceed prior to redemption of the card 362. Thereby, the invention has accomplished a twofold goal of being adaptive to a large variety of wagering situations, and of providing a forgery-proof process for redemption of the cards 362.

The features of the invention, as provided by the system 900, are readily implemented in a fashion convenient for people at home, as well as other locations, as may be appreciated from the ensuing discussion of the operation and the advantages of the invention. The invention is applicable to the conducting of a large variety of games of chance including lotteries wherein players can participate in their homes and obtain entry tickets, such as in the form of the card 362, by way of example, directly in their homes. Furthermore, the

93

players can pay for their wagers without leaving their homes, so that players who do not win do not have to leave their homes, and players who do win need make only one trip to a local lottery agent at the redemption facility 906 to collect their winnings.

FIG. 29 shows the use of the central telephone facility 702 in conjunction with the switchboard 622 to provide a convenient method of paying for one's wagers without leaving the home. By means of prior arrangement with the telephone facility 702, a player at any one of the playing stations 260 is provided with a personal identification number (PIN) which is readily entered via pushbuttons on a telephone to identify the player to the telephone company. The PIN number securely identifies the player to permit a monetary charge to be placed against his account in the same fashion as a charge is placed for a long-distance telephone call. The PIN number and the amount of money being wagered can be applied via the keyboard 356 and the modem 634 to be received by the telephone facility 702 in the same fashion as can be accomplished the the use of pushbuttons on a telephone, but at a much greater convenience than by use of the telephone. The keyboard 356 in conjunction with the computer 804 and the modem 634 enable a player to attain connection with the data facility 904 in much the same fashion as a computer terminal may be employed in the home to interrogate a computer service, such as a service providing legal, medical, travel, financial, or other materials as are currently available. By means of the authorization unit 908 which checks the PIN number, the telephone facility 702 ascertains that the player is a bonafide approved user of the telephone system.

The amount of money wagered is billed automatically by the telephone facility 702 to the bank 708 of the player, or telephone subscriber. To facilitate this billing function, the computer 804 may tally the amount of all wagers being entered by a player in response to a game show or other wagering situation presented by the central station 202 and then, upon completion of a succession of wagers, present via the modem 634 the total value of the wagers to be deducted from the players account in the bank 708. If desired, an indication of payment by the player may be transmitted by the telephone facility 702 to the data facility 904 to ensure that there is no consideration of a player's wager until after payment has been made. The process of billing the player, or telephone subscriber, is similar to that described above with reference to FIG. 24. Alternatively, the billing may be performed by a separate entity (not shown), such as by a service provider connected via telephone lines to the switchboard 622.

It is an advantage of the present invention that the identity of winning players and the amount won can be announced on television or radio immediately following the drawing of a winning number. The convenience of use of the inventive wagering system contrasts greatly with wagering processes presently available to the general public. At the present time, individuals who wish to participate in a lottery must visit the location of a local lottery agent or retailer to purchase a lottery ticket. Thereafter, a second trip is necessary to collect the winnings at the agent's location. The identities of winners often are not publicly announced immediately following the drawing, and sometimes are delayed for one or more days. Normally, no televised entertainment value is attached to a lottery. These and other drawbacks are overcome by the present invention.

94

The response unit 800 is registered in the name of an owner, such as a TV viewer who may elect to become a player in a wagering game. The hard-copy records dispensed by the response unit 800 can bear identification data tracing the hard-copy record back to the specific response unit. The user's name may even be printed on each ticket. The hard-copy record, described above as the card 362, may serve as a coupon, ticket, or proof-of-entry ticket for participation in a lottery or other wagering situation. Furthermore, as noted above, the card may also serve as a winning ticket by which a player redeems his prize at the redemption facility 906.

The card 362 may be provided with validation data and coded markings, as has been described above, for additional security to be used in conjunction with the forgery-proof benefit provided by the placing of a copy of the card data in the data facility 904 in a secure fashion which is inaccessible to all persons other than personnel operating the data facility 904.

If desired, a player may select his or her own lottery number, and to compare a selected number with a winning number printed on the hard-copy record without delay, to enable the player to determine whether a prize has been won. A ticket or card 362 may be printed with alphanumeric characters which are readable by the player, and/or by means of bar coding which is to be read by machine for increased accuracy and security in the ticket redemption process. Furthermore, by printing both the winning number or entry along with the player's entry on the ticket prior to the drawing, a player is able readily to compare his entry with a winning entry. In terms of construction of the system 900, the data facility 904 may be located distant from the central station, or may be located on site with the central station 202. Also, the scoring computer 902 and the evaluation unit 808 may be located at sites distant from both the central station 202 and the data facility 904 or, alternatively, either one or both of the computer 902 and the evaluation unit 808 may be located at the central station 202 or the data facility 904. Furthermore, while the playing stations 206C are located normally at considerable distance from the central station 202, such as in a different city, it is within the inventive concept to locate one or more of the playing stations 206C relatively close to the central station 202 as is done in the situation of a studio audience participating in a contest, or in the aircraft shown in FIG. 11. Also, by virtue of communication between the data facility 904 and the central telephone facility 702, different credit limits can be set for different lotteries such that the storage unit 940 is provided with credit limit data prior to the conducting of a lottery or other wagering situation. A wager which exceeds the credit limit is rejected by the data facility 904, and the telephone facility 702 is directed to credit the subscriber's account in the bank 708.

If desired, the data facility 904 may store additional data of players who have registered to play a wagering game. For example, photographs of individual ones of the players may be stored digitally in the storage unit 940 for subsequent transmission to the central station 202 followed by a television transmission, to the playing stations 206C to allow all members of the viewing audience to see a picture of a winning person. If desired, the televising of a person's previously stored picture may be employed for participation from a remote station in a game show even without the placing of a bet on an outcome of a game show. The game show and the lot-

95

tery may be, but do not have to be, televised from the same central location.

To ensure additional protection against forgery various identification numbers or other indicia may be imprinted in coded format, or in an invisible format such as by use of magnetic media, or holographic optical recording media, with a copy of the identifying data being stored at the data facility 904. A ticket presented for redemption must have the requisite identifying data.

In the playing of a lottery game, the player has the option of selecting a winning number or, alternatively, allowing the computer 804 of the response unit 800 to pick a number for the player. This may be accomplished by providing a random number generation program for the computer 804, such programs being well known. Thereupon, the computer 804 is able to select in random fashion one or more numbers from a set of numbers used in the lottery.

The capacity of the system of the invention to create and to dispense wagering tickets with security against cheating is an important object of the invention because this allows players to operate their response units, including the printers, in their homes without danger of someone tampering with a printer to forge a winning ticket. The validating data imprinted on a ticket and the comparison of data with previously stored data in the central data facility enable a foolproof verification of the ticket. By virtue of the invention, the printer cannot be used as a forgery tool. Also, the system meets the objective of providing convenience to players by allowing persons to participate on the spur of the moment in a lottery game or other predictive contest while being debited automatically without leaving their home. The conduction of wagering in conjunction with a task, contest or game of skill rewarded with a prize adds significant entertainment value and possibly instructional value to the wagering experience. Game of lotto and bingo can be accomplished with particular facility by the invention, and the capacity for immediate announcement of winners on television enhances excitement among the participants.

The systems and the methods of the invention apply to events or games, by chance, such as lotteries, and to events or games covered by knowledge, skill or ability, such as quizzes, tournaments, bouts, contests, and races by humans, machines and animals. It should be understood that a prediction may pertain, for example, to an event of the past, but not known or no longer remembered by a player, so as to constitute a de facto prediction from that player's perspective. An operator or judge of a game of chance or skill determines the rules or conditions that are to be met to qualify for a prize. For example, in a form of betting known as "off track" betting on a horse race, there are odds governing payoffs to winners. The odds are determined at a central location and are reflected in the winning wager information transmitted from the central location to the remote playing stations for imprinting on the players' tickets.

In the practice of the invention for wagering, the terms "operator" or "organizer" of a game of chance or skill are intended to include all individuals in charge of such gaming activities or in any kind of decision-making capacity, including judges, referees, handicappers, umpires, racing committees and other officials. The terms "forgery-resisting" and "tamper-proof" are intended to include prevention and alteration, as well as the preventing of tampering with an object of the forgery,

96

typically a lottery ticket, and also includes making inaccessible and preventing electronic access to the object of forgery. The terms "fee" or "charge" are intended to include the meaning of debit, cost, or price charged to participants in a wagering situation. The terms "wagering", "betting" or "gaming" are intended to include the meaning of players' predictions of, or bets and wagers on, the total, final, midstream, or partial outcome of a game of skill, such as a golf tournament, and includes also the wager amount. The term "ticket" is intended to include the meaning of vouchers, coupons, certificates and other hard copy records.

The term "presentation" of a wagering situation or scenario is intended to include a presentation over TV, radio, and/or the telephone. The term "authentication" is intended to include processes of validation, verification, confirmation and acceptance of a winning ticket. The term "matching" as in "matching numbers" is intended to include any predetermined relationship between a player's entered data and the determined reference element, and between selected and winning numbers, such as a mathematical, partial, or zero relationship. The term "forgery-resistant data storage facility" is intended to include any facility in which stored data are protected against tampering, are inaccessible, or beyond the reach or influence of would-be forgers. If a wager is offered by an operator and such wager carries only a single type of fixed award, for example, or if only one wager amount is offered, then the term "wager amount determined by a player" is intended to include the acceptance of such fixed wager.

The term "game show" is intended to include the meaning of one or more questions, quizzes, predictions and solicitations to perform a task. The term "response" is intended to include the meaning of an answer and of a prediction. The term "scenario" is intended to include the meaning of a presentation, definition, view or description of an event or a situation. The term "entered wager" pertains to data entered by a player prior to the determination of the data constituting a winning wager. The term "winning wager" pertains to an entered wager having a determined correlation to a reference element. The term "reference element" pertains to data, such as a number, by which an entered wager is judged in order to determine whether the entered wager is a winning wager. The term "reference element" is intended to include measurements and expressions of evaluation, such as points scored, time consumed, judged performance, achieved ratings and standings of participants and players/contestants.

In a preferred embodiment of the invention, the operators of a game of chance decide on a formula by which prizes may be won by players whose selected indicia do not completely match a winning indicia. Rewards may be granted to players whose selected number or indicia come closest to the winning indicia. Players may enter selected indicia up to a cutoff point in time determined by a game operator; also, means may be provided for modifying a selected wager prior to the cutoff point. By way of example, if a winning indicia is the number 100 and the prize is $50,000 for a completely matching number, the following formula may be determined and applied in the event that none of the players has selected the number 100. Players having selected number 101 or 99 divide $30,000 among them, and players having selected numbers 102 or 98 divide $20,000 among them. Other schemes may be employed.

5,227,874

97

As has been described above, a number or indicium may be selected by a player or may be established by random selection. The number assigned to a player is communicated to the central data storage facility prior to a drawing of the winning number.

By way of further example in the use of the invention, a question may be posed in a TV show, the question asking the years in which World War I began and ended. A time limit for answering and a prize also are announced. A winning player would enter the years 1914–1918 in the response unit. The response unit prints out a ticket stating the players' entered information and identification. The response unit also transmits the same information via a modem and a telephone line to the central data storage facility.

When or after the host of the TV-show has announced the correct answer on the air, the signals conveying the correct answer and prize information are transmitted from the location of the TV-show to players' remote response units. The response units print the winning information on all players, tickets for comparison purposes. Winning tickets on which a player's entered information matches the winning information may be presented by the ticket holders at an appropriate location for redemption or playoff. As described above, the agent at the location can verify the authenticity of the ticket by communicating with the data storage facility and obtaining confirmation. In the case of a ticket formed as a magnetic card, the magnetic card can be validated by passing it through a well-known scanner connected to the data storage facility, the scanner reading the data recorded on the card for transmission to the data facility whereupon the data facility transmits back a signal acknowledging verification or denying verification.

In some instances, the conditions under which a lottery is conducted are similar in many respects to those of sweepstakes and other games. The present invention therefore is intended to be applicable to any game, contest or wagering based on knowledge, skill, or chance, in which it is important to prevent tampering with or forging of hard copy records by interested parties. While it may not be necessary to employ all the safeguards described herein in connection with every wager, the operator of the wager game has the option of employing the security measures disclosed herein. For example, in the case of wagering situations for which prizes of high value may be awarded, there may be further storage of a player's data indicia, number or symbols in an accessible location to facilitate secure redemption of a ticket. In the event that a player's betting exceeds acceptable monetary limits, the automatic billing via the telephone system, as disclosed hereinabove, may limit the amount of betting and disclose to the central data facility and to the response unit a rejection or limitation of bets exceeding a previously established limit. When required, players are notified and are asked to communicate their wager information to a designated location for storage and comparison purposes. Such a notice to players makes it clear that tampering with a player's home response unit is useless. Thus, players are dissuaded from attempting forgery or other form of falsification.

Security is enhanced further by providing the response unit with a registration or serial number by which each response unit is registered in the name of its owner. Hard-copy records dispensed by the response unit may bear the same serial number, if desired, to

98

enable tracing of a hard-copy record to the specific response unit which generated the record. This security is in addition to that provided by the PIN number described above by which a player gains access to the telephone system. Normally, in a wagering situation, a time limit is established electronically for the entering of wagers at the keyboard of each response unit such that a late entry, made after the time limit becomes effective, are not stored at the central data facility, and are not printed on the player's ticket, this precluding the player from winning a prize for a late entry of wager.

In the printing and dispensing of hard-copy records by a response unit, it is noted that the records may have a variety of forms which facilitate different manners of utilizing the hard-copy record. For example, in the event that a ticket is employed wherein the winning number and a player's entry are printed, the player has the opportunity to check as to whether he has won, or to the extent in which he has won in the event that various levels of winning are present. In the event that a magnetic card is employed as the hard-copy record, the card can be utilized in connection with automatic electronic debiting of a player by the amount of the wager, and with an automatic electronic crediting of winnings to a player's account. Equipment, such as automatic banking machines employing card readers, are already available for cooperation with the inventive system for providing these functions of crediting and debiting. Bar codes and bar code readers may also be employed in which case the bar code is imprinted on a ticket along with data imprinted with alphanumeric characters to be readable by a player.

As has been described above in the operation of a response unit, the invention enables participants in the remote audience to designate areas of interest. This is particularly important with respect to an award received by individual ones of the participants, such that the award is related directly to a participant's area of interest. Thus, in the case of a game show wherein advertisers' products are displayed in various areas of interest, a participant of the remote audience can select a product area of interest and, subsequently, receive an award in the form of a coupon allowing him to purchase a product in the area of interest. This greatly increases a participant's interest in the game show. This feature also increases greatly the chance that a participant will employ his coupon, as by visiting the store of an advertiser to redeem the coupon. Also, in a quiz program, a contestant is given the opportunity to select an area of interest from alternative areas of interest in which the contestant is believed to have a special knowledge area. Prize coupons may be available to winning contestants entitling the player to a discount on merchandise promoted by a sponsor. However, in the event of a discount coupon issued for a product that is not in demand, the unwanted product, most likely, would not be redeemed. However, unlike merchandising systems of the past where coupons have been issued in areas of little interest with consequential low rates of redemption, in the case of the present invention a high rate of redemption is anticipated because of the capability afforded to participants to select areas of interest, both with respect to manufacturers' or retailers' products as well of areas of interest in terms of a participants' knowledge.

In view of the use of the telephone system for communication of data between a response unit and the central data facility, it is possible also to employ the telephone system to substitute for communication via

9

100

the television and/or radio in areas wherein television and/or radio reception are not available to a participant. Thus, by way of example, the progress of a contest can be reported via telephone to a participant. Also, if desired, such progress can be reported by a telephone to supplement data received via television and/or radio broadcast.

If desired, the central data facility or the telephone system may store financial information regarding individuals who are subscribers to a wagering service provided by the invention. The financial information may be updated periodically or when desirable, for instance each time a subscriber pays a bill or commits a sum to a wager. This enables the telephone or other service facility to check the financial standing or credit status of each player in the context of the wager a player wishes to make.

In accordance with a further aspect of the invention, it is noted that the concept of playing a game by responding to stimuli, such as a scenario presented by television, by radio or by telephonic communication, can be extended over a period of days, weeks, or even months. Scenarios may be authorized such as in the case of dramatic or prearranged scenarios. Over such an extended interval of time, a respondent might make entries via the keyboard of the response unit 22 (FIG. 4), 210 (FIG. 8) or 800 (FIG. 26), or update entries during participation in a game, a contest, an educational process, a process for shopping for merchandise, or other extended field of endeavor. An extended playing or responding interval can be illustrated readily with respect to a shopping for items that may be offered on sale or at a discount at some future time. The basic procedural steps follow those which have been described above for the conduction of an educational game. There follows an example by use of the system 200 of FIG. 6 with the response unit 800 of FIG. 26.

The extended shopping interval proceeds as follows. A list of items obtainable by purchase at a local market is set forth in a listing contained, by way of example, in a newspaper, in a mailing to householders, or on the television screen 208 along with identifying numbers which are provided also to the memory of the response unit via the instructional signal. The listing may comprise all of the products obtainable from a manufacturer or from a retailer, even if only some or none of the products are on sale or discounted at the time of the listing.

The respondent employs the keyboard to enter into a memory of the response unit the identifying numbers of those items for which there is an interest in a future purchase at a sale or discounted price. From time to time over the ensuing days, weeks, or even months, the instructional signal transmits to the response unit an updated listing of the items of merchandise including data of items put on sale or on discount by the manufacturer or retailer. This effectively flags those items which are on sale or available at discount. The computer 804 (or a comparator 372 or 374 in the case of use of the response unit 210 of FIG. 8) compares the respondent's entries with the flagged items, and then indicates a match by a suitable indication such as by sounding the bell, and by leaving a message on the display 358 of the response unit. The respondent, by command entered at the keyboard, directs the printer to list the sale or discounted items. Alternatively, respondent enters on the keyboard items desired for purchase and, upon such items being put on sale, the printer of the respondent's

response unit prints out coupons conveying a discount on the items without additional commands by respondent. Such discount coupons may be printed even during an absence of the respondent, and will be waiting for the respondent upon his or her return.

Furthermore, with respect to the wagering aspect of the invention, the respondent, or player, can wager on which item or items may go on sale or be discounted. The selected items serve as the subject of a bet in the same fashion as presented in the foregoing description of the wagering.

The foregoing description has demonstrated that the various configurations of central station and remote station can be employed additionally in the conduction of a wagering situation, either by itself as in a game of lotto, or in conjunction with an educational program, a sporting event, or a program directed specifically to products of interest to an advertiser, by way of example.

The methods of the invention will now be described in connection with FIGS. 32 and 33, depicting method steps and FIG. 34 illustrating a mailing piece used in collecting household data.

FIG. 32 is a diagram of the initial steps in practicing the present method following exposure of a shopper 1003 to an advertisement 1001 which generates a visual and/or audio stimulus 1002. The stimulus has an immediate impact as well as a lasting effect on shopper 1003. It is an object of the present method to quantify the degree of erosion of the effectiveness of a stimulus over a short period of say two days, or a longer period of, say seven days.

Stimulus 1001 can take any form, including TV and radio commercials, print media advertisements and others.

The advertisement 1001 is identifiable by a reference element, such as a number, or by the date and time it is displayed and noticed by the individual 1003. One or more products may be promoted and identified in advertisement 1001.

Advertisement 1001 also may promote a service, an organization, a resort, or any offering to the public herein collectively referred to as product. The individual 1003 who is persuaded by the said stimulus to become a buyer, lessee, etc. of the promoted product, registers his or her intent to acquire the product identified in the advertisement 1001 in step 1004, which is an entering in the coupon dispenser or response unit 1005 of a request for a record 1008 described in FIG. 33. The entering step 1004 includes an identification of the stimulus of advertisement 1001. Thus, both the product intended for purchase and the advertisement which prompted the buying decision are identified and can in turn be identified on the record dispensed by the dispenser or response unit 1005. Response unit 1005, is described in connection with FIGS. 1, 3–6, 8 and 26 and can include a clock directing the printer of the individual coupons and the cumulative record 1018 of FIG. 33 to print the time of a shopper's request on both types of records.

The term "stimulus" as used herein is intended to include the meanings of any presentation designed to bring about an act on the part of a person exposed to a stimulus, including TV and radio commercials, telephone promotion or telemarketing, print advertisements, direct mailings, free-standing inserts, indoor and outdoor advertising, direct mail coupons, billboards, posters, electronic displays and the like. Thus, a stimulus can be a theater or sports program listing an event

101

and the cost of an admission ticket. Such an announcement can indicate the discounts available to persons exposed to and acting upon said stimulus,

The terms "tabulating, analyzing, measuring, massaging, comparing, processing and quantifying" are used interchangeably, except where specifically described or limited.

The term "shoppers' locations or "individuals' locations" are intended to include locations remote from a central transmitting station, such as homes, offices, clubs, restaurants, etc., such locations being provided with a response or dispensing unit.

The use of a noun is intended to include when applicable, the singular or the plural of the noun. The term "product" is intended to include services, such as those pertaining to credit cards, insurance, home improvements, transportation, etc. The terms quantifying, analyzing, evaluating, tabulating and processing shoppers' records are, when appropriate, used interchangeably.

The term advertiser is intended to include the meanings of marketer, seller, lessor, promoter, retailer, discounter and organizer of a contest, poll, vote or campaign.

The purpose of exposing individuals to a stimulus is to prompt, cause or induce such individuals to perform an act desired by the promoter, such as the act of purchasing, renting, leasing, selling, voting, responding to surveys and polls, selecting, identifying, responding or expressing an opinion, both direct and implied.

In FIG. 33, the response unit 1005 prints a record 1008, such as a discount coupon requested by a shopper in a printing step 1006, which may be combined with printing step 1007 of a cumulative printout or record 1018. Record 1008 specifies the selected product and the purchase incentive, i.e. the discount or other value available to a shopper upon purchase of the product. Record 1008 also identifies the shopper and the stimulus that prompted the purchase decision. The identification of the stimulus can, but does not have to be, a condition to be met by a shopper to qualify for the benefit. Alternatively, a shopper identifying the advertisement through appropriate entry on the response unit, can qualify for a larger benefit than one who has not identified the stimulus.

The coupon is taken by the shopper to a retail store to step 1010. Between the moment the shopper enters the store and the actual purchase of the targeted product, the shopper is exposed to step 1011 to the influence of competitive in-store promotion and point-of-purchase advertising. Shopper's purchase decision 1012 reflects all conflicting influences and results in a purchase decision 1013 in favor of the originally selected product, or in purchase decision 1014 in favor of a competitive product, or in the abandoning of the purchase 1021.

Following decision 1013, the shopper purchases the selected product and presents the record for redemption in step 1015. Shopper's records are collected by the seller in step 1016 and are available for tabulation or other analysis in step 1017. Because all coupons associate the purchased product with the individual shopper and the stimulus which prompted the product selection, the tabulation of a shopper's redeemed coupons creates over time a completely accurate picture of that shopper's buying behavior.

According to the present invention, the response unit or dispenser 1005 includes known means for printing on a paper tape or other matrix a composite record of products for which individual coupons have been dis-

102

pensed. In a preferred embodiment, the printer of the dispenser creates a duplicate imprint of the information printed on the coupon on the matrix of the cumulative record 1018, which also identifies the response unit user or dispenser 1005.

Shoppers replace the matrices of records 1018 periodically as needed, preferably when replenishing the tape forming the matrix for individual coupons 1008. The cumulative records 1018 also can take the form of a mailing piece described in connection with FIG. 34. Normally, records 1018 are collected by the same organization performing record tabulation 1017. However, because records 1018 list all products selected and the associated stimuli, the records 1018 represent a valuable data base in the sense of portraying a family's shopping intent. In a related sense, a shopper's buying interest, even if not ultimately implemented, makes such a shopper a prime target for a follow-up promotion, such as direct mailing.

Additional valuable conclusions may be drawn by a comparison and analysis of records 1018 and records 1017. By simply deducting in step 1019 the products of records 1017 actually purchased from the products of record 1018, the net loss of sales 1020 following the time of requesting a coupon (and the assumed decision and intention of buying the product), can be determined.

Such net loss will be due to a decision not to buy any product of the kind specified on coupon 1017, or a decision to buy a competitive product; the latter being the much more likely reason.

The use of the methods of the invention relative to the quantitative analysis of some variables in the fields of advertising and promotions will now be discussed. The variables cited are intended to be illustrative of different types of measurements that can be performed; others can be added by persons skilled in the art. Variations in results by virtue of modified, controlled conditions are statistically evaluated in the following examples The resulting records 1017 and/or 1018 are analyzed in each instance.

EXAMPLE 1

A product commercial is shown once in prime time on a single TV-station in the area served by said station and is not repeated for one week. The cut-off period for the redemption of discount coupons is fixed at one week. In a modified example, different commercials for the same product are shown and their results are compared and evalued.

EXAMPLE 2

The circumstances of Example 1 are replicated, except that the TV-commercial is shown twice or more frequently in prime time.

EXAMPLE 3

Examples 1 and 2 are replicated except, that some or all commercials are shown at different times of the day.

EXAMPLE 4

Examples 1 and 2 are replicated, except that a radio commercial is added under otherwise identical circumstances.

EXAMPLE 5

Examples 1–4 are replicated, except that the discount rate of the coupons is varied.

5,227,874

103

104

## EXAMPLE 6

Examples 1–5 are replicated except that the cut-off period for redemption of coupons is varied.

## EXAMPLE 7

Examples 1–6 are replicated for products in various price ranges.

## EXAMPLE 8

Examples 1–7 are replicated and coupon redemption is limited to specified stores.

## EXAMPLE 9

Examples 1–8 are replicated at different times of the year.

## EXAMPLE 10

Examples 1–9 are replicated, except that some or all commercials are replaced or supplemented by print advertisements.

## EXAMPLE 11

Examples 1–9 are replicated. The product commercial promotes two or more different products and the effectiveness of a commercial relative to different products is evaluated.

## EXAMPLE 12

Examples 1–11 are replicated, except that identical stimuli (e.g. broadcast commercials or print advertisements) are presented by two or more sources (e.g. broadcast stations or newspapers) which overlap in the territories they cover. The relative effectiveness of individual sources is evaluated.

The present method has other important applications in the field of statistical analysis, one being the effect of different stimuli on groups of persons having the same characteristics and the other being the effect of an unchanged stimulus on different groups of persons.

By measuring the impact of controlled variables of stimuli on an unchanged population sample, the effectiveness and the change in effectiveness of different or modified stimuli can be quantified.

Conversely, by measuring the impact of an unchanged stimulus on different population samples, the effectiveness of the same stimulus on different populations can be quantified.

FIG. 34 depicts an alternative form of the cumulative hard copy record 1018 dispensed by the response unit described herein. In the embodiment of the hard copy record designed for use in market research, a mailing piece, such as a post card is dispensed by the response unit. According to a preferred embodiment, the printer of the response units in shoppers' homes described in connection with FIGS. 1, 3–6, 8 and 26 is adapted to accommodate and print on a card capable of being mailed under bulk mailing regulations, whereby the card requires no postage by the sender, the postage being paid by the addressee or in this instance the advertiser.

One side of the record 34-B bears address 1035, which is the address of the organization undertaking the research, which can include tabulation and analysis of all of the records collected from shoppers. In the top left hand corner the numbered response unit 1036 identifies the shopper or user through the response unit.

Each response unit is registered in the name of an identified individual.

The reverse side 34-A of the post card can take the form shown, including the heading "Identification" 1030, a column headed "Advertisement" 1031 and a heading "Product" 1032. The stimuli or advertisements under the heading 1031 are numbered and listed in group 1033. The products under heading 1032 and promoted in said advertisements are grouped under 1034. For instance, the decision to request a coupon redeemable upon the purchase of tomato soup was prompted by TV-commercial No. 47; the decision to request a coupon with a discount on an airline ticket was prompted by the printed advertisement No. 56. It is a simple matter for the sponsor of a promotion to indicate the number of the commercial or advertisement in the commercial or advertisement by a number, letter or other symbol. This enables the organization analyzing the marketing data to determine the source of the stimulus, e.g. TV-station, radio station, or print publication, as well as to relate the purchasing decisions to the time factor, i.e. the date and the part of the day during which the stimulus or stimuli appeared. Date and time can be printed by well known means added to the printer of the response unit. Thus, the comparative effects of differing stimuli during different parts of the day can be determined. Such a capability would be of interest in the event a retailer cooperates with a manufacturer in a test market. In such a case the redeemed coupons which can be coded or otherwise identified, can be tabulated and the period elapsed between the time of coupon receipt and use can be measured, including the diminishing rate of redemption over measured time periods.

If desired and to allow shoppers to express their reactions accurately, provisions can be made on the card to indicate that the buying decision was the result of cumulative effect of several stimuli for the same product. In that instance, the consumer would check off a space, marked "cumulative", or even identify two or more stimuli by entering identification information.

The above described hard copy record can have the configuration of a normal post card with return address and a bulk mail permit appearing on one side, the other side being available for a listing of the type described and including, when desirable, space for advertising or promotional messages. Such messages can be printed by the dispenser or directed by the instructional signals controlling the printer. The said record can have other configurations and can also, by itself, constitute or comprise a discount coupon or cash voucher. In order to ensure the surrendering of said record to a retail outlet or other organizer of the research program, the record can contain a notation that, upon surrender, the shopper will be entitled to receive value, which may be a discount, cash, free samples, etc. According to a preferred method, the said cumulative record is exchanged by a shopper for a new matrix at the same time the paper tape which serves as the matrix for the coupons must be replaced. Preferably, the matrices for the individual coupons and the cumulative record are inserted into the response unit at the same time. Normally, the matrix for the composite record has a number of spaces on the side shown in FIG. 34-A equal to the number of coupons 1008 comprising the coupon matrix tape.

The value of the incentives described and intended to induce shoppers to purchase the promoted products can be varied by the instructional signals and can range from cents off to larger discounts, including 100% dis-

counts, i.e. free samples. The electronic signals controlling the dispenser units also can control inhibiting or blocking means which prevent the receipt of certain electronic signals not intended for the owners of such dispensers. Using well known techniques, the receiving means in the dispenser unit include means to selectively permit or inhibit the reception of coded electronic signals, thus distinguishing between different signal streams. As an example, a dispenser is provided with means to accept the receipt of a plurality such as six distinct streams of coded electronic instructional signals and to reject all others. The sender of said electronic signals, by including the appropriate coded signal instructions, can select the types of information to be conveyed by said signals and accepted by the dispenser unit. Accordingly, information regarding unwanted or excluded products is not received by the dispenser and no coupons regarding these products are printed. In this manner, the promoter of products can focus said promotional activities on targeted audiences and can avoid the dispensing of coupons carrying value consideration to individuals believed not to have a need for said products.

It will be obvious that, using the above system and methods, a sponsor can ensure maximum efficiency of promotional efforts by adapting the dispensing of tokens such as discount coupons and free sample coupons to those shopper groups, including demographic, psychographic and other groups, most responsive to the promoter's sales strategy.

In another embodiment of the methods described, the stimulus, e.g. a radio commercial, is automatically identified in the following manner without input by the shopper. Concurrently with the transmission of the commercial message, electronic instructional signals are transmitted to the response units which convey an identification of the radio commercial. The electronic signals direct the printer to print an identifying reference element on the discount coupons as well as on the cumulative record. The said instructional signals can be coded and combined with signals conveying purchase inducements or scoring instructions for computing the value of a prize awarded for answering a question or having made a successful prediction.

In another application of the invention, a marketer can measure the counteracting effect of a stimulus presented by said marketer. For instance, following a competitor's advertisement, a marketer can expose a sample population to a stimulus specifically designed to blunt or overcome the effect of the competitive advertisement. The marketer can measure the effectiveness of said stimulus in the face of competitive efforts.

In the practice of the invention, an entire family, as well as individual members of household consisting, say of father, mother and 4 children 17, 12, 8 and 5 years of age, can all be sampling units. The older members of the family can be participants in contests, such as game shows or prediction of the outcome of sports events and can receive coupons. Challenges designed for younger children and educational programs can offer awards in the form of coupons on different toys or food items wanted by children. Each member of the family, including the five year old, has a personal identification code entered by the individual at the time of selecting the preferred item.

The coupons dispensed to each individual are either redeemed by said individual or are turned over to the family head, the family shopper or other designated

person. The coupons requested, as compiled on the cumulative record, reflect as a minimum each person's desire to receive the selected item. Although some of the coupons, such as those dispensed to children, may not be redeemed once the family shopper has entered the store, valuable information as to each person's desires is collected by the promoters of these programs and can be followed by promotions targeted with rifle-shot precision.

A determination of the demographic or psychographic characteristics of a population becomes difficult or even meaningless in areas having mixed populations. In such areas, a market test can be replaced by a sampling unit consisting of a family or even an individual to whom promotions can be directed. The findings of such a test can then be used as probability samples in projection and in multistage sampling. Each household member can be provided with a PIN-number or other identification which is entered when specifying a product coupon. The method described can be useful when it is intended to experiment with a new method of merchandising to a narrowly defined market segment.

The invention enables advertisers to directly measure and quantify the immediate impact of advertisements and promotions, as well as their diminishing effect over time. Furthermore the initial and lasting effect of a single aspect or feature of an advertisement or promotion can be quantified. The effect of even slight modifications can thus be measured.

In a preferred application of the invention to market research, an advertiser or promoter arranges for a single insertion of an advertisement in a single newspaper; no other advertisement, broadcast commercial or other stimulus is presented in the market area served by said newspaper. By means of the techniques described, the effect of said stimulus can be measured in terms of any desired units of elapsed time or in terms of other discrete, controlled variables. For example, if said advertisement appears in a morning newspaper, the number of requested and redeemed coupons can be tabulated for, say the first twelve hour period following the appearance of the advertisement. The cumulative record compiled in the response units indicates the time at which a coupon has been requested, the time of the appearance of the advertisement being known. Alternatively, the measurements can be twenty-four or forty-eight hours, or it can be a week or longer.

The said measurements can be made over any desired time periods irrespective of the cutoff date for coupon redemption. However, a marketer may wish to quantify the immediate impact of a promotion and may tabulate coupons redeemed by the end of the following business day.

Similarly the effectiveness and the synergism of a combination or repetition of stimuli can also be measured both with reference to the number of insertions (advertisements, commercials, etc) and the number of sources (newspapers, broadcast stations, etc).

The dispenser normally is provided with means by which individuals enter the identification or designation of the stimulus which has prompted a buying decision. In order to test the accuracy of a shopper's continuing recollection, the instructional electronic signals directing the printer of the dispensing unit to print a product-specific token, can also convey in coded form the identity or other designation of the specific stimulus to which individuals have been exposed and the effectiveness of which is to be tested or measured. A comparison

5,227,874

of these two inputs establishes the strength of the impact, or lack thereof, or the shopper in terms of accurately recalling the stimulus.

It can be argued that the reason for unredeemed dispensed coupons is related primarily to the diminishing or overridden effect on the shopper of the initial advertisement. It may also be contended that most or all of the said sales loss is likely to be caused by the in-store offer or promotion of a competitive product. Particularly if the time limit set for claiming the discount or other incentive is short, not exceeding for example one week or even two days, the likelihood of a shopper receiving a discount coupon on a competitive product by means other than in-store couponing in such a short time span is very small. Therefore any sales loss, as reflected by the difference in the totals of requested coupons and redeemed coupons will largely be due to in-store promotion and advertising. By tabulating and analyzing said records, the early and the lasting impact of an identified advertisement by an identified TV-station, radio station or print medium can be quantified, along with its vulnerability to competing stimuli.

The invention enables advertisers to directly measure and quantify the immediate impact of advertisements and the diminishing effect of such advertisements over time. Furthermore, the initial and lasting effect of a discrete advertisement and modifications thereof can be quantified.

In a preferred embodiment of applying the invention to market research, an advertiser arranges for a single insertion of an advertisement in a single newspaper; no other advertisement, broadcast, commercial or other stimulus appears in the market area served by said newspaper. By means of the techniques described herein the results of the single advertisement can be measured over any desired units of time. For example, if said advertisement appears in a morning newspaper, the number of requested and redeemed coupons can be tabulated for, say the first twelve hour period following the appearance of the advertisement. Alternatively the period chosen can be twenty-four or forty-eight hours, or it can be a week or a month.

Similarly the immediate and lasting effectiveness of repeated stimuli, such as broadcast commercials can be measured. The effectiveness and the synergism of a combination of stimuli can also be measured, both in terms of the number of insertions (advertisements, commercials, etc) and the number of sources (newspapers, broadcast stations, billboards, etc).

In a modified version of the method described hereinabove, an organizer or research firm intends to induce individuals to perform a certain act in consideration of an inducement, which can be a financial inducement. As an example, an organizer of a survey may present a stimulus to individuals in their homes. The stimulus may be an identifiable radio advertisement. Instructional electronic signals are transmitted on a subcarrier frequency by said radio station to the dispenser or response units of individuals at remote locations. The act to be performed by the member of that broadcast audience, i.e. the users of the response units, can be the completion of a questionnaire, such as a list of questions, or the selection of items from a listing printed on a post card or other token in accordance with said electronic signals. The token can be adapted for automated processing by a research firm or the survey organizer. Upon surrendering said token to the organizer, the individual who has completed the survey, is entitled to a reward. Fol-

lowing exposure to the stimulus, respondents receive the questionnaire, complete the same and surrender it to the organizer at a specified location to collect their reward in person or by mail. Upon receipt of many such filled-in questionnaires, a market research firm will be able to analyze the aggregate results of that survey and report the findings to the organizer of the survey. It will be obvious that by structuring the survey to meet different objectives, a great many objects of tabulating, processing and analyzing the survey returns on the hard copy record may be achieved. The types of stimuli are numerous and can meet objectives of organizers in the fields of quantitative and qualitative market research, the teaching of educational courses and the grading of examination results, conducting televised home shopping programs and many entertainment programs, such as game shows.

The present method is much more reliable than the so-called diary method currently used in market research, in that it requires only a single act in response to a promotional message, i.e. a product selection by touching keyboard buttons. In the diary approach, the steps required, which are a product selection and a diary entry, do not automatically follow each other and one step may inadvertently be omitted. Thus, the diary approach, in which a person intending to purchase a needed product first selects or clips a coupon and as an independent step, makes a diary entry is a two-step process. It is replaced by the present method, in which the shopper by requesting a product-specific coupon performs only one, and much less cumbersome, act.

The invention permits generating a household by household data base quantifying the effect of stimuli under varying circumstances of promotion. By tabulating and comparing coupons requested and redeemed under conditions of controlled variables, singly or grouped, the effectiveness of each such stimulus can be analyzed and quantified. The requesting by shoppers of coupons having monetary value and associating the product selection with the identified stimulus replaces the keeping of diaries and other attempted forms of tracking shoppers' purchasing decisions. Variables whose impact on shoppers could not be quantified heretofore on a single household basis, include purchase incentives, frequency and timing of stimuli, singly or in combination. Such assessments are made possible by the present invention.

The method described permits a very direct and focused quantitative analysis of the effectiveness of a stimulus. This is achieved by limiting the incentive to a single one, such as a discount on a movie ticket, and presenting the stimulus through a single source, say one newspaper advertisement. By avoiding the fuzziness introduced by offering incentives on different products and therefore of different degrees of interest, a clearly identified, single incentive permits an unequivocal assessment of the impact of a specific stimulus.

The method permits a sharply focused analysis of a single stimulus on a homogeneous population. An example of an ideal statistical measurement situation would be the exposure of the residents of a retirement home to a newspaper advertisement for a denture adhesive, wherein the original purchase, use and replacement of the product can be monitored.

It is to be understood that the above described embodiments of the invention are illustrative only, and that modifications thereof may occur to those skilled in the art. Accordingly, this invention is not to be regarded as

5,227,874

**109**

limited to the embodiments disclosed herein, but is to be limited only as defined by the appended claims.

What is claimed is:

1. A method for measuring the effect of stimuli on the purchasing decisions of product shoppers, comprising the steps of

a) exposing a plurality of individually identifiable shoppers to an identifiable stimulus intended to prompt a shopper's decision to purchase an identified product,

b) providing individual shoppers with a dispenser activatable by a shopper and traceable to said shopper, said dispenser being programmable by electronic signals transmitted from a central location, said dispenser being capable of printing and dispensing permanent records,

c) following exposure of a shopper to said stimulus and upon the activating by a shopper, dispensing by said dispenser at a shopper's location a permanent record carrying an incentive to purchase said identified product as conveyed by said programming signals, said incentive being available upon the purchase of said product, said shopper's activating including an identification of said stimulus for printing on said record, said record being traceable to said dispenser by means of identification on said record,

d) In conjunction with the purchase of said product, a shopper presenting said record to receive said incentive, said record identifying

I. the purchased product,

II. the dispenser having dispensed said record, and

III. the stimulus which prompted said shopper's decision to purchase the identified product,

e) repeating the aforementioned steps a) to d), and

f) tabulating a shopper's records to analyze said shopper's purchasing behavior in response to identified stimuli.

2. The method according to claim 1, wherein said coupons are the severed portions of a matrix.

3. The method according to claim 2, wherein said matrix is a paper tape.

4. The method according to claim 1, wherein the shoppers are exposed to a plurality of identified stimuli to promote the sale of identical products and in which individuals identify the specific stimulus which has caused them to purchase the identified product.

5. A method for determining the purchase behavior of individual members of a household, comprising the steps of

assigning a personal identification reference element to each member of a household,

presenting to members of said household identifiable stimuli intended to promote the sale of identified products,

a household member selecting a promoted product for intended purchase,

providing at household locations means identified with a household and activatable by a member of said household for generating and dispensing monetary coupons traceable to said means,

following activating of said means by a member of said household, generating and dispensing at said household location a coupon carrying a monetary incentive to purchase a selected product, said incentive being available upon the purchase of said product, said activating including an identification of the stimulus which prompted said selection by

**110**

said individual member of said household, said activating including an entering of said household member's personal identification,

in conjunction with the purchase of a selected product a household member surrendering said coupon to receive said incentive,

collecting surrendered coupons, and

determining the purchase behavior of individual members of a household by tabulating said surrendered coupons carrying incentives to purchase products selected by individual members of said household identified on said coupons.

6. A method for determining the purchase behavior of individual members of a household, comprising the steps of

assigning a personal identification reference element to each member of a household,

presenting to members of said household identifiable stimuli intended to promote the sale of identified products,

a household member selecting a promoted product for intended purchase,

providing at household locations means identified with a household and activatable by a member of said household for generating and dispensing monetary coupons and for compiling a cumulative record of said coupons, said coupons and said record being traceable to said means,

following activating of said means by a member of said household, generating and dispensing at said household location a coupon carrying a monetary incentive to purchase a selected product, said incentive being available upon the purchase of said product, said activating including an identification of the stimulus which prompted said selection by said individual member of said household, said activating including an entering of said household member's personal identification, said identification appearing on said coupons and on said record,

in conjunction with the purchase of a selected product a household member surrendering said coupon to receive said incentive,

collecting surrendered coupons, and

determining the purchase behavior of individual members of a household by tabulating said surrendered coupons carrying incentives to purchase products selected by individual members of said household identified on said coupons and by analyzing said tabulation in the context of said cumulative record.

7. A method according to claim 6, wherein said cumulative record is a redeemable record.

8. The method according to claim 6, wherein said cumulative record is a mailing piece.

9. The method according to claim 8, including the step by a household member of mailing said cumulative record to an organization for evaluation.

10. A method for evaluating the inducement effect of a stimulus on individuals comprising the steps of:

an organizer exposing individuals to a stimulus intended to induce the performance of a desired act by said individuals,

providing said individuals with electronically programmable token dispensers capable,

upon the request of individual ones of said individuals, of dispensing a token having value to said requesting individual, said value being available upon

5,227,874

111

the performance of said act and upon surrender of said token,

programming said dispersers by means of electronic instructional signals transmitted from a central location, said programming including value information to be borne by said token, said step of programming occurring subsequent to exposure of individuals to said stimulus and, prior to an individual requesting the dispensing of a token through entry of a command in said dispenser,

dispensing to each of said requesting individuals a token bearing said value information,

performing the desired act by at least some of said individuals having tokens,

said token surrendering individuals surrendering said tokens to said organizer,

said token surrendering individuals receiving said value, and

said organizer measuring the inducement effect of said stimulus on individuals by evaluating the performance of the desired act by said individuals as evidenced by surrendered tokens.

11. The method according to claim 10, in which said stimulus is identified by individuals who enter said identification on said token following dispensing thereof.

12. The method according to claim 10, wherein said stimulus is identified by an individual at the time of surrendering said token.

13. The method according to claim 10, wherein said dispenser includes means for inhibiting the reception of specific electronic signals, said inhibiting being controlled by instructional electronic signals.

14. The method according to claim 10, wherein said dispenser includes means for negating the printing of records not specifically identified by said instructional signals.

15. A method for measuring the effectiveness of broadcast and print advertisements, said method comprising the steps of:

presenting advertisements to shoppers, said advertisements advertising specific products, each advertisement being identifiable by timing of its presentation and/or by a reference element,

providing shoppers with dispensers, each dispenser having means operable by an individual shopper for printing and dispensing a hard copy record carrying an incentive to purchase at least one of said specific products, the benefit of said incentive being receivable in a retail store within a stipulated period of time, each of said dispensers being identifiably associated with an individual one of said shoppers, said record being of the type which is honored upon the purchase of an advertised product by a shopper in said retail store, said record identifying the dispenser having printed said record and indicating the advertisement corresponding to said advertised product,

a shopper selecting for intended purchase at least one of said advertised products,

a shopper operating said shopper's dispenser to direct the printing of one of said records,

a shopper's dispenser printing and dispensing said at least one record to said shopper, said record identifying said shopper's dispenser, one of said advertised products, and the advertisement corresponding to said advertised product that wa presented when the shopper selected the advertised product for intended purchase,

112

a shopper purchasing said selected product in said retail store,

in conjunction with said purchase, a shopper presenting said record in said retail store within said stipulated period of time to receive the benefit of said incentive,

collecting presented records from said retail store, and

tabulating a presentation rate of said presented records relative to their associated advertisement.

16. The method according to claim 15, wherein said period of time ends on the day following the day of dispensing said record.

17. The method according to claims 1, 5, 6 or 15, wherein a single stimulus promotes the sale of a plurality of identified products and wherein a shopper enters a selection of a product from said plurality in said dispenser, the token dispensed by said dispenser carrying value available to a shopper upon the purchase of the selected product.

18. A method for evaluating the effectiveness of stimuli on the purchasing behavior of individuals comprising the steps of

a seller exposing individuals to an identifiable stimulus intended to promote the purchase of a product,

providing said individuals at their locations electronically programmable token dispensers operable by said individuals and capable upon the request of individual ones of said individuals of dispensing a token carrying a purchase incentive value, said value being available to a shopper upon purchase of a product promoted in said stimulus and upon surrender of said token,

programming said dispensers by means of electronic instructional signals transmitted from a central location, said programming including information relative to the purchase incentive value carried by said token,

subsequent to exposure to said stimulus, an individual operating said dispenser to request a token, said request identifying the stimulus to which said individual has been exposed,

dispensing said token to said individual,

said individual purchasing said promoted product from a seller,

said individual surrendering said token to a seller,

said individual receiving said incentive value, and

said seller analyzing the effectiveness of said stimulus as evidenced by surrendered tokens.

19. A method for measuring the purchase inducing effect of stimuli under a variety of circumstances on a plurality of individuals, the method comprising the steps of

a seller exposing a plurality of individuals to stimuli intended to induce the purchase of products by said individuals,

providing said individuals at their individual locations electronically programmable token dispensers capable upon the request of an individual of dispensing to said individual a token having purchase inducement value, said value being available to an individual upon the purchase of a product and the surrendering of said token,

programming said token dispenser through electronic signals transmitted from a central location, said programming including a varying of purchase inducement values,

5,227,874

113

subsequent to the exposure of individuals to said stimuli, an individual requesting the dispensing of a token through entry of a command in said dispenser,

dispensing a requested token at said individual's location,

said individual purchasing said product,

said individual surrendering a token to the seller,

said individual receiving said value, and

said seller measuring the inducement effect of said stimuli on said individuals by analyzing the purchase of said products by said individuals,

said measuring method being implemented under a variety of circumstances, singly or in combination, said circumstances being determined by said seller and varying with respect to and selected from the group consisting of the nature, frequency and combination of stimuli; the nature and value of inducements; the nature and price range of promoted products; shoppers' demographic and psychographic characteristics; shoppers' distance from point of purchase; the time of day; the day of the week; and the season.

20. A method for quantifying the diminishing effect of a broadcast or print advertisement comprising the steps of

exposing shoppers to an identifiable advertisement which promotes the sale of a first product in a retail store,

providing individual shoppers an opportunity to operate a dispenser for generating a permanent record carrying an incentive to purchase said first product intended to be purchased by said individual shopper, said record identifying said advertisement,

a shopper operating said dispenser,

a dispenser generating a first product record carrying said incentive,

dispensing said first product record to said shopper,

compiling in individual dispensers at shoppers' locations listings of first product records dispensed to individual shoppers,

a shopper delivering a first product record to a retail store,

prior to the purchase of said first product in said retail store, a shopper being exposed to the advertising of a second product competing with said first product,

a shopper deciding whether to purchase said first product,

a shopper, having decided to purchase said first product, purchasing said first product and surrendering to a retail store said first product record to receive the benefit of said incentive,

tabulating the first product records surrendered by a shopper to a retail store, and

deducting the surrendered first product records of a shopper from the first product listing of said shopper,

so as to quantify the loss of sales of the first product advertised in said identified advertisement and intended by a shopper to be purchased, between the time of said shopper's exposure to said advertisement and the time of said shopper's purchase of said first product in a retail store.

21. In a method for evaluating the effectiveness of stimuli on individuals, the method being of the type including the steps of:

114

a) exposing individuals to at least one stimulus intended to induce the performance by said individuals of an act desired by an organizer,

b) distributing permanent records to individual recipients at their locations, said records having value that has been determined by said organizer and is available to a record recipient upon the performance of said desired act induced by said stimulus,

c) receiving said value by said individuals upon performance of said act and surrender of said record to said organizer

d) said organizer evaluating the effectiveness of said stimulus as evidenced by surrendered records,

the improvement which comprises the steps of:

e) carrying out said method under a variety of circumstances, said circumstances varying with respect to and selected from a group of variables consisting of the nature, frequency and combination of stimuli; the nature and value of inducements; the nature of the desired act; individuals' demographic and psychographic characteristics; individuals' distance from the location of the performance of the desired act; the time of day of the stimulus; the day of the week of the stimulus; and the season of the stimulus; and

f) evaluating the effectiveness of stimuli under said varying circumstances applied discretely or in combination.

22. A method for evaluating under varying sets of circumstances the effectiveness of stimuli experienced by individuals, the method comprising the steps of:

a) exposing individuals to a stimulus under a set of circumstances, said circumstances having been selected from a group comprising nature, frequency, combination and timing of stimuli; and redemption value of records,

b) individuals acting upon said stimulus,

c) distributing permanent records having redemption value, said value being available to said individuals who have acted upon said stimulus and who redeem said records,

d) evaluating the effectiveness of said stimulus as evidenced by records redeemed,

e) repeating steps a)–d) under at least one additional varied set of circumstances, and

f) evaluating the change in the effectiveness of stimuli under said varied sets of circumstances as evidenced by said records redeemed.

23. The method according to claims 1, 5, 6, 10, 18, 20, 21 or 22, wherein the effectiveness of a stimulus is measured over at least one discrete determined period of time.

24. The method according to claims 1, 5, 6, or 15 wherein said stimulus is carried by one television station in the market served by said television station.

25. The method according to claims 1, 5, 6, or 15 wherein said stimulus is carried by one radio station in the market served by said radio station.

26. The method according to claims 1, 5, 6, or 15 wherein said stimulus is carried by one print publication in the market served by said print publication.

27. A method for measuring the effect of purchasing stimuli on purchasing decisions comprising steps of:

exposing an individual to a variety of purchasing stimuli;

presenting said individual with an opportunity to select a plurality of available product-specific coupons;

5,227,874

**115**

selecting, by said individual, at least one of said coupons for redemption, said at least one coupon at least partially identifying said individual and at least one stimulus from said stimuli;

redeeming said selected coupons with the purchase of a product; and

reviewing redeemed selected coupons to determine effect of at least one of said stimulus upon comparison of redemption rates of said coupons for said variety of stimuli.

28. A method for measuring the effect of purchasing stimuli on purchasing decisions comprising steps of:

exposing individuals to a variety of purchasing stimuli;

providing means for said individuals to request and be given a variety of product-specific coupons related to said purchasing stimuli;

dispensing coupons to requesting individuals, said step of dispensing comprising providing said dispensed coupons with information regarding the purchasing stimuli that said requesting individual was exposed to; and

determining effect of individual stimulus of said variety of stimuli by reviewing a comparison of said

**116**

requests by said individuals, said purchasing stimuli that said individuals were exposed to, and said coupons that are redeemed.

29. A method for quantifying effect of discrete purchase stimuli variables on purchasing behavior of shoppers comprising steps of:

exposing individuals to purchase stimuli relating to products;

presenting said individuals with an opportunity to select product coupons relating to said products;

selecting, by at least some of said individuals, at least some of said product coupons;

recording information regarding discrete variables of said purchase stimuli that said selecting individuals were exposed to in relation to said selecting individuals' actual selections;

varying said discrete variables of said purchase stimuli over a period of time; and

reviewing selection rates of said selected product coupons relative to different types of said discrete variables of purchase stimuli used over said period of time.

* * * * *



# United States Patent [19]

## Von Kohorn

[11] **Patent Number:** 5,249,044

[45] **Date of Patent:** * Sep. 28, 1993

[54] **PRODUCT INFORMATION STORAGE, DISPLAY, AND COUPON DISPENSING SYSTEM**

[76] Inventor: **Henry Von Kohorn**, 945 Treasure La., Vero Beach, Fla. 32963

[ * ] Notice: The portion of the term of this patent subsequent to Jul. 7, 2009 has been disclaimed.

[21] Appl. No.: **878,642**

[22] Filed: **May 5, 1992**

[51] Int. Cl.$^5$ ............................................. H04N 1/00
[52] U.S. Cl. ...................................... 358/86; 455/4.2; 455/6.3; 364/401; 358/85
[58] Field of Search ........ 358/84, 86, 85; 455/2, 455/4.1, 4.2, 6.3, 45, 66, 158.5, 186.1, 186.2; 364/403, 485, 401

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,095,653 | 7/1963 | Corrigan | 35/9 |
| 3,546,791 | 12/1970 | Koos et al. | 35/9 |
| 3,599,221 | 8/1971 | Baer | 346/1 |
| 3,606,688 | 9/1971 | Zawels et al. | 35/9 R |
| 3,671,668 | 6/1972 | Reiffel | 178/6.8 |
| 3,810,627 | 5/1974 | Levy | 273/138 A |
| 3,848,082 | 11/1974 | Summers | 178/5.6 |
| 3,910,322 | 10/1975 | Hardesty, Jr. et al. | 340/172.5 |
| 3,964,179 | 6/1976 | Bennett | 35/31 R |
| 3,993,861 | 11/1976 | Baer | 178/5.6 |
| 3,999,307 | 12/1976 | Tsuda et al. | 35/9 A |
| 4,044,380 | 8/1977 | Justice et al. | 358/142 |
| 4,052,798 | 10/1977 | Tomita et al. | 35/9 A |
| 4,141,548 | 2/1979 | Everton | 273/1 E |
| 4,264,924 | 4/1981 | Freeman | 358/86 |
| 4,268,744 | 5/1981 | McGeary | 235/375 |
| 4,271,351 | 6/1981 | Bloodworth | 235/375 |
| 4,286,323 | 8/1981 | Meday | 364/411 |
| 4,329,684 | 5/1982 | Monteath et al. | 340/707 |
| 4,339,798 | 7/1982 | Hedges et al. | 364/412 |
| 4,377,870 | 3/1983 | Anderson et al. | 455/2 |
| 4,388,008 | 6/1983 | Greene et al. | 400/578 |
| 4,541,806 | 9/1985 | Zimmerman et al. | 434/258 |
| 4,573,072 | 2/1986 | Freeman | 358/86 |
| 4,592,546 | 6/1986 | Fascenda et al. | 273/1 E |
| 4,593,904 | 6/1986 | Graves | 273/1 E |
| 4,608,601 | 8/1986 | Shreck et al. | 358/146 |
| 4,611,996 | 9/1986 | Stoner | 434/202 |
| 4,630,040 | 12/1986 | Haertling | 340/763 |
| 4,671,772 | 6/1987 | Slade et al. | 434/219 |
| 4,745,468 | 5/1988 | Von Kohorn | 358/84 |
| 4,807,031 | 2/1989 | Broughton et al. | 358/142 |
| 4,833,710 | 5/1989 | Hirashima | 380/20 |
| 4,876,592 | 10/1989 | Von Kohorn | 358/84 |
| 4,896,791 | 1/1990 | Smith | 364/479 |
| 4,907,079 | 3/1990 | Turner et al. | 358/84 |
| 4,910,672 | 3/1990 | Off et al. | 364/405 |
| 4,926,255 | 5/1990 | Von Kohorn | 358/84 |
| 4,926,256 | 5/1990 | Nanba | 358/84 |
| 4,949,256 | 8/1990 | Humble | 364/401 |
| 4,972,504 | 11/1990 | Daniel, Jr. et al. | 455/2 |
| 5,034,807 | 7/1991 | Von Kohorn | 358/84 |
| 5,057,915 | 10/1991 | Von Kohorn | 358/84 |
| 5,063,610 | 11/1991 | Alwadish | 455/45 |
| 5,111,927 | 5/1992 | Schulze, Jr. | 100/9.2 |
| 5,128,752 | 7/1992 | Von Kohorn | 455/2 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 1172847 | 8/1984 | Canada . |
| 1287304 | 8/1972 | United Kingdom . |
| 2120507A | 11/1983 | United Kingdom . |

### OTHER PUBLICATIONS

Sync (catalog), pp. 2 and 3, Advertisement Titled "Now You Can Beat The Contestants on TV's Most Popular Game Show", 1988.
Rand Report No. R–88–MF, Baer, Nov. 1971.

*Primary Examiner*—Reinhard J. Eisenzopf
*Assistant Examiner*—Edward Urban
*Attorney, Agent, or Firm*—Perman & Green

[57] **ABSTRACT**

A system for generating product coupons at remote locations. The system includes an apparatus for receiving and storing product information signals broadcast from a central location. The apparatus is connected to a television at the remote location and has a coupon generating unit. The coupon generating unit can generate a product coupon having selectively entered product information thereon. The system further comprises a switch such that stored product information signals can be displayed on the television.

**31 Claims, 3 Drawing Sheets**

Case 8:01-cv-02271-EAK  Document 1   Filed 12/29/01   Page 105 of 116 PageID 105

# FIG. 1.



# FIG. 3.





**FIG. 2.**

**FIG. 4A.**

**FIG. 4B.**

**FIG. 5.**



FIG. 6.

FIG. 7.

5,249,044

1

# PRODUCT INFORMATION STORAGE, DISPLAY, AND COUPON DISPENSING SYSTEM

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to generating tokens or coupons having value. More specifically, the present invention includes a system and method that permits the generating and dispensing of tokens, such as product discount coupons, specified by individual members of a broadcast audience in remote locations, such as their homes, these individual members of the broadcast audience being potential shoppers or customers.

### 2. Prior Art

The current use of discount coupons has a serious drawback in that there is a substantially low rate of redemption of such coupons. Frequently there is only about a 2.5 to 4 percent redemption of the total number of coupons printed in newspapers, magazines, mailings, free-standing inserts, etc. This low rate of redemption significantly hinders the intended purpose of product coupons and the like; i.e.: to induce or encourage purchasers to buy a certain brand of product over other brands or, to encourage a potential purchaser to come to a specified seller's location rather than a competitor's location.

U.S. Pat. No. 4,910,672 to Off et al. discloses a system for creating discount coupons in response to the purchase of products. U.S. Pat. No. 4,949,256 to Humble discloses a coupon validation network. U.S. Pat. Nos. 4,745,468; 4,876,592; 4,926,255; 5,057,915; and 5,034,807 to Von Kohorn disclose various dispensing units intended to be used with television broadcasts.

## SUMMARY OF THE INVENTION

In accordance with one embodiment of the present invention, a system for generating product coupons is provided. The system comprises broadcast means, a television at a remote location, an apparatus for receiving and storing product information signals, means for generating product coupons, and means for selectively displaying stored product information signals on the television. The broadcast means is located at a central location and is adapted to transmit electronic signals to remote locations of members of a broadcast audience. The signals include product information signals and television program signals. A television is located at each of the remote locations and has means for presenting the television program signals and product information signals. The apparatus for receiving and storing product information signals and for generating product coupons is connected to the television and comprises means for receiving the product information signals. The product information signals can be transmitted by cable, telephone, or broadcast over airwaves. The transmission can be initiated at a central location or upon a telephone request by an individual at a remote location. The apparatus can also include means for storing received product information signals. The system can also include a coupon generating unit. The coupon generating unit comprises means for selectively entering product information therein, and means for generating a product coupon having at least a portion of the selectively entered product information recorded thereon. The means for selectively displaying or otherwise presenting the stored product information signals on the

2

television is selectively operable by individual members of the broadcast audience.

In accordance with another embodiment of the present invention, a system for generating coupons is provided comprising a television located at a remote location, means for receiving electronic product information signals transmitted from a central location, a storage device, means for selectively transmitting stored signals from the storage device to the television, and a coupon generating unit. The means for receiving electronic product information signals is located at the remote location. The storage device is connected to the means for receiving and has means for storing product information signals received at the means for receiving. The coupon generating unit is located at the remote location for generating coupons. The unit has means for selectively entering product information therein and for generating the coupons with product information thereon.

In accordance with another embodiment of the present invention, a system for selectively generating product coupons is provided. The system includes means for receiving and storing electronic signals transmitted from a central location; means for selectively transmitting product information stored in the means for receiving and storing to a television for presentation to the viewer; and a coupon generating unit located at the remote location. The unit has means for selectively entering product information therein and dispensing a product coupon with entered product information thereon.

## BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing aspects and other features of the invention are explained in the following description, taken in connection with the accompanying drawings, wherein:

FIG. 1 is an illustrative view of a central station and remote location for use with the present invention.

FIG. 2 is a perspective view of one embodiment of a generating unit incorporating features of the present invention.

FIG. 3 is an illustrative view of a redemption center for use with a method of the present invention.

FIG. 4A is a perspective view of a matrix intended to be used as coupons generated from the generating unit shown in FIG. 2.

FIG. 4B is a front view of a coupon generated from the generating unit shown in FIG. 2.

FIG. 5 is a perspective view of an alternate form of matrix to be used with an alternate embodiment of the generating unit shown in FIG. 2.

FIG. 6 is a front perspective vie of an apparatus for receiving and storing product information signals.

FIG. 7 is a schematic view of the electronics used in the apparatus shown in FIG. 6.

## DETAILED DESCRIPTION OF THE INVENTION

To facilitate an understanding of the terms used herein, the following definitions are provided.

The terms "redeem" and "redemption" are intended to include the presentation, delivery, surrender or other form of turning in a token, in person, by mail, or otherwise, in exchange for merchandise, discounts, prizes, cash vouchers or other consideration.

The term "token redemption data" is intended to include data specifying locations where tokens can be

**3**

redeemed, dates or time limits during which tokens can be redeemed, and/or information to prevent fraud or cheating, such as verification data.

The term "consideration" is intended to include value whether monetary, commercial or symbolic.

The term "central" is intended to include a location or locations other than remote receiving locations such as a television transmission station or any transmitter serving an area of members of a broadcast audience.

The term "token" is intended to include hard copy records, coupons, certificates, magnetic cards and other records that can be redeemed.

The term "dispensing tokens" is intended to include the issuing, delivery or making available tokens to a member of the broadcast audience, whether mechanically or manually.

The term "matrix" is intended to include a substrate on which information may be provided, recorded or stored, for example electro-magnetically as in the case of magnetic cards, plastic film, or by printing as in the case of a paper matrix, etc.

The term "product information" is intended to include listings, specifications, prices, discounts and other information for a product or service including depiction by language or graphics.

The term "code" is intended to comprise alphanumeric and/or other indicia or symbols.

In the context of the present method the term "sponsor" is intended to include advertisers, broadcasters, sales outlets, manufacturers, and suppliers of goods and services.

Referring to FIG. 1, there is shown a diagrammatical view of a central transmitter 10 and remote location 11. Although the present invention will be described below with reference to a television broadcast, it should be understood that the invention is applicable to any type of broadcast including radio broadcast and closed circuit broadcasts. Generally, a television program is transmitted by standard broadcast facilities 10 and received at various remote locations 11 on standard television receivers 12. Receiver 12 can be any suitable type of receiver including a passive video display or a liquid crystal display. Viewers 13, which also constitute potential shoppers or customers, at the various remote locations 11 constitute a broadcast audience. The present invention includes providing generating units 14 at the remote locations 11 of the members 13 of the broadcast audience. Each generating unit 14 is intended to be self contained and individually operated by a viewer 13 to generate and dispense tokens or coupons 2 (See FIG. 3) to the viewer 13 in the convenience of the viewer's home.

Referring also to FIG. 2, each generating unit 14, in the preferred embodiment shown, generally comprises a housing 16, a display screen 18, input keys 20, control keys 22, a replaceable matrix unit 24, a replaceable printer unit 26, a replaceable memory unit 28, a battery power source (not shown), and an electronic controller (not shown). It should be understood that the description of this preferred embodiment of the generating unit 14 is only illustrative. Alternate embodiments of the generating unit may include additional or less features. The generating unit 14 need not have a battery power source, but may alternatively have an electrical cord (not shown) for attachment to a household electrical outlet. In the embodiment shown, the generating unit 14 is generally intended to generate coupons 2 printed on paper. However, it should also be understood that the

**4**

invention is equally applicable to the creation of other types of tokens, such as magnetic cards. The display screen 18, in the embodiment shown, is an LCD screen and can display information input into input keys 20. However, in an alternate embodiment of the invention, the screen 18 need not be provided. The product information can be provided on a TV screen or, can be provided audibly on a voice channel frequency. The input keys or data entering section 20 permits a TV-viewer 13 to enter product information into the unit 14, such as product names and specifications of a product which the viewer intends to buy in the near future, and verification data. The control keys or control section 22, in the embodiment shown, generally comprise an on/off key 30, a clear key 32, a clear-all key 34, and a print activation key 36. The control keys are suitably connected to the electronic controller (not shown) which is, in turn, connected to the memory unit 28 and printer unit 26. The memory unit 28, in the embodiment shown, generally comprises a first memory section 38 and a second memory section 40. The first memory section 38 is intended to be used as a temporary memory for storing information input at input keys 20 until such time as one of the control keys 22 are used. The temporary memory section 38 has two separate portions, a first single item memory portion and a second single record memory portion. The single item memory portion is intended to store only one type of information at a time, such as product name, product size, or discount value, etc. The single record memory portion is intended to store information for a single record which includes product name, product size, discount value, and verification data, etc. The viewer 13 can input data or information at keys 20 which is stored in the single item memory portion until an enter key is depressed and the information can be transferred to the single record memory portion. Alternatively, the viewer 13 can depress the clear key 32 to delete the information in the single item memory portion, but not affect information in the single record memory portion. Information in the single record memory portion can either be deleted by depressing th clear-all button 34 or depressing the print button 36. If the viewer depresses the print button 36, in addition to printing a coupon 2, the generating unit 14 can also store the printed information in its second memory section 40 for purposes as described below. The cost of the generating unit 14 can be inexpensive because the unit requires no complicated installation, wiring or attachment. The keyboard used as an entry device is not elaborate and may resemble that of a telephone keypad with touch buttons.

When the viewer has entered information into the unit and pressed the print key 36, the printer unit 26 advances a matrix 42 (see FIG. 4A) from the matrix unit 24, prints the information from the single record memory portion onto the matrix, and dispenses the matrix with printed information (a coupon) out of the housing 16. The printing can be accomplished with or without impact using ink sprays, applying heat, magnetic pulses, laser beams, other light sources, providing depressions, or embossed markings. Referring to FIG. 3, the viewer 13 can present the coupon 2 at a redemption center or sales outlet 3 for consideration such as reduction in the purchase price of a product 4 or a free prize 5. While at home, the viewer can select a product in which the viewer is interested and, can use and activate the generating unit so as to print a token or discount coupon specifying such product or merchandise. Normally, the

**5**

coupon will have printed on it product indicia line 52 and a discount information line 54 (see FIG. 4B). These product indicia and discount information lines can include coupon redemption information such as places available for redemption, time period for redemption, etc. The employee 15 at the redemption facility 3 can review or authenticate the product indicia line, discount information line, and any other recorded coupon redemption information to verify compliance with predetermined redemption requirements or limits before granting value consideration to the shopper 13. The employee 15 might authenticate by comparing the redemption information to a redemption listing or by entering the redemption information into a computer, such as by a keyboard or bar code reader, which would automatically compare the redemption information on the coupon to a redemption listing or database.

In the course of a television program, viewers can be informed of special sales, discounts, or promotional offers or events which make it attractive to a viewer to utilize coupons reflecting such offers. A number of methods to attract shoppers to sales outlets will now be described. For paper matrix 42 (see FIG. 4A), the matrix preferably has perforations 44, but these need not be provided if the generating unit 14 has a cutter to separate the printed coupon from the matrix. When desired, the matrix sections formed between the perforations 44 are premarked or prenumbered with indicia 46 suitable for use for verification or authentication purposes. However, this indicia 46 need not be provided or alternatively, may be provided by the generating unit 14. Thus, the coupons 2 generated and dispensed by the units 14 normally are prenumbered, such numbers being dissimilar. In an alternate embodiment, the indicia or code 46 may be provided as a machine-readable code. The code can also be provided from a group of markings consisting of numbers, letters, dots, dashes, regular and irregular shapes, codes, symbols and, discrete, connected, and continuous configurations. Utilizing this indicia 46, or parts thereof, an additional prize can be granted. An example would be a "blind" prize payable in cash or merchandise to a shopper who redeems one of the coupons in the course of the purchase of the discounted merchandise. If the indicia 46 on a coupon 2 matches indicia selected by the sponsor of the program, the shopper redeeming the coupon 2 is entitled to an additional prize 5. In a preferred embodiment, the shopper 13 will learn of such a "blind" prize having been won only upon the redemption of the coupon 2. Thus, the method will help to attract shoppers to stores to redeem coupons.

According to another embodiment, a code or "lucky" number 48 is originated by a member of the broadcast audience and shown on the token 2. This method of the invention permits an audience member to select his or her own "lucky" number in the hope that it will match the "lucky" number of the day selected by the sponsor and preferably ascertainable or discernible only upon redemption of the token 2.

In another embodiment, the transmitter or television station 10 also transmits verification data that must be entered into the generating unit 14 which is recorded on the coupon 2 as verification data or indicia 50. This verification indicia 50 can also be used to award "blind prizes". Thus, for example, a prize may be awarded to a shopper whose verification code 50 contains indicia specified and posted at a sales outlet 3 on the day of redemption. According to another method, the host of

**6**

a TV-program can announce that coupons pertaining to a certain product "will carry a discount in excess of 20%". The shopper will not know how much larger than 20% the discount is until the coupon is redeemed.

The system also provides for a cumulative record being kept, if desired, by the generating unit 14 of all coupons requested by a member of the television audience. This record is compiled and retained in the generating unit in memory 40 and can be made available to sponsors of promotions in different ways. One method of making such coupon generation records available to a sponsor is by retrieving the recorded information from the generating unit 14 by a representative of the advertiser. A preferred method is to take advantage of the shoppers' need to periodically replenish the paper tapes or matrix unit 24 used to produce the coupons in the generating unit. Such paper tapes or matrix units 24 may be available to shoppers in retail stores or other redemption points and, when a shopper receives such a tape, the above mentioned purchase record may be collected from such shopper and made available to the sponsor.

The methods of the invention may permit a combination of measures to prevent forgeries and cheating. The matrix 42 may be of a special composition to make duplication difficult. If the token is to be a paper coupon, the coupons can be prenumbered or provided with other verifiable codes. Numbers or codes can also be transmitted from a central location, which numbers or codes replace or are in addition to the numbers or codes preprinted on the matrix 42. In order to prevent forging and counterfeiting, particularly of more valuable tokens, the token redemption terms can include alphanumeric and/or other indicia or symbols capable of authentication at a redemption center and can include a combination of two separate codes each capable of verification. For example, the information governing the redemption of a token can include a first verification code preprinted on a matrix and a second verification code entered into the generating unit by a shopper in accordance with information transmitted to shoppers by a TV station. The coupons may also have the user's identification preprinted thereon and, for larger prizes, a user may be asked to present identification at the time of redemption.

The system and method described above has the advantage that the generating unit 14 need not be programmed or controlled by external sources such as by electronic signals. The only electronic communication flow is from the central location to the TV-viewers, and the only information input into the generating unit is that entered by a TV-viewer on the input keys 20 or other entry device. The absence of two way communication significantly reduces capital investment and operating costs of the system. However, the system and method could be used with a two way communication system such as when the viewer communicates with the central transmitter station to indicate display or broadcast of product information on a specific product or group of products before using the unit 14 or during use of the unit.

, The product information conveyed by electronic signals from a central location 10 may pertain to a single available product or to a plurality of available products, each accompanied by its specification, prize or discount information and, when desired, verification data. A member 13 of the broadcast audience can determine or select a product of interest at that time. If the product

information conveyed relates only one product, and the viewer 13 desires to obtain a token for that product, the user can enter the appropriate product information and verification data into the unit 14 and generate a token. If more than one product is available, the viewer can select the desired product or products and enter the information and data pertaining to the chosen merchandise or services into the unit 14. A single product may be available in different sizes or with different features and specifications in which event shoppers can select the size, feature or specification of their choosing. Alternatively, if the product is of no interest, the audience member may choose to disregard the offer of that product and, in effect, reject it by doing nothing. As used herein, the term "select" therefore is intended to apply also to the act of specifying a single available product for intended purpose, in addition to its more common meaning of selecting from a number of choices.

One method that can be employed may provide for a viewer to originate and specify a product from a class of products. The host of a TV-show may, for example, announce a special code and state that any coupon generated and bearing that code carries with it a predetermined amount of consideration or discount for a predetermined class of products, such as a discount of 30% on any household product. The special code can be combined with a verification code preprinted on the matrix to award large prizes. The combination of the two codes in a predetermined correlation to each other giving entitlement to the large prize. The viewer can generate such a coupon by specifying or entering into the unit a product of his or her own choosing, the announced discount, and the special code. In this manner, viewers can apply such discounts to products of their own choosing from a class of products. Random selection, or otherwise selecting codes in a controlled manner, can be used to give a "lucky" prize to a token redeemer similar to a sweepstakes or lottery with a "lucky" prize winner being ascertainable at either the viewer's remote location and/or a redemption facility.

Although the product specification can originate with the television viewer, the sponsor will frequently prefer to provide on the broadcast the names, prices and specifications of products available for prizes and discounts. In one of the methods, the host of a TV-program can state as part of the redemption terms for a token that a specified store or redemption center will grant a stipulated discount on an identified product or products within a limited period of time. Similar announcements can also be made part of a commercial or promotional message broadcast. The viewer can then select the product, related price or other information to generate a token. The verification or redemption data provided on the token can enable the redemption facility to reject coupons presented after the cutoff data or, coupons which are not for that facility.

The inducement of various kinds of "blind prizes" discernible only at the point of redemption and occasional sweepstake prizes, will ensure greater use and higher redemption rates of coupons. In addition to the product information, discount information and code numbers, the coupons can carry additional preprinted advertising and promotional messages. Advertisers can provide shoppers with predetermined numbers or codes for use in specifying specific products and product information, such as printed tables distributed at sales outlets or on the goods themselves or packaging of the goods. The viewer/shopper can then merely enter the

abbreviated number or code for the selected product instead of the entire product information into the unit 14. Thus, a faster entry of product information can be provided.

Although the present invention has been primarily described above with reference to a paper matrix and printed paper coupons, FIG. 5 shows an alternate embodiment of a matrix/coupon. In the embodiment shown, the matrix 60 is comprised of a plastic card having magnetic type strips 62 thereon. The strips 62 can have product information and verification data magnetically recorded thereon which can be read by a suitable reader at the redemption center. For this type of matrix, the generating unit would obviously have a means for magnetically recording information onto the strips 62. Once the card 60 is used as a token it could be returned to the customer with the information on the magnetic strips 62 erased for further use in the future.

After broadcast of product information, the viewer/shopper can either select or not select a product. If a product is selected, a token will only be generated by the viewer/shopper activating the printer by pressing the print button. Until the print button is pressed, no token is generated. Upon pressing the print button a token is generated and its information stored in a memory unit retrieved by the sponsor when the matrix unit is replaced. Once the token is generated, the viewer/shopper can redeem the token by taking it to a redemption facility. If indicia on the token matches predetermined special prize indicia selected by a sponsor, the viewer/shopper also is awarded a "blind prize" in addition to the token's value. The systems and methods described above lend themselves well to the kind of data collection useful to advertisers for the purpose of determining shopping patterns of TV viewers. A number of data collection methods will now be described.

The token generating units can be provided with individual serial numbers. When desired, the printer can be equipped with permanent means for printing a viewer/shopper's name on every coupon, thus providing additional and verifiable identification. When a unit is sold or leased to the member of a household who is a potential shopper, the identity of that individual for that unit can be recorded. Thus, the coupons dispensed by that generating unit can print the serial number on the coupon and be traced back to and associated with the individual or household. Over a period of time the buying habits or patterns of that shopper or household can emerge by reviewing the redeemed tokens. When a generating unit is to be placed in a household comprising several members, particulars of the entire family can thus be elicited and recorded.

In addition to the above method, an identification card containing the user's name and the serial number of the generating unit can also be issued to the individual who buys or leases the unit. This card may be required for presentation and authentication when a large or sweepstake prize is claimed. The aforementioned cumulative record of all coupons requested by and dispensed to a shopper also can be used to create a demographic database. If, for example, a paper tape forms the matrix for 100 coupons, a sponsor, upon receipt of the cumulative record, has a ready made list of purchases expressed in percent for each product category.

Another method of awarding a blind prize or additional prizes can include the situation when a token generated by the unit 14 and a preprinted coupon, such as those found in newspapers and the like, are both

presented for redemption at a redemption facility. In this method of the invention, the token could have a first code and the preprinted coupon a second code, such as machine-readable bar codes. In the event that both codes match, or at least partially have a predetermined correlation, the viewer/shopper would be entitled to the additional prize or a blind prize. Another method might include using a preprinted coupon as the matrix for a token. This method would include giving consideration in the form of a prize and/or discount to a redeemer upon redemption of such a combined coupon/token including both the value of the preprinted coupon and the value of the product discount entered into the generating unit and printed on the preprinted coupon. An additional prize or consideration for such a combined coupon/token might also be given.

Another system and method might include the transmission or broadcast by the central station 10 of a machine-readable signal and providing the generating unit with means for reading the signal. This machine-readable signal can be transmitted concurrently with the normal audio and visual signals, such as during a television commercial. If the viewer desires to purchase the product being advertised or desires access to the specific product information being transmitted in the machine-readable signal, the viewer would only need to press a button on the generating unit; either a print button or a view button. The generating unit could then either print a token or display the product information. If the product information was merely displayed, the viewer can either clear the displayed product information if a token is not desired or, print a token for that product. Another method might include transmissions over an extra television channel or several television channels which constantly update listings of product information. It might also be possible for viewers to call up categories most to their desire such as detergent, furniture polish, etc.

In the embodiment of the system shown in FIG. 1, the system also includes an apparatus 70 for receiving and storing product information signals. Referring also to FIG. 6, a perspective front view of the apparatus 70 is shown. The apparatus 70 generally comprises a housing 72 with various controls 106 (see FIG. 7) connected to the housing 72 and electronic circuitry located inside the housing. The apparatus 70 includes an electrical cord 74 adapted to be plugged into an electrical outlet to supply power to the apparatus 70. A battery power supply could also be provided. The apparatus 70 also includes suitable terminals 110 and 111 (See FIG. 7) to allow transmission cables 76 and 77 to be connected thereto. The first cable 76 is connected to the antenna 78 (see FIG. 1). The second cable 77 is connected to terminals of the television 12. The controls 106 of the apparatus 70 generally include an ON/OFF switch 80, a channel display 82 and channel selector keys 84, a time and date display 86, time and date selector keys 88, a sensor 90 to be used with a wireless remote control device (not shown), a record control button 92, control play buttons 94, input terminal 96, output terminal 97, and a switching control 98 with TV button 99 and product information button 100. However, it should be understood that any suitable type of controls could be provided.

Referring also to FIG. 7, a schematic view of the electronic circuitry located inside the housing 72 is shown. The electronic circuitry generally includes a controller 102, a clock/timer 104, the controls 106 described above, a receiving and storage device 108, input terminal 110, output terminal 111, input terminal 96, and output terminal 97. The controller 102 generally comprises a memory 112 and a microprocessor 114. The memory may include any suitable type of memory or memories including Read Only Memory (ROM), Random Access Memory (RAM), Programmable Read Only Memory (PROM), DRAM, etc. The receiving and storage device 108 generally comprises a receiver 116 and a recorder/player 118. The receiver 116 is generally adapted to receive broadcast transmissions, via the antenna 78, from the transmitter 10. The recorder/player 118, in the embodiment shown, is generally adapted to record signals received at the receiver 116 and adapted to play back recorded signals. The recording medium can include any suitable type of recording device, such as video or audio tape. Alternatively, the recorder/player 118 may be replaced by a suitable connection to an external recorder/player, such as a VCR.

Operation of the apparatus 70 is relatively simple. Broadcast signals or live transmission signals from the transmitter 10 are picked up by the antenna 78. These broadcast signals can include television program signals with product information signals. The product information signals may be transmitted along a subcarrier of the television program signals or on a totally separate frequency. Signals received at the antenna 78 are transmitted to the apparatus 70 by means of the transmission cable 76 and received at terminal 110. The signals are then transmitted to the receiving and storage device 108. The device 108, among other things, is generally adapted to transmit signals to the output terminal 111 and to the television 12 via the transmission cable 77. However, the signals transmitted to the television 12 may not include both the television program and product information signals. The device 108 is adapted to either allow the television program signals to be transmitted to output terminal 111 or be blocked from the output terminal 111. In addition, the product information signals received at the device 108 can be transmitted to the output terminal 111, either alone or concurrently with the television program signals, or blocked from transmission to the output terminal, and can be recorded by the recorder/player 118 and played back at a later time. In the embodiment shown, if the TV button 99 is depressed, television program signals are sent to the television 12, but the product information signals are not sent to the television 12. If the product information button 100 is depressed, the product information signals are sent to the television 12, but the television program signals are not sent to the television. If both buttons 99 and 100 are depressed, both the television program signals and the product information signals are sent to the television and displayed or broadcast simultaneously, such as on a split screen display. For such simultaneous display a suitable audio control switch (not shown) may be provided to switch between audio signals of the two displays.

In addition to display of the live signals mentioned above, the apparatus 70 is also adapted to transmit stored product information signals to the output terminal 111. Recording of the product information signals may be activated manually by depressing record button 92 or by use of the timer 104 and keys 84 and 88 to establish a date, time and channel for automatic recording of product information signals. A wireless remote control (not shown) might also be used with sensor 90 to set up recording parameters. When the device 108

**11**

records, it records only product information signals; not television program signals. However, in an alternate embodiment, the device 108 may record both product information signals and television program signals with the user then using buttons 99 and 100 during playback to display either or both of the signals. In the preferred embodiment, the user merely plays back the recorded product information signals by depressing the PLAY button of the control play buttons 94. Alternatively a wireless remote control (not shown) could be used. Of course, the rewind (REW) and forward fast (FF) buttons could be used to advance the recording to desired portions of the recorded signals. When the PLAY button is depressed, the device 108 transmits recorded product information signals to the output terminal 111. Preferably, both of the live television program signals and live product information signals are stopped or stored at the device 108 while the stored product information signals are being played back. However, in a preferred embodiment, the TV button 99 and/or the product information button 100 may be depressed to also display live broadcast signals simultaneously with the recorded signals. Of course, any suitable type of live/recorded displays could be provided.

The input terminal 96 is connected to the controller 102 and is generally provided such that an input device, such as a bar code reader or key pad can be connected to the apparatus 70. The input device can be used to input predetermined record times, dates, channels and lengths into the controller 102. Such predetermined data is presently published in television magazines with television listings in code. These codes could be input into the apparatus 70, by use of the input device, in order to quickly set up recording features of the apparatus by use of keys 84 and 88. In addition, the input device could be used to read bar codes of products that the user presently purchases and input this information into the controller such that when the controller 102 senses a live product information signals broadcast corresponding to the entered product, the controller 102 automatically activates the device 108 to record the product information signal. In the embodiment shown, the device 108 includes a data comparison device 119. The data comparison device 119 is connected to the receiver 116 and the controller 102. The data comparison device 119 is adapted to monitor live produce information signals and compare these signals, or specific portions of these signals, to predetermined data recorded in the controller 102. Upon correlation of the predetermined data with a live product information signal, the data comparison device 119 can signal the controller of this event. The controller 102 can then automatically activate or deactivate the recorder/-player 118. This can automatically allow for recording of product information signals for user-specified products without the viewer having to watch live product information signal broadcasts, or ever be home. In one method of this type of embodiment, the product information signals for each product may include an identifier code signal that precedes the rest of the product information signal for the product. Thus, the identifier code signal can be used to trigger the data comparison device 119. Of course, any suitable type of input device could be used for any suitable type of purpose.

In the operation of another type of system, a sponsor can provide shoppers with a printed list of products available from the sponsor, some of which may be promoted by discounting or otherwise featured from time

**12**

to time, the time of such promotion not being known to shoppers. Product information on said list is numbered or coded. As an example, a seller may designate the beverage group as A, all soda waters as A-1 and the brand of soda water known as "Club Soda" as A-1-3. Thus, any product can quickly and easily be identified. A shopper can select from the list a product needed at the time and targeted for purchase on the next shopping trip.

The unit 14 can be suitably connected to the receiver 116 and the data comparison device 119 or, may have its own receiver and data comparison device. The shopper enters the listed number or code of the selected product in unit 14 and the number or code is stored in memory unit 28. Additional product identifications may similarly be stored.

When the needed product or products, whose identifications have been stored in unit 14, are promoted by the seller through discounting or otherwise featured, the product numbers or codes are transmitted from a central station to unit 14 and stored in memory 28 or 112. Sensors in comparing means 119 or in the unit 14 detect a match in numbers and/or codes between a sponsor's featured product identification and a shopper's entered product identification. Upon the occurrence of such a match, the comparing means activate the printer of unit 14 to generate a coupon for the needed and featured product. Such coupons can be generated in the absence of the shopper. Thus, the recorder/player 118 need not be provided.

The output terminal 97 is also connected to the controller 102 and is generally provided such that the coupon generating unit 14 can be connected to the apparatus 70, such as by means of an electrical cable (not shown). The coupon generating unit 14 includes a terminal 120 (see FIG. 2) such that the electrical cable (not shown) can be connected to the unit 14. The terminal 120 is preferably connected to the memory unit 28. Connection of the unit 14 to the apparatus 70 allows product information signals received at the apparatus 70 to be transmitted directly to the unit 14. Such an embodiment would alleviate the necessity of the user having to enter product information into the unit 14 merely by means of input keys 20. Of course, it should be understood that wireless transmission of the product information from the apparatus 70 to the unit 14 could be used. In addition, the coupon generating unit could be provided with the apparatus 70 as single unit. The apparatus 70 could also be provided as a single unit with a television and/or VCR.

One of the advantages of the present invention is that the television need not be on and the viewer does not need to view live product information in order to produce product coupons. This can obviously save a considerable amount of viewing time for the viewer while still providing the same number of product coupons. Apparatus 70 can alternatively or additionally be equipped with means 122 for receiving electronic signals over telephone wires conveying product information. Recent developments in telephonic signal transmission technology permit transmitting signals of graphic and television quality over telephone wires. In such an embodiment, the apparatus 70 can include known means for receiving such signals and for storing them. When activated, the apparatus 70 can transmit the signals to the television as herein disclosed.

Product information signals can be received by and stored in apparatus 70 as follows. When a seller, such as

13

a supermarket, wishes to list and promote a number of discounted products, the seller employs a well known telemarketing technique in which a large number of prerecorded messages are transmitted over telephone wires to telephones at selected numbers. These messages alert TV viewers to the fact that new or additional product information has been formatted and is available by activating transmitting means in apparatus 70. The alerting can be performed through any suitable signal means, such as lights, sounds or displays on the television. A viewer interested in receiving the latest product information can then display the product listing transmitted by apparatus 70 to the television receiver 12.

Alternatively, a telephone subscriber can dial a designated number, such as a 800 or 900 number. The call can be an automatic request and command to transmit product information over telephone wires to apparatus 70. Thus a single telephone call, which can be made by touching a few buttons on a telephone keypad, conveys a product information request to a central location by individual subscribers and triggers a flow of product information to the subscriber from a central transmitting facility.

This type of method minimizes the time required for transmission of product information because a shopper, having requested the information, will expect the same, will act on the same more quickly, and will not require a lengthy display of the product information on the television, detracting from the television entertainment viewing. The present invention also allows long wavelength transmissions to be used to broadcast the product information signals with the apparatus 70 playing back recorded signals at a faster rate than live signals. The present invention obviously makes remote coupon generating much more user-configured and, thus, should increase user participation over mere live broadcast systems.

Let it be understood that the the foregoing description is only illustrative of the invention. Various alternatives and modifications can be devised by those skilled in the art without departing from the spirit of the invention. Accordingly, the present invention is intended to embrace all such alternatives, modifications and variances which fall within the scope of the appended claims.

What is claimed is:

1. A system for generating product coupons comprising:
   means, at a central location, for transmitting electronic signals to remote locations of members of a broadcast audience, the signals including product information signals and television program signals;
   a television at each of the remote locations for presenting product information and television programs;
   an apparatus for receiving and storing product information signals, the apparatus being connected to the television and comprising means for receiving the product information signals, means for storing received product information signals, and means for selectively transmitting stored product information signals to the television, the means for selectively transmitting being selectively operable by individual members of the broadcast audience; and
   a coupon generating unit at each of the remote locations, the unit comprising means for selectively entering product information and means for dispensing product

14

coupons having at least a portion of the selectively entered product information thereon.

2. A system as in claim 1 wherein the means for selectively transmitting stored product information signals also includes means for selectively interrupting reception of television program signals by the television.

3. A system as in claim 1 wherein the apparatus further comprises means for selectively transmitting live signals conveying product information to the television.

4. A system as in claim 1 wherein the system further comprises means for directly transmitting product information from the apparatus to the coupon generating unit.

5. A system as in claim 1 wherein the apparatus includes means for simultaneously transmitting both television program signals and stored product information signals to the television for display of both a television program and product information on the television at the same time.

6. A system as in claim 1 wherein the apparatus includes means for automatically selectively storing product information signals based upon predetermined information.

7. A system as in claim 6 wherein the apparatus includes means for comparing a portion of a live signal conveying product information to a predetermined product information signal and, upon correlation of at least a portion of the live and predetermined product information signals automatically store the live signals conveying product information.

8. A system as in claim 6 wherein the apparatus includes means for inputting at least a portion of predetermined product information signals into the apparatus.

9. A system for generating product coupons, the system comprising:
   a television located at a remote location;
   means, located at the remote location, for receiving electronic product information signals transmitted from a central location;
   a storage device connected to the means for receiving, the storage device having means for storing product information signals received at the means for receiving;
   means for selectively transmitting stored signals from the storage device to the television for display on the television; and
   a coupon generating unit at the remote location for generating coupons, the unit having means for selectively entering product information therein that is displayed on the television and for generating the coupons with at least a portion of the product information thereon that has been entered into the unit.

10. A system as in claim 9 further comprising means for selectively switching transmission of stored signals and live signals conveying product information to the television.

11. A system as in claim 9 wherein the means for selectively transmitting stored signals to the television includes means for simultaneously displaying stored signals on a first portion of a screen of the television and a television program on a second portion of the television screen.

12. A system as in claim 9 further comprising means for transmitting at least a portion of the stored product information signals directly to the coupon generating unit in conjunction with transmission to the television.

13. A system as in claim 9, further comprising means for inputting predetermined product information comparison data into a memory of a comparison device connected to the means for receiving, the comparison device being adapted to compare the input predetermined comparison data to live product information signals.

14. A system as in claim 9, wherein said receiving means is adapted to receive product information signals transmitted over telephone wires.

15. A system as in claim 13 wherein the comparison device includes means for automatically activating the storage device upon correlation of a portion of the comparison data with the live signals conveying product information.

16. A system for selectively generating product coupons, the system comprising:
  means for receiving and storing electronic product information signals transmitted from a central location, the means for receiving and storing being located at a remote location with a television;
  means, operable by a viewer of the television, for selectively transmitting said product information signals stored in said means for receiving and storing to the television for presenting to the viewer; and
  a coupon generating unit at the remote location, the unit having means for selectively entering product information presented on the television to the viewer therein and dispensing product coupons with the selectively entered product information thereon.

17. A system as in claims 16, wherein said means for receiving electronic product information signals includes a television signal receiving means.

18. A system as in claims 15, 16 or 17, wherein said means for receiving electronic product information signals includes a radio signal receiving means.

19. A system as in claims 15, 16 or 17, wherein said means for receiving electronic product information signals includes a telephone signal receiving means.

20. A system for generating product coupons for products intended for purchase, the system comprising:
  means, located at a remote location, for inputting and storing a product identification code, the code identifying a product intended for purchase;
  means, at the remote location, for receiving electronically transmitted product information signals from a central location, said information signals pertaining to products available for purchase;
  means for comparing the stored product identification code to at least a portion of the product information signals; and
  means, located at the remote location, for automatically generating a product coupon based upon a predetermined correlation between the stored product identification code and the product information signals, the means for automatically generating being adapted to generate product coupons with at least a portion of the product information code recorded thereon.

21. A system for displaying product information and for generating product coupons, the system comprising:
  means, at a central location, for transmitting electronic signals including product information to members of a remote broadcast audience;

means, at a central location, for transmitting electronic signals including a television program to said members;
means at said members' remote locations for receiving and storing said product information signals;
a television receiver at each of said remote locations having means for displaying a television program and product information;
switching means at each of said remote locations, operable by individual ones of said members, for selectively displaying a television program or said stored product information on said television receiver;
means, operable by an individual one of said members, for selectively entering product information;
coupon generating means connected to said selected product information entering means, said generating means including:
  storing means for at least a portion of said selectively entered product information;
  a removable matrix adapted to record information thereon;
  means operable by individual ones of said members for recording on said matrix at least a portion of said entered product information; and
  means for generating from said matrix a coupon having at least a portion of said selected product information recorded thereon.

22. A system as in claim 1 including:
means, at a central location, for transmitting electronic product information signals over telephone communication means, and
means in said apparatus for receiving said telephonic product information signals.

23. A method of recording product information signals comprising steps of:
transmitting product information signals from a central location to remote locations, the product information signals including an identifier code;
providing, at least at one of the remote locations, a system for receiving and storing transmitted product information signals and, for inputting predetermined identifier codes; and
automatically activating the system to record transmitted product information signals upon the identifier code transmitted with the signals corresponding to a predetermined identifier code previously input and stored in the system such that when a user of the system inputs a predetermined identifier code into the system, the system automatically activates and records product information signals when the system senses a correspondence between the input code previously stored in the system and the identifier code transmitted with the product information signals.

24. A method of displaying product information signals at remote locations, the method comprising steps of:
transmitting electronic product information signals from a central location to the remote locations;
providing, at the remote locations, a system for automatically receiving and storing transmitted product information signals, the system including means for signaling people that transmitted signals have been received and stored, means for inputting an activation code, and means for activating the storing of transmitted signals upon at least a portion of

5,249,044

**17**

the transmitted signals matching the activation code;

automatically receiving and storing transmitted product information signals by the system upon at least a portion of the transmitted signals matching the activation code;

signaling people, at least at one of the remote locations, by the means for signaling that product information signals have been recorded by their system; and

activating the system, by a person at the remote location, to display recorded signals.

**25.** A method of recording and displaying information signals comprising steps of:

providing a system at a remote location for recording product information signals conveyed over a telephone line and, for displaying the signals on a television at the remote location;

a person, at the remote location, contacting a central location by means of a telephone and entering a code;

transmitting product information signals from the central location to the remote location over telephone wires in response to entering of the code;

recording the transmitted product information signals at the remote location on the system; and

displaying the recorded signals on the television at the remote location.

**26.** A method for generating tokens comprising steps of:

electronically transmitting program signals and product data signals from a central location;

providing an apparatus at remote locations for generating a token, the apparatus generating tokens with the product data thereon that has been input to the apparatus;

providing members of an audience with a list of identification data of products;

entering selected identification data from the list by at least one of the members of the audience into a storage device at the member's remote location, the device having means for storing entered identification data and comparison means;

receiving the transmitted signals at least at some of the remote locations;

automatically comparing received product data signals to stored identification data by the comparison means; and

**18**

automatically storing select received product data signals in the storage device upon the comparison means detecting a predetermined correlation between the received product data signals and the stored identification data.

**27.** A method for generating coupons comprising steps of:

electronically transmitting program signals and product data signals from a central location;

providing an apparatus at remote locations for generating coupons, each apparatus comprising means for entering product data, means for storing entered product data, comparison means, and means for generating coupons with entered product data thereon;

providing members of an audience with a list of identification data of products;

entering selected identification data from the list, by at least one of the members of the audience, into the apparatus at the member's remote location, the entered identification data being stored in the means for storing;

receiving the transmitted signals at least at some of the remote locations;

automatically comparing received product data signals to stored identification data by the comparison means; and

generating a coupon from the apparatus having at least a portion of the received product data signals recorded thereon when the received product data signals correspond to the stored identification data.

**28.** A method as in claims **26** or **27** wherein the step of electronically transmitting comprises transmitting the product data signals on a sub-carrier of the program signals.

**29.** A method as in claims **26** or **27** wherein the step of electronically transmitting comprises transmitting the product data signals on a frequency separate from a frequency of the transmission of the program signals.

**30.** A method as in claims **26** or **27** wherein the apparatus comprises means for compiling a cumulative record of predetermined activity of the generating apparatus.

**31.** A method as in claims **26** or **27** further comprising providing forgery preventive steps including storing a verification code into the generating apparatus and the code being printed by the generating apparatus when product data signals are printed.

* * * * *